**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MARLIN GODFREY, et al.,** | * | |
| **Plaintiffs,** | * | |
| | | **Civil Action No. 05-2044** |
| **vs.** | * | |
| | * | **(ESH) (DAR)** |
| **ALLEN IVERSON, et al.** | * | |
| **Defendants.** | * | |
| | * | |

**SUPPLEMENTAL REPLY OF PLAINTIFFS' TO DEFENDANT JASON**
**KANE'S MEMORANDUM AS TO WHY SANCTIONS SHOULD NOT BE IMPOSED**

Comes now, the plaintiffs, by and through counsel, and hereby submit their supplemental reply to Jason Kane's Memorandum As to Why Sanctions Should Not be Imposed.  As the Court is well aware, we arrived at this point because defendant Kane filed incredulously stupefying discovery responses  that no reasonable person could have believed satisfied his obligations under Rules 33 and 34.  In response to those sorry responses, the plaintiffs filed a motion to compel which was granted and the Court ordered Mr. Kane to properly respond to plaintiffs' discovery requests. Mr. Kane filed supplemental discovery responses wherein he again failed to produce any relevant documents sought.  (We shall only deal with Mr. Kane's Supplemental Responses to David A. Kittrell's Requests for Production as they are fully demonstrative of the outrageous conduct of Mr. Kane and his counsel).  Exhibit 1.

The Court also directed defendant Kane to explain why sanctions should not be imposed for his failure to properly respond to plaintiffs' discovery requests in the first instance.  Mr. Kane complied with that directive and for the most part attempted to convince the Court that his responses were substantially justified and that the imposition of sanctions would be unjust under the

circumstances. In response to the pleading filed by Mr. Kane, the plaintiffs informed the Court that Mr. Kane had been deposed and that his deposition revealed a pattern of misconduct which this Court should be aware of as it considers the issue of sanctions.

For starters, and for this Court to fully grasp and understand the depth of Mr. Kane's outrageous refusal to cooperate in discovery, the Court is directed to pages 7-14 of Mr. Kane's deposition wherein he jousts with counsel about his name:

> Q      And you've never had any records indicating that your name is Jason Kane?
>
> A      [No response.]
>
> Q      You have to answer.
>
> A      No.
>
> Q      So when your lawyers filed documents indicating that you, Jason Kane, was supplying supplemental answers to Marlin Godfrey's Interrogatories, you don't know where that name came from; is that right?
>
> MR. MARTIN: Objection. Asked and answered.
>
> BY MR. LATTIMER:
>
> Q      You have to answer before I can go on to the next one.
>
> A      Repeat the question.
>
> BY MR. LATTIMER: Could you read it back Ms. Reporter?
> [Off the record]
>
> MR. LATTIMER: We have a number of things that have been pre-marked, Ms. Reporter, and I'll hand them to you.
>
> [Exhibits 1 through 8 were
> marked for identification.]
>
> BY MR. LATTIMER:

Q     Now Mr. Kane, a number of documents have been set before you, could you take a look at those documents please?  The first document, and that has exhibit number on it, do you see that at that bottom?

A     Yes.

Q     And what number exhibit is that?

A     One.

Q     All right.  And exhibit one, could you read the heading on that document, the bold lettering in the middle of the page?

A     Marlin Godfrey.  Allen Iverson.

Q     The bold type lettering on that page.

A     Jason Kane.

Q     And that says "Jason Kane's Supplemental Answers to Marlin Godfrey's Interrogatories?"

A     That's correct.

Q     Okay.  Now, who is this Jason Kane if it's not you?

MR. MARTIN:  I'll object.  He's answered the question.

MR. LATTIMER:  I understand that.  Who is the Jason Kane if it's not you?

MR. MARTIN:  Mr. Lattimer, he's answered that question.

MR. LATTIMER:  Well I haven't heard the answer.

MR. MARTIN:  You sued Jason Kane.

MR. LATTIMER:  Right, and he says he's not that person.

MR. MARTIN:  He didn't say that.  He says he goes by--he is Jason Kane.

BY MR. LATTIMER:

-3-

Q     Well wait a minute.  Let me go back.  I asked you what your name was and you said Jonathan, correct?

A     Yes.

Q     And I asked you where did Jason come from and you said you don't know, correct?

A     [No response.]

