# Exhibit C

1

```
 1          SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

 2                        Civil Division

 3      - - - - - - - - - - - - x
                               :
 4      MARLIN GODFREY, et al.,  :
                               :
 5               Plaintiffs,    :
                               :
 6        - vs -                :    Civil Action No.
                               :    05-0007-327
 7                             :
                               :
 8      ALLEN IVERSON,          :
                               :
 9               Defendant.     :
                               :
10      - - - - - - - - - - - - x

11                                   Washington, D.C.

12                                   Thursday, May 4, 2006

13      Deposition of:

14                   DAVID ANTHONY KITTRELL

15      a Plaintiff, was called for oral examination by

16      counsel for the Defendant, in the offices of Ford &

17      Harrison, 1300 19th Street, N.W., Suite 700,

18      Washington, D.C. 20036, commencing at approximately

19      11:38 p.m., on Thursday, May 4, 2006, before Deborah

20      L. Spear, a Notary Public in and for the District of

21      Columbia, when were present on behalf of the

22      respective parties:
```

5

```
 1      A    In '94.

 2      Q    And are you employed?

 3      A    Yes.

 4      Q    Where are you employed?

 5      A    Charter Funding.

 6      Q    What is Charter Funding?

 7      A    It is a mortgage lending company.

 8      Q    Do you own Charter Funding?

 9      A    No.

10      Q    Are you a principal in it?

11      A    No.

12      Q    What's your position there?

13      A    I'm the Director of Marketing and a Senior

14 Loan Officer.

15      Q    Do you live paycheck to paycheck?

16           MS. MORAN:  Objection.

17           THE WITNESS:  No.

18 BY MR. MILSTEIN:

19      Q    Let me call your attention to July 19th,

20 2005.  What time did you arrive at the Eyebar?

21      A    9:30.

22      Q    And who were you with?
```

7

1    Q    I mean when you got -- I know you could have

2   walked around, but from 9:30 on were you assigned that

3   table --

4    A    Yes.

5    Q    -- that Mr. Godfrey talked about?

6    A    Correct.

7    Q    And what alcohol was being served there from

8   9:30 until the time Mr. Godfrey got there?

9         MS. MORAN:  Objection.

10        THE WITNESS:  At my table?

11  BY MR. MILSTEIN:

12   Q    Yes.

13   A    There was a bottle of Gray Goose and a

14  bottle of champagne.

15   Q    And how many drinks did you have up to the

16  point Mr. Godfrey got there?

17   A    Probably two.

18   Q    In the three hours?

19   A    Yes.

20   Q    There wasn't any entertainment there, was

21  there?

22        MS. MORAN:  Objection.

12

1   for most of the clubs in this region.  So he is a club

2   owner.  He owns -- he also owns D.C. Life Media, which

3   is the print broker firm that I do the printing for.

4       Q    So is he a customer of yours or are you a

5   customer of his?

6       A    He is a customer of mine.

7       Q    And when he came over, Mr. Demoya came over

8   and told you that you were going to have to move what

9   did you say?

10      A    Well, I knew before I came to the club that

11  I wasn't going to be in my normal section.

12      Q    Oh, you knew it even before 9:30?

13      A    Yeah, I knew before I came to the club.

14      Q    How did you know that?

15      A    He called me.

16      Q    And when he called you he told -- he called

17  to tell you that what?

18      A    That Allen Iverson would have my normal

19  section and did I mind moving to the back.

20      Q    And what did you say?

21      A    I didn't care.

22      Q    So when Mr. Iverson came into the club what

1   happened next?

2       A    He came in with a large, large entourage,

3   probably 15 people, and they entered the VIP section

4   and overly crowded the thing automatically.

5       Q    And then what happened?

6       A    Then because there were so many people there

7   and, you know, he went to the back of his section up

8   against the wall with two young ladies, and his

9   security kind of created a perimeter where, you know,

10  our section kind of -- in our section as well is where

11  they posted up to kind of give him more room.  We

12  noticed the posture, we noticed the guys, you know,

13  staring at us, you know, heard little sly comments

14  that they were making.

15      Q    Like what, what did you hear, what kind of

16  sly comments did you hear?