Q     Correct?

A     My nickname is J, some people say Jason.

Q     So now some people say Jason?

A     [No response.]

Q     You have to say yes or no.

A     Yes.

Q     All right.  And even you call yourself Jason from time to time, correct?

A     No.

Q     Turn to page 15 of that document.

A     [Witness complies.]

Q     And do you see signature lines on that page?

A     Yes.

Q     And do you see "As to Answers Jason Kane?"

A     Yes.

Q     Is that your signature that appears there?

A     Yes.

Q        Okay.  So you signed as Jason Kane?

A        Yes.

Q        So on some occasions you do, in fact, call yourself Jason Kane?

A        Yes, it's a nickname.

Q        So Jason is a nickname too?  Is that what you're saying now?

A        Yes.

Q        Okay.  And you call yourself Jason on some occasions, correct?

A        Yes.

Q        Now, do you have another–

MR. MARTIN:  He needs to ask me a question.  There's no question on the floor now.

[Witness confers with counsel.]

BY MR. LATTIMER:

Q        Can you turn to the next document?

A        [Witness complies.]

Q        Is that number two?

A        Yes.

Q        And that document indicates Jason Kane's Supplemental Answers to David Kittrell's Interrogatories; is that right?

A        Yes.

Q        You also signed those interrogatory responses; is that right?

A        Yes.

Q        On page 13, correct?

A      Yes.

Q      And you signed as Jason Kane, correct?

A      Yes.

Q      So again, you call yourself Jason Kane, correct?

A      Yes.

Q      And do you have number three, Exhibit 3?

A      Yes.

Q      And that is Jason Kane's Answers and Objections to Marlin Godfrey's Interrogatories; is that correct?

A      Yes.

Q      And you signed those documents; is that right?

A      Yes.

Q      And again, you signed your name as Jason Kane, correct?

A      Yes.

Q      So you call yourself Jason Kane again, right?

A      Yes.

MR. MARTIN:  Can we stipulate that?

MR. LATTIMER: No, not when you answered differently before.

MR. MARTIN:  Just trying to expedite this.

BY MR. LATTIMER:

Q      Turn to Exhibit 7.

A      [Witness complies.]

Q    Do you have that?

A    Yes.

Q    And that is Jason Kane's Answers and Objections to David Kittrell's Interrogatories, correct?

A    Yes.

Q    And that document, you again signed, correct?

A    Yes.

Q    And you signed your name as Jason Kane, correct?

A    Yes.

Q    So again, you have identified yourself as Jason Kane; correct?

A    Yes.

Q    Okay.  And that's because it's your nickname?

A    Yes.

This absurd conduct is rampant throughout his deposition.

Next, the Court is directed to pages 21-26 of Mr. Kane's deposition.  Here, Mr. Kane appears to appropriately discuss his education and work experience.  However, beginning on page 234 of his deposition, Mr. Kane is asked about an arrest.  He is instructed not to answer that question by counsel.  On page 235 of the deposition, Mr. Kane is asked about a conviction, his counsel instructs him not to answer that question as well.  Dep. at 235-236. Mr. Kane is then asked if he has ever served a prison sentence, his counsel again instructed him not to answer.  Dep. at 236.  Shortly thereafter, Mr. Kane's counsel goes off the record and he and Mr. Kane leave the room.  When they reemerge, counsel for Mr. Kane, apparently realizing the error of his ways, allows Mr. Kane to answer the questions he previously told

him not to answer.  Dep. at 237-239.  On pages 239-240 of the deposition, the undersigned

recalled that Mr. Kane testified earlier in his deposition that he graduated high school in

1990, went to George Mason University, played football in college, and went straight to

college from high school.  Dep. at 21-26.  On pages 240-241 of his deposition, Mr. Kane

disavows any recollection of having said any of the above, disavows any recollection of

when he went to college, when he began working, when he went to jail, how long he was in

jail or where he was incarcerated.  Dep. at 241-249.  Clearly, Mr. Kane was attempting to

obstruct discovery.  Exhibit 2.

      Another clear example of Mr. Kane's unfiltered attempt to obstruct discovery with

the complicity of counsel appears at page 41 of the deposition transcript:

    Q     You file any tax returns?

        MR. MARTIN:  Objection to form and relevancy.