17      A    I heard one say, you know, because I was

18  standing on the couch, you know, I heard one say, you

19  know, look at that clown ass nigger.

20      Q    What do you mean you were standing on the

21  couch?  I don't understand.

22      A    You know, I was partying, so, you know, I

20

```
 1      A      Yes.

 2      Q      Over six feet?

 3      A      Yes.

 4      Q      And how about Terrance, how tall is he?

 5      A      Taller than the two or four mentioned guys.

 6      Q      So also taller than six feet?

 7      A      Yes.

 8      Q      Did you see Terrance at the Eyebar?

 9      A      Yes.

10      Q      Did you see Maurice at the Eyebar?

11      A      Yes.

12      Q      Did you see Jason Kane at the Eyebar?

13      A      Yes.

14      Q      Did you acknowledge them or talk to them at

15   all?

16      A      No.

17      Q      What happened next after you saw --

18      A      Actually let me rephrase that.  When the

19   incident first -- like when Marlin was standing there

20   and they first made that comment to him I didn't hear

21   them say, you know, you need to get the fuck out of

22   here.  I saw the expression, you know, on my friend's
```

21

1  face, and leaned down over him and said, you know, is

2  everything okay, and, you know --

3      Q    That was to who?

4      A    To Marlin.  And, you know, Marlin said,

5  yeah, you know, everything is cool.  And how they -- I

6  mean how they came in and their posture of just, you

7  know, just gritting and all that kind of stuff, we are

8  partying.  So I said, you know, you guys don't have

9  your bottles yet, do you guys need a drink, you know,

10 what's -- you know, is everything okay, you know, just

11 trying to, you know, kind of break that ice or

12 tension, you know.  And of course that didn't work,

13 and, you know, they were just like get the fuck out of

14 here.  So that was enough energy from them for me for

15 the night.

16     Q    And what happened next?

17     A    Soon after, you know, Night came through and

18 said, you know, Tony, I need a favor from you and

19 Marlin.

20     Q    You said Night.  Night is who?

21     A    Lee Grant.  And he came over and said, you

22 know, I need to -- you know, would you mind moving

 1   your table from where it is over to the left of where

 2   we were, and I said we didn't care, you know.  He

 3   along with the wait staff started moving the ice, the

 4   mixers, and all that kind of stuff to our left, and I

 5   asked for all my guests to move to the left.

 6       Q    And what happened next?

 7       A    I hopped over to the other couch adjacent to

 8   mine, and all my guests moved over, and I thought we

 9   were all together, and then a huge commotion broke out

10   to my right.  I looked over, I see Curtis on his back

11   like a turtle.

12       Q    Curtis Fitzgerald?

13       A    Yes.  And him trying to get up, and there

14   were three gentlemen, not large gentlemen, but three

15   gentlemen over him that just started pouncing on him.

16   I noticed Marlin lean forward as if he was going to

17   help him up, and then, you know, melee kind of just,

18   you know, happened.  I jumped from my couch where I

19   was and, you know, Night kind of tapped me on the arm,

20   and that couch along the wall is where I got unstood.

21       Q    When you got unstood at that couch along the

22   wall what did you see?

25

```
 1   hit me.

 2        Q    Did Jason Kane hit you ever?

 3        A    No.

 4        Q    Did Mr. Iverson hit you ever?

 5        A    No.

 6        Q    Did Jason Kane throw anything at you?

 7        A    Yes.

 8        Q    What did he throw at you?

 9        A    He threw the ice scoop, he threw the glass,

10   drinking glasses and champagne glasses.  Several

11   members of Iverson's, you know, security when they

12   couldn't get to me because Nightmare was standing

13   directly in front of me along with, you know, my

14   friends, they couldn't get to me, so they just started

15   pelting items at me.

16        Q    I'm not talking about -- I asked you

17   specifically about Jason Kane.

18        A    Yes, he did.

19        Q    What did Jason Kane throw at you?

20        A    Several glasses --

21             MS. MORAN:  Objection.  Hold on.  Objection,

22   asked and answered.
```

1    BY MR. MILSTEIN:

2        Q    Go ahead, you can answer.

3        A    Several glasses and an ice scoop.

4        Q    Did they hit you?

5        A    Yes.

6        Q    Did the glasses hit you?

7        A    Yes.

8        Q    Did they break?

9        A    One broke.

10       Q    Did it cut you?

11       A    No.

12       Q    Did it hurt you?

13       A    Yes.

14       Q    Did the ice scoop hurt you?

15       A    Yes.

16       Q    Why do you say it like that?  Either it did

17   or it didn't.