        BY MR. LATTIMER:

    Q     You can't recall if you filed tax returns?

    A     [No response.]

    Q     Is that correct?

    A     I can't recall.

    Q     So you don't recall if you filed a tax return in 2000?

        MR. MARTIN:  Are you asking him if he made enough income to

file?

        MR. LATTIMER: I'm asking did he file one.  My question was very

clear.

        BY MR. LATTIMER:

Q       Did you file one in 2000?

A       I can't recall.

Q       And you don't recall whether you filed one in 2001?

A       I can't recall.

Q       And you don't recall whether you filed one in 2002?

A       I can't recall.

Q       And you don't recall whether you filed one in 2003?

A       I can't recall.

Q       And you don't recall whether you filed one in 2004?

A       I can't recall.

Q       And you don't recall whether you filed one before April 15th of this year for last year?

A       Yes.

Q       Yes what?

A       I filed one for the last year.

Q       So you filed one for 2005?

A       Yes.

Q       But you don't know if you filed one for any of those other years?

A       Yes.

Q       Yes what?

A       I answered your question.  I filed one for 2005.

Q       Okay. And my question was, and you don't recall if you filed one for any of those other years?

A      No.

Q      Well why don't we just try to help you out.  I am handing you a form 8121, which is a tax authorization form where we are asking you to execute that document so that we can find out if, in fact you filed tax returns for those years.

MR. MARTIN:  He's not going to sign that.

MR. LATTIMER:  Okay.

BY MR. LATTIMER:

Q      Your counsel has indicated you are not going to sign that.  Is that your position?

A      Yes.

Q      Okay.  Now, did you provide us with tax returns for 2005?

A      No.

Q      Why?

A      My wife has that and I haven't had a chance to get everything--all the paperwork together.

Q      Your wife had it and--so when you filed responses to--when you filed Jason Kane's Responses to Marlin Godfrey's Request for Production back on August 21, 2006, your wife had them and you hadn't had a chance to get them; is that right?

A      Repeat the question.

Q      When you filed responses to Marlin Godfrey's Request for Production of Documents--you have it there, you can take a look at it.

MR. MARTIN:  What exhibit number?

MR. LATTIMER:  I think that is –

MR. MARTIN:  I have it.

BY MR. LATTIMER:

-10-

Q       When that was filed back on August 21, 2006, those documents were in possession of your wife and you had not had a chance to get them?

A       [No response.]

MR. MARTIN:  Are you referring to something that you said?

BY MR. LATTIMER:  No, I'm asking him about a time period.  That's all I'm asking.

MR. MARTIN:  He's just asking you the time.

BY MR. LATTIMER:

Q       Is that right?

A       Repeat the question.

Q       Back on August 21, 2006, when you responded to Marlin Godfrey's Request for Production of Documents, did your wife have those returns but you did not get a copy of them from her?

A       [No response.]

MR. MARTIN:  You understand the question?

MR. KANE: Not really.

MR. MARTIN:  On August 21st, did your wife have the tax returns.

MR. KANE:  Or the accountant, yeah.

BY MR. LATTIMER:

Q       Or the accountant?

A       Yes.

Q       And you didn't get them from him?

A       No.

-11-

Q        Even though you were asked to produce those documents; is that right?

A        [No response.]

Q        Request Number 2.

A        [No response.]

Q        I'm sorry, request Number 1.

A        [No response.]

Q        Is that right?

A        Yes.

Q        And was there a reason that you didn't get those from your wife or your accountant?

A        I can't recall.

Q        You can't recall.  And when you filed your supplemental responses in this case on September 29, 2006, did your wife and/or your accountant have the tax returns and you still didn't get them?

MR. MARTIN:  Objection.  You going to ask about the wife and the accountant, it's a compound question.  That's two questions.

BY MR. LATTIMER:

Q        Let's break it in to two.  At that time, did your wife have the returns, on September 29, 2006?

A        I can't recall.

Q        You don't recall?  Well if she had them on August 21st, you don't recall if she had them on September 29th?

A        I can't recall.

Q        Okay. Did your accountant have them on September 29th?

-12-

A       I can't recall.