18            MS. MORAN:  Objection to characterization of

19   like that.

20            THE WITNESS:  I was trying to get a

21   reference of the pain.

22   BY MR. MILSTEIN:

28

```
1       A    It's metal.

2       Q    And did Mr. Kane say anything to you?

3       A    During the incident?

4       Q    Yes.

5       A    Whatever he was yelling at me I did not

6   hear.  Music was still playing, but he was yelling

7   stuff at me.

8       Q    Did you say anything to him?

9       A    No.

10      Q    What happened next?

11      A    Once I saw, you know, once I could get my

12  bearings to get to help Marlin, I jumped off -- I

13  pushed one of his body guards off of him, was then

14  snatched back up on the couch by Nightmare and --

15      Q    Nightmare again is Mr. Grant?

16      A    That's correct.

17           MS. MORAN:  Objection.

18           THE WITNESS:  And, you know, they just, you

19  know, fended everyone off of me.  Their attention

20  turned over to Iverson, and they shot me out of the

21  front of the club, but then they went back in the

22  club, and I was outside by myself.  Allen's entourage
```

1    came out the front.  They said, you know, there is the

2    nigger right there.  They came down the steps, out the

3    front door, just like bees coming out of a hive,

4    surrounded me, and that's when I was hit twice from

5    the behind -- behind.  I don't recall who actually hit

6    me because I was watching Terrance trying to get --

7    pry a table loose.  It's a cafe right beside the

8    Eyebar, and they chain up the, you know, their patio

9    tables and stuff like that.  He was trying to get that

10   table loose.  So as I am focusing on him, you know, I

11   was hit once, refocused on him and was hit again.

12   Noticed Iverson coming out, he just looked, he laughed

13   because the second hit it knocked my glasses off, he

14   smirked, got into the Phantom, and there was a black

15   Escalade, and there was a black like Yukon, and they

16   left.

17        Q    Did Mr. Iverson hit you in that second

18   incident?

19        A    No.

20        Q    Did Jason Kane hit you in that second

21   incident?

22        A    I do not recall who it was that struck me

1    from behind.

2        Q    How long did the melee inside last?

3        A    Five minutes.

4        Q    Have you ever talked with Curtis Fitzgerald

5    about what happened there?

6        A    Just, you know, during our sessions with our

7    attorneys.

8        Q    Did you ever talk with Mr. Grant about what

9    happened there?

10       A    Yes.

11       Q    Outside of the attorneys?

12       A    Yes.

13       Q    What did Mr. Grant say?

14       A    Mr. Grant and one of his associates that was

15   involved in another incident, you know, was trying to

16   offer us money to make this go away.

17       Q    Mr. Grant was offering you money?

18       A    Right, third party.  He was brokering the

19   deal, if you will.

20       Q    How much money did Mr. Grant offer you?

21       A    There was never a monetary amount

22   determined.

1      Q    Did Mr. Grant say on whose behalf he was

2  offering you money?

3      A    I would assume that it was out of Iverson's

4  camp or through one of his associates.

5      Q    But did he say that?

6      A    No.

7      Q    What injuries, if any, did you sustain?

8      A    I sustained a contusion to my right temporal

9  region.  I had a sore right mandible, you know, my

10  whole jaw bone and all that was swollen and sore for

11  weeks, and just bruises from the cuts and glasses

12  being thrown.

13      Q    So you had a contusion, and where was the

14  contusion?

15      A    Right here.

16      Q    On the left side of your forehead?

17      A    On the right side.

18      Q    Right side of your forehead?

19      A    Correct.

20      Q    How long did the contusion last?

21      A    Probably -- it was probably there for two

22  weeks.