Mr. Kane was asked about his tax returns, he claims to have filed one in 2005 but did not produce it.  Mr. Kane's counsel filed responses to document requests wherein they claimed that all such documents have been produced.  Exhibit 1 at Response to Request 10.  In addition, counsel for Mr. Kane obstructed plaintiffs obtaining the documents themselves by instructing the defendant not to execute an IRS tax authorization form that is designed specifically for that purpose.

On pages 52-62 of Mr. Kane's deposition, Exhibit 2, it is clear that he did not properly respond to plaintiffs requests for documents and it is equally clear that the pleading filed by Mr. Kane's counsel purporting to be a Supplemental Response to the Request for Production from David A. Kittrell is entirely bogus.

Astonishingly, this is just the tip of the iceberg insofar as the theatre of the absurd is concerned regarding this defendant's obstruction and his counsel's complicity.  After another of the countless "breaks" that Mr. Kane and his counsel took, Mr. Kane, who had been observed in the hallway having a rather animated conversation with Allen Iverson's attorney, was asked what he and Mr. Milstein were talking about out there?  The following colloquy ensued:

Q       Mr. Kane, I want to have this played and have you review it, but first, what were you and Mr. Milstein talking about out there?

A       [No response.]

MR. MARTIN:  Objection. Privileged.

MR. LATTIMER: What's that privilege?

MR. MARTIN: Attorney/Client.

MR. LATTIMER: Mr. Milstein doesn't represent Mr. Kane.

MR. MARTIN:  Privileged.

MR. LATTIMER:  What's the privilege?

MR. MARTIN: Attorney/Client.

BY MR. LATTIMER:

Q     Mr. Milstein represents you, Mr. Kane?

A     [No response.]

Q     Hello.

MR. MILSTEIN: It's a joint defense.

MR. LATTIMER:  Excuse me?

MR. MILSTEIN: We're a –

MR. MARTIN:  Joint defense.

BY MR. LATTIMER:

Q     Mr. Kane, does Mr. Milstein represent you?

MR. MARTIN:  It's joint.

MR. LATTIMER:  I understand.  That's what I'm asking Mr. Kane.

MR. KANE:  Joint defense agreement.

BY MR. LATTIMER:

Q     Joint defense agreement.  So you have a retainer agreement with Mr. Milstein?

A     [No response.]

Q     Okay. So how does Mr. Milstein represent you?  On what basis?

A     [No response.]

-14-

Q       You got to answer for me to get to the next question.

A       [No response.]

Q       We're waiting, Mr. Kane.

MR. MARTIN:  He's not going to answer the question because it's a joint defense agreement.  It's privileged.  He's not going to answer.

MR. LATTIMER: He's not going to answer how he represents him?

MR. MARTIN: It's a legal--he's not, it's a legal issue.

MR. LATTIMER: I'm not aware of Mr. Milstein having entered and appearance for Mr. Kane in this case.

MR. MARTIN: I am invoking a joint defense agreement--joint defense participation for the discussion.

MR. LATTIMER:  So, Mr. Milstein represents Mr. Kane in this proceeding? MR. MILSTEIN:  You don't understand the–

MR. LATTIMER:  I don't.

MR. MILSTEIN:  Okay. Then you don't.

MR. LATTIMER:  That's right.  That's why I'm asking.

MR. MILSTEIN:  If you don't understand it, you don't understand it.

MR. LATTIMER:  I understand.

MR. MILSTEIN: We're not going to educate you at the moment if you can't understand--if you don't understand what a joint defense agreement is.

MR. LATTIMER:  I mean, we can flesh it out by way of motion, or you can explain it to me now and them I'll understand.

MR. MILSTEIN:  Why don't you just file a motion.

Dep. at 65-68.

-15-

There can be no agreement regarding representation that the client does not know about. D.C. Rules of Professional Conduct Rule 1.4. Counsel for Mr. Kane intended to and did preclude the plaintiff from making inquiry into a matter, a conversation between Mr. Kane and the lawyer for Mr. Iverson, that occurred during a break that was in no way privileged. Mr. Milstein has not entered an appearance on behalf of Mr. Kane, Mr. Kane knows of no joint defense agreement, and more importantly, there is no such animal that exists under the facts and circumstances present here. Obstruction was the objective and always has been the objective.

If there is any question that remains about whether the objective here was obstruction, the following excerpts put those questions to rest:

Regarding Terrence Williams

Q    Now, Mr. Williams lives where?

A    I don't know.

Q    You don't know?