34

```
1       Q    You never saw a physician?

2       A    No.

3       Q    So then you left?

4       A    Yes.

5       Q    You didn't see a nurse either?

6       A    I mean, you know, they came out and gave me

7   ice packs and stuff like that, but...

8       Q    Is there a medical record from that

9   emergency room visit?

10           MS. MORAN:  Objection.

11           MR. MILSTEIN:  If you know.

12           MS. MORAN:  If you know.

13           THE WITNESS:  I'm not sure.

14  BY MR. MILSTEIN:

15       Q    Have you ever seen one?

16       A    No.

17       Q    After the emergency room -- after you left

18  the emergency room did you see any other medical

19  physicians?

20       A    No.

21       Q    Have you ever seen any medical personnel for

22  any of the injuries you allege you sustained that
```

1    night?

2         A    No.

3         Q    Did you see any psychiatrist for the

4    injuries you sustained that night?

5         A    Well, you know, because of the stress

6    related to the Iverson incident and all that I was

7    diagnosed with diverticulosis, and they said that that

8    is brought on by a lot of anxiety and undue stress.

9         Q    You have diverticulosis?

10        A    Yes.

11        Q    Do you know what that is?

12        A    Yes.

13        Q    What is it?

14        A    It is a -- it is a polyp in the lining of

15   where mine is the ascending colon that is inverted,

16   and, you know, it causes your -- wherever it is it

17   causes it to get infected and all that.

18        Q    When were you diagnosed with diverticulitis?

19        A    A month ago.

20        Q    A month ago?

21        A    Uh-huh.

22        Q    Who diagnosed you with diverticulitis?

38

1            MR. MILSTEIN:  Any of those questions.

2            MS. MORAN:  No.  Well, identify which

3    question you -- no, no, no, no.  You need to ask a

4    question.  He is not going to just pick a question to

5    answer.

6    BY MR. MILSTEIN:

7        Q    Do you know what stress is?

8        A    Yes.

9        Q    Before this incident did you ever have

10   stress?

11       A    Not to the magnitude of this.

12       Q    Did you ever have stress before the

13   incident?

14       A    Yes.

15       Q    Work related stress?

16       A    Somewhat.

17       Q    Family related stress?

18       A    Not really, no.

19       Q    Never had family related stress?

20            MS. MORAN:  Objection.

21            THE WITNESS:  Not really.

22   BY MR. MILSTEIN:

40

```
 1              MR. MILSTEIN:  I'm just -- I'm just --
 2              THE WITNESS:  No.
 3              MR. MILSTEIN:  You never had your ass
 4    bodied, if that's possible?
 5              MS. MORAN:  Objection.  Don't answer that
 6    question.  Don't answer the question.  Has he been
 7    killed?  You are asking him has he been killed?
 8              MR. MILSTEIN:  If that's what it means, I'm
 9    sorry, I don't --
10              MS. MORAN:  Well, why don't you ask that.
11              MR. WATSON:  He is not in a body bag today.
12              MS. MORAN:  Why don't you be professional
13    and ask that.
14    BY MR. MILSTEIN:
15        Q    Is that what it means?
16        A    Yes.
17        Q    Has anybody ever at any of these clubs
18    threatened you or hit you?  You have never been in
19    another incident at any other club, have you?
20        A    No.
21        Q    Have you ever seen Jason Kane since this
22    incident?
```

41

```
1       A       Yes.

2       Q       When did you see him?

3       A       I saw him on an occasion outside of the

4    Eyebar.

5       Q       Where was that?

6               MS. MORAN:  Where?

7               THE WITNESS:  Outside the front door of the

8    Eyebar.

9    BY MR. MILSTEIN:

10      Q       Oh, you mean immediately outside the Eyebar?

11      A       Yes.

12      Q       That night you mean?

13      A       No.

14      Q       When was that?

15      A       I would say maybe back around November.

16      Q       Did he say anything to you?

17      A       Yes.

18      Q       What did he say to you?

19      A       We had an associate that basically was

20   trying to amend or, you know, squash the beef, if you

21   will, and Jason was actually beside a pillar and

22   stepped out from the --
```

```
 1        Q    Wait a second, Jason what?

 2        A    He was standing behind a pillar.

 3        Q    Pillar, okay.

 4        A    Yeah.  And Rodney was like, you know, T, you

 5   need to squash this, this, that, and the other.  Jason

 6   stepped out around from behind the pillar and was

 7   like, you know, what's up, man, and I said what's up

 8   to him, pulled Rodney to the side and said, man, you

 9   know, it's out of my hands, you know, there is nothing

10   I can do at this point, we have retained attorneys,

11   and, you know, left it at that.

12        Q    Who is Rodney?

13        A    Just a club going associate.

14        Q    Do you know what Rodney's last name is?

15        A    No.

16        Q    Can you describe Rodney?

17        A    Black male, 5-5 -- or no, probably 5-10 with

18   braids.

19        Q    Braids you said?

20        A    Yes.

21        Q    Did Jason threaten you at that moment?

22        A    No, he did not.
```