A    No.

Q    Didn't you provide us addresses for Mr. Williams?

A    Yes.

Q    So let's try that question again. You don't know where he lives, but you provided us an address for him; is that right?

         *          *          *          *          *

Q    Okay. Now, Mr. Williams doesn't live in California, right?

A    No.

-16-

Q       In fact, he lives on the East Coast; isn't that right?

A       Yes.

Q       So when you saw Mr. Williams on the West Coast, you had no idea how he had gotten there, is that fair to say?

A       Yes.

Q       Okay.  Now, Mr. Williams then joined your party; is that right?

A       [No response.]

        MR. MARTIN: Can I ask what you mean my joined the party?  Was he a guest or security?

        BY MR. LATTIMER:

Q       He joined your party, right?

A       [No response.]

Q       He began associating with you, and in fact, instructing people on what and was not going to happen; isn't that right?

A       I don't recall.

Q       You don't recall.

        MR. LATTIMER:  Can you continue the tape?
        [Videotape continues.]

        MR. LATTIMER: Can you hold it right there?

        BY MR. LATTIMER:

Q       Now, Terrence is the guy with the hat turned to the back, right?

A       Yes.

Q       And that's the one telling the people, "Make me move," right?

A       Yes.

-17-

Q       Okay.  So Terrence had joined the party and was giving people instructions; is that fair to say?

A       Yes.

Q       But you don't know how he got there?

A       No.

Q       Okay. And you hadn't talked to him before he got there, right?

A       No.

Q       You didn't know he was going to be there, right?

A       I can't recall.

Q       You can't recall if you knew he was going to be there?  Well, if you didn't talk to him, how would you know?

MR. MARTIN:  Objection as to form.

MR. KANE: I don't know.

BY MR. LATTIMER:

Q       If you didn't talk to him, as you say –

MR. MARTIN:  He says he doesn't know.

MR. LATTIMER:  Can I finish my question?

MR. MARTIN:  The same question is asked and answered.

MR. LATTIMER:  It ain't answered nothing.

BY MR. LATTIMER:

Q       If you didn't talk to him, you wouldn't know that he would be there, correct?

MR. MARTIN:  Not true.

MS. MORAN:  Who's the witness?

-18-

BY MR. LATTIMER:

Q    Correct?

A    I don't recall.

Q    You don't recall what?

MR. MARTIN: Objection as to form.

BY MR. LATTIMER:

Q    Which part don't you recall?

A    Repeat your question.

Q    Which part don't you recall?

A    I don't recall.

Q    You don't recall which part you don't recall?

A    Repeat your question again.

Q    What I asked you was simply which part of my question didn't you recall?

A    The question before that.

Q    The question before that.  If you did not talk to Terrence, then you could not have a way of knowing that he would be there, correct?

MR. MARTIN:  Objection as to form and foundation.

BY MR. LATTIMER:

Q    Correct?

A    I don't recall.

Q    Okay.  Again, which part don't you recall?

A    I don't recall if I spoke to him or not.  I don't recall.

-19-

Q    Okay.  You don't recall if you spoke to him?

A    Yes.

Q    All right.  So you may have spoken to him, you just don't recall?

A    I don't recall.

Dep. at 77-85.

<u>Regarding Michael Persons</u>

Q    Who is Michael Persons?

A    It's a security guard.

Q    Okay.  How do you know him?

A    Through the security field.

Q    Who does he work for?

A    Various people.

Q    Okay.  Where do you know him from working from?

A    Various people.

Q    He's a security guard for who?  How do you know the man?

A    He works with different celebrities.

Q    Okay. So he provides security for other individuals; is that right?

A    Yes.

Q    All right.  And where does he live?

A    He lives in D.C.

Q    Where?

A    I don't have his exact address in my head right now.

-20-

Q       He lives in D.C.?

A       Yes.

Q       Is that the address you gave us for him, at D.C. address?

        MR. MARTIN: You need to refresh your recollection?

        MR. KANE:  Yeah, I need to recollect.

        [Witness looks through papers.]

        BY MR. LATTIMER:

Q       Look at Exhibit 8, Jason Kane's Rule 26(a)(1) disclosures.

        [Witness complies.]

        BY MR. LATTIMER:

Q       You got that?  See Michael Persons name at the bottom of the page?