1      Q    Has anybody ever threatened you that you

2  believe is related to that moment?

3           MR. LATTIMER:  Which moment?

4           MS. MORAN:  Yes.

5           MR. MILSTEIN:  The incident.

6           MS. MORAN:  He just -- objection.  You just

7  discussed with him about threats.  What do you mean?

8           THE WITNESS:  For instance yesterday I

9  called my --

10          MS. MORAN:  No, don't talk about any

11 conversations with us.  You can tell what happened

12 outside of us, but don't talk about actions with us.

13          THE WITNESS:  I received a threat on

14 yesterday.

15 BY MR. MILSTEIN:

16     Q    What threat did you receive yesterday?

17     A    A threat for me not to be out in the clubs

18 because, you know, if we do find you out in the club,

19 you know, something is going to happen.

20     Q    How did you receive that threat?

21     A    A mutual friend called me, he was in a

22 conversation with some guys on Sunday, not knowing

44

1   that we were associated, you know, that he knew me,

2   and they were just talking.

3       Q   Who was the mutual friend?

4       A   His name is William Harbor.

5       Q   Harbor, H-A-R-B-O-R?

6       A   I'm not sure.

7       Q   And you said a mutual friend, mutual to

8   whom?

9       A   Will is a mutual friend of mine and

10  Marlin's.

11      Q   Oh, I'm sorry, you and Marlin's?

12      A   Yes.

13      Q   And what did Mr. Harbor tell you?

14        MS. MORAN:  Objection, asked and answered.

15        THE WITNESS:  He said that, you know, T, you

16  need to watch your back because the guys that I was

17  talking to, this is what they said exactly, and he

18  said exactly what I stated before.

19  BY MR. MILSTEIN:

20      Q   What guys did he say he was talking to?

21      A   I'm not sure.  I don't know them.  He didn't

22  even mention, you know, who they were.

45

1    Q    Did he say that he spoke to these other

2 guys?

3    A    Yes.

4    Q    But he didn't tell you who they were?

5    A    No.  I didn't even ask.

6    Q    And other than that has there been any

7 threat on you, to you?

8    A    There have been at least three or four

9 others in the past.

10    Q    Well, describe the others.

11    A    The same type of, you know, of someone out

12 around the Horsemen, who Jason Kane, Terrance,

13 Maurice, and those guys, and someone would probably

14 bring up the incident, and they would say, yeah, I

15 wish I could find those punk asses, or, you know,

16 this, that, and the other.

17    Q    Well, give me the specifics of the incident

18 that -- of the threat that you are talking about, who

19 said what to whom when and where?

20    A    I don't recall the specific place, time, and

21 all that.  It's been since that November incident when

22 I didn't, you know, embrace Jason Kane.

51

```
1        A     No.

2        Q     Let me just understand what it is that you

3   do for Charter Funding, is it mortgages, is that what

4   it is?

5        A     Yes.

6        Q     Mortgages for residential primarily?

7        A     Residential, commercial.

8        Q     And is it mostly leads that you get from

9   your bosses or leads that you generate?

10       A     I generate.  I am an originator.

11       Q     And how are the leads generated, how are

12  your --

13       A     Direct marketing, beating the streets, me

14  courting, going from real estate agent office to real

15  estate agent's office, you know, pounding the

16  pavement.

17       Q     What videotapes to your knowledge exist

18  related to the incident?

19       A     There is News Channel 4, ESPN, there is

20  several video, you know, videotapes.

21       Q     Is there any videotape of the actual fight

22  to your knowledge?
```