A       Yes.

Q       Now, tell me why you gave us a Bowie, MD address if the man lives
in the District of Columbia?

A       [No response.]

Q       Waiting.

A       I don't recall.

Q       You don't recall why you gave us a Bowie address for somebody who
lives in the District?  You don't recall that?

A       No.

Q       No? Where does the man live?

        MS. MORAN:  Did she get his answer?

        MR. LATTIMER:  I'm sorry, did you get an answer from him?

-21-

COURT REPORTER: No.

BY MR. LATTIMER:

Q      Okay. Can you answer that question again?

A      Repeat the question.

Q      Why did you give us--let me finish.  Why did you give us a Bowie, Maryland address for somebody that you know lives in the District of Columbia? Now you can answer.

A      I don't recall.

Q      You don't recall why you didn't give us the proper address for the man?

MR. MARTIN:  Objection. Form.

BY MR. LATTIMER:

Q      Why did you give us a Springdale, Maryland address for Terrence Williams when you know he lives in Bowie?

A      [No response.]

Q      Look at page 1.  8935 Hobart Street, Springdale, Maryland, is the address you gave us for Terrence Williams.  Why did you give us that address if you know this man lives in Bowie?

A      I don't recall.

Q      You don't recall?  Well, weren't you supposed to be giving an accurate and truthful address for these people?

MR. MARTIN:  Objection to form.

BY MR. LATTIMER:

Q      Wasn't that your understanding at least?

A      [No response.]

-22-

Q       Mr. Kane?

A       Repeat your question.

Q       Wasn't it your understanding that you were supposed to be providing accurate and truthful information in this proceeding?

A       Yes.  I want to speak to my lawyer.

Q       Well, you have to answer the question.

A       I said yes.

        MR. LATTIMER:  Did you get the answer?

        COURT REPORTER:  [Nods.]

        MR. LATTIMER:  Okay. What did he say?

        COURT REPORTER:  Yes.

        MR. LATTIMER:  Okay.

        MR. MARTIN: See, they heard him.

        [Off the record.]

              *           *           *           *           *

Q       Do you see that, Number 2?

A       MM-hmm.

Q       Can you turn to page 4 and the answer to interrogatory number 6.  Do you see where you say, "I already provided complete contact information for the persons identified in my initial disclosures."  Do you see that?

A       Yes.

Q       And can you turn to page 10, answer to Interrogatory Number 20.  Do you see that?

A       [No response.]

-23-

Q       Do you see the answer to Interrogatory Number 20?

A       Yes.

Q       You gave us the exact same addresses that you provided in your initial disclosures, did you not?

A       Yes.

Q       And this is a document that you signed on September 22nd of this year; isn't that right?

A       Yes.

Q       And in these documents--in this document, you indicated that you were telling the truth; isn't that right?

A       Yes.

Dep. at 184-188.

Regarding Document Requests:

Q       What documents did you give showing your income for 2005?

A       I can't recall.

Q       You can't recall.  What documents did you give showing your income for 2004?

A       I can't recall.

Q       But your wife has all of that information, right, or your accountant?

A       My accountant.

Q       Who's your accountant?

A       I don't know his name.

Q       You don't know your accountant's name?

A       Say that again.

Q    You don't know your accountant's name?

A    No, I misunderstood what you said.  What did you say?

Q    Who's your accountant?

A    I thought you said something else.  Larry.

Q    Larry?

A    Yes.

Q    Larry who?

A    I don't know his last name.

Q    You don't know your accountant's last name?

A    No.

Q    Okay.  Where does your accountant work?

A    In Maryland.

Q    In Maryland?

A    Mm-hmm.

Q    Okay. Where?

A    I can't recall the exact location.

Q    You can't recall where your accountant's office is?

A    No, I can't recall.

Q    What's his phone number?

A    I can't recall.

Q    You don't know your accountant's phone number?
A    I can't recall at this moment.

Q        So you don't know your accountant's name.  You don't know where-

A        I just told you his name is Larry.

Q        But you don't know his last name?

A        No.

Q        You don't know where he works and you don't know his phone number, right?

A        Right.

Q        But this is the person you give all of your financial information to; is that right?

A        No.

Q        No?  So what do you give to him?  If he prepared your taxes, why don't you give him your financial information?

A        Repeat that question.

Q        If he prepared your taxes, why don't you give him your financial information?

A        I can't recall.

Q        You can't recall why you don't give him your financial information?

A        I can't recall.

Q        That's what I'm asking you.  Are you saying that you can't recall why you don't give him your financial information?

A        I can't recall.

Q        All right.  Let me ask you something, you got a cell phone, right?  Is his phone number in your cell phone?

A        No.
Q        Were would you keep it?

-26-

A        I can't recall.

Q        You can't recall where you keep your accountant's phone number?

A        Not at this moment, no.

Q        How do you --how are you going to get information from him to give to us if you don't know his last name, you don't know where is office is, and you don't know his phone number?

A        I can't recall.

Q        You can't recall how you are going to get us information?

A        [No response.]

Q        I mean, you do understand you have an obligation to provide information that we have requested pursuant to discovery documents, correct?

            MR. KANE:  I need to talk to my lawyer.

            MR. LATTIMER:  Not while the question's pending?

            MR. KANE:  What was the question?

            BY MR. LATTIMER:

Q        You do understand that you have an obligation to give to us the materials that we have requested pursuant to discovery documents, correct?

A        Yes.

            MR. LATTIMER: Fine.  You want to talk to him.

            [Off the record.]

            BY MR. LATTIMER:

Q        We were talking about your obligation to provide us with documents responsive to our discovery requests.  Apparently you haven't done that; would that be fair to say?

A        Repeat that.

-27-

Q       Apparently you have not provided us with documents responsive to our discovery?

MR. MARTIN:  Objection to form and foundation.

BY MR. LATTIMER:

Q       Well let me put it this way:  Right now, we've already discussed the point you haven't provided us with any phone bills for your cell phone, right?

A       No.

Q       And you haven't provided us with any tax information regarding at a minimum, the 2005 taxes that you filed, correct?

A       No.

Q       Okay.  So those two things you haven't provided, right?

A       No.

Q       And those things were requested and you know that, right?

A       Yes.

Q       Now, why did you not provide us with those documents even though you know they were requested?

A       I have to get the documents.

Q       Okay. My question is: Why didn't you provide them to us when you were supposed to?

A       I was in the process of obtaining them.

Q       Okay.  And now you said that you also got--Mr. Fitzgerald and Mr. Grant, when you met with them you got the termination papers from Mr. Grant, right?

A       Yes.

Q       Where are those?

A    I don't have then with me right now.

Q    Okay.  Well, where are they?

A    [Indicating to Counsel.]

Q    What's that mean?  You can't point.  She can't get that down.

A    The paper's with the statement.

Q    So the termination papers are with the statement?

A    Yes.

Q    And is there a reason you didn't provide us with that?

MR. MARTIN:  If you know.

MR. KANE: No, I don't know

Dep. at 204-211.

Defendant Kane and his counsel treat discovery as if everyone else has to comply but he does not and the following exchange removes any doubt about the bad-faith and the complicity of Mr. Kane's counsel in this charade:

Q    Well do you keep any records in that regard?

A    I don't keep any documents.

Q    You don't keep any documents?

A    No.

Q    What did you give your accountant?

A    My wife handles all that.

Q    Okay. So you give it to your wife, she keeps the documents?

A    My wife handles all that.

-29-

Q       Okay. I'm asking you, did you give that to your wife and then she keeps the documents?

A       She handles all that.

Q       Is that yes or no?

A       Yes.

Q       Okay. Now, have you asked your wife, at all, for any documents that--did you provide these to your wife, these document requests to your wife?

MR. MARTIN: Objection. Privilege.

MR. LATTIMER:  It's not privileged why he gave it to her.

MR. MARTIN:  That is privileged.

BY MR. LATTIMER:

Q       Did you give them to her?

A       [No response.]

Q       We can get to the next question until you answer this one.

MR. MARTIN: We're going to render an objection and instruct the witness not to testify and answer that based on the marital privilege and the act of production.  The act of production in and of itself–

MR. LATTIMER: So you're saying that there's a marital privilege that exists in the District of Columbia regarding whether or not someone gave a request for Production of Documents to their wife?

MR. MARTIN:  We're saying there's a marital privilege under the Federal Rules of Evidence, and we're saying that there's an act of production that recognized under the Federal Rules of Evidence, yes.

MR. LATTIMER:  So anything that this guy doesn't what to turn over, he can turn over to his wife and then it's privileged?

MR. MARTIN:  We're saying that in response to these questions, the act of production and marital privilege apply and we're going to raise it.

-30-

BY MR. LATTIMER:

Q    You're not answering that question?

A    No.

Q    And that's because, as I understand it, your wife handles all of your business affairs in terms of taxes and documents and things like that?  Is that what you've already said?

A    [No response.]

Q    Mr. Kane, we can't get to the next question until you answer the one that's out there.  That ain't going to change.

MR. MARTIN:  Could you answer that, please.

MR. KANE: Yes.

Dep. at 215-217.

Pursuant to D.C. Code § 14-306, one spouse may not be compelled to testify for or against another, nor may a spouse be compelled to testify as to any confidential communication.  Asking a party to a lawsuit who testifies that his wife handles his personal and financial documents if he provided a copy of the request for production of documents to that spouse in no way, shape or form violates the marital privilege.  It was non-sensical for the defendant to even raise this objection and it was most certainly improper and another obvious attempt at obstruction.

As to the so-called "Act of Production," this is not a criminal case, there are no Fifth Amendment issues regarding whether or not defendant Kane gave requests for production to his wife, nor are there any such issues as to whether or not he asked his wife about such documents.  Again, the defendant and his counsel were doing nothing but obstructing discovery.

As previously indicated to the Court, defendant Kane has filed blatantly inappropriate

-31-

discovery responses, his counsel have participated in this mockery and in fact, refused to allow Mr.

Kane to execute a release for plaintiffs to obtain tax information regarding Mr. Kane, that admittedly

exists, that was not produced in response to plaintiffs' discovery requests, even though this Court

ordered that such information be produced.

Notwithstanding the fact that counsel for Mr. Kane was present at his deposition, and heard

everything that plaintiffs' counsel heard, and saw everything plaintiffs' counsel saw, they filed a

document labeled a "Reply of Jason Kane Concerning Of Imposition of Sanctions," on October 16,

2006, that does not include the documents that Mr. Kane should have produced, that does not correct

his misstatements and lies, that does not retreat from indefensible positions taken during the

depositions, nor did it offer to have Mr. Kane answer questions that he clearly should have answered.

Instead, Mr. Kane's counsel represent to this Court, in a manner consistent with the deposition

testimony of Mr. Kane:

> The recollection of Mr. Kane's counsel with respect to Mr. Kane's deposition
> testimony differs markedly from that of plaintiffs' counsel.  Though it may not have
> conformed to plaintiffs' hopes or expectations, Mr. Kane's testimony was truthful
> and not misleading.

Kane Reply at n. 1.

Nothing else really needs to be said.  Mr. Kane obviously performed consistent with his

counsels' expectations.  The fact that he obstructed discovery and violated this Court's order

regarding the motion to compel, is of no moment since it appears from the actions of Mr. Kane's

counsel that obstruction was the objective from the outset.  Mr. Kane posits further that "the content

of Mr. Kane's deposition is wholly irrelevant to that question."  Kane Reply at 1.  Mr. Kane and his

counsel, however, miss the point.  Good-faith or bad-faith is always relevant to the issue of whether

or not to impose sanctions. And in this case, it is certainly relevant whether or not Mr. Kane complied with the Court's order granting plaintiffs' motion to compel, which he did not and still has not complied with, over a month after he was ordered to do so.

Wherefore, for the reasons stated herein and in the record of this proceeding and because Mr. Kane has still not complied with this Court's order of September 20, 2006 and because it is clear from the deposition of Mr. Kane that his actions and those of his counsel have been willful it is respectfully urged that the Court impose sanctions in this matter in the form of an award of attorneys' fees associated with this motion pursuant to F.R.C.P. 37(a).[1]

Respectfully submitted,

Gregory L. Lattimer, [371926]
1100 H Street, N.W.
Suite 920
Washington, D.C. 20005
(202) 638-0095

Stephanie D. Moran, [471555]
E. Gregory Watson
Watson & Moran, LLC
8401 Corporate Drive
Suite 110
Landover, MD 20785
(301) 429-0505

---

[1]/ The plaintiff will be filing a motion shortly specifically requesting Rule 37(b) sanctions.

-33-