# Exhibit E

JR                                                                      1

21                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - -X
                         :
MARLIN GODFREY, et al.,  :
                         :
         Plaintiffs,     :
                         :  Civil Action No. 1:05-
    v.                   :  cv-2044 (ESH)(DAR)
                         :
ALLEN IVERSON, et al.,   :
                         :
         Defendants.     :
_____X




                         Tuesday, October 3, 2006
                         Washington, DC



         The deposition of JONATHAN JASON KANE was
called for examination by counsel for the
Plaintiffs in the above-entitled motion, pursuant
to notice, in the offices of Blank Rome, LLP, 600
New Hampshire Avenue, NW, 12th Floor, Washington,
D.C. 20037, convened at 10:50 a.m. before
Jacqueline Richards-Craig, a notary public in and
for the District of Columbia, when were present on
behalf of the parties:

JR
                                                                52

1        Q    Okay. And you went through it and did you

2   attempt to obtain any of the documents that were

3   responsive to any of the requests that are made in

4   that document?

5        A    Yes.

6        Q    And could you turn to request number 3

7   which is on page 2?

8             MR. MARTIN:  Request number?

9             MR. LATTIMER:  3 on page 2.

10            [Witness reads document.]

11            BY MR. LATTIMER:

12       Q    Do you have any documents that are

13   responsive to that request?

14       A    No.

15       Q    So you have no documents that would

16   indicate any monies that you earned for the past

17   five years; is that right?

18       A    I'm in the process of trying to get all

19   the paperwork together.

20       Q    My question--well when you filed your

21   taxes did you use any documents to show what monies

22   you had earned?

JR                                                                          53

1       A    [Pause.]  Yes.

2       Q    Okay. So you do have documents that are

3    responsive to that request; is that right?

4       A    I'm in the process of looking for them.

5       Q    Well, let's go back.  I thought I just

6    understood you to say that when you filed your

7    taxes, which you said you filed for last year,

8    correct?

9       A    [No response.]

10      Q    Am I right?

11      A    Yes.

12      Q    And I thought I understood you to say that

13   when you did that, you used documents that

14   indicated how much money you had earned so that you

15   could file your taxes; am I correct?

16      A    Repeat your question.

17      Q    I thought I understood you to say that you

18   used documents indicating what amount of money you

19   had earned for 2005 in preparing your taxes; is

20   that right?

21      A    Break it down for me.

22      Q    Okay. One more time.  You filed taxes for

JR

54

1    2005, so you say, right?

2        A    Yes.

3        Q    And in order to file taxes you have to

4    report your income, correct?

5        A    Yes.

6        Q    And in reporting your income, you used

7    documents for that purpose, correct?

8        A    Yes.

9        Q    So then you do have documents indicating

10   your income for the past five years?

11           MR. MARTIN:   Objection.

12           BY MR. LATTIMER:

13       Q    At least one of them, correct?

14           MR. MARTIN:   Objection as to form.

15           BY MR. LATTIMER:

16       Q    Correct?

17       A    [No response.]

18       Q    Can't get to the next question until you

19   answer this one.

20       A    I thought I answered the question.

21       Q    You haven't said a word.  I'm waiting on

22   it.

JR                                                                          55

1          A     Repeat the question.

2          Q     All right.  Let's try it one more time.

3     You filed taxes for 2005, right?

4          A     Yes.

5          Q     And you reported income, correct?

6          A     Yes.

7          Q     And you had documents indicating what your

8     income was, correct?

9          A     For 2005?

10         Q     Right.

11         A     Yes.

12         Q     Therefore, you have in your possession

13    documents that are responsive to request number 3,

14    correct?

15         A     I'm in the process of obtaining that from

16    the accountant.

17         Q     You're in the process of obtaining your

18    documents showing your income from the accountant?

19         A     Yes.

20         Q     And what have you done to do that?

21         A     Phone calls were made.

22         Q     All right.  So you've been calling him

JR

56

1  since August?

2      A    I can't recall the exact time and date I

3  called him, no.

4      Q    Well, these requests were submitted on

5  August 21st.  I take it you called him before then,

6  correct?

7      A    I can't--I can't recall the exact time he

8  was called.

9      Q    You submitted supplemental responses to

10  Requests for Production on September 29th.  I take

11  it you called him before then, correct?

12      A    I'm in the process of obtaining them from

13  my accountant.

14      Q    I understand that.  That's not my

15  question.  My question is: I take it you called him

16  before September 29th, correct?

17      A    Yes.

18      Q    All right. And have you called him more

19  than once?

20      A    I can't recall how many times he's been

21  called.

22      Q    Okay.  And it is your testimony that not

JR                                                                                  57

1    withstanding your calls to your accountant, you

2    haven't been able to get this information; is that

3    right?

4        A    Yes.

5        Q    But you do have--there is such information

6    that exists; is that right?

7        A    I'm trying to obtain it from the

8    accountant.

9        Q    I understand that.  My question wasn't

10   were you trying to obtain it.  My question was,

11   there are documents--

12       A    Yes.

13       Q    Let me finish my question.  There are such

14   documents that exist, correct?

15       A    Yes.

16       Q    All right.  Now, Request Number 4 on page

17   3, you were asked to provide all statements--any

18   and all statements, invoices, bills, cancelled

19   checks, receipts or other documents concerning

20   information related to the cost of any security

21   that was provided by you from July 1, 2005 through

22   July 21, 2005.  Do you have nay such documents?

JR

58

1     A    No.

2     Q    Okay.  So you did not have any expenses

3 related to your providing security services for Mr.

4 Iverson during that period; is that right?

5          MR. MARTIN: Objection as to form.  You

6 said any documents that say that.

7          MR. LATTIMER:  I understand that.

8          BY MR. LATTIMER:

9     Q    Is that right?  Did you or did you not

10 have expenses?

11    A    Repeat the question.

12    Q    Did you or did you not have expenses

13 related to providing security for Mr. Iverson in

14 July of 2005?

15    A    Elaborate on expenses.

16    Q    Well, have you ever heard that term

17 before?

18    A    No.

19    Q    So when you file your taxes, there's not a

20 place where it talks about expenses?

21    A    I can't recall what those documents say.

22    Q    You can't recall.  So as you sit here

JR

59

1  today, you're not familiar with the term expenses;
2  is that right?
3      A    Not this paper, no.
4      Q    I'm not asking you about the paper, I'm
5  asking you about expenses, e-x-p-e-n-s-e-s.  You're
6  not familiar with that term as you sit here today;
7  is that right?
8      A    Correct.
9      Q    Okay. So you didn't know how to answer
10 this question; is that right?
11     A    [No response.]
12     Q    Would that be fair to say?
13     A    No, sir.
14     Q    Request Number 5 which is also on page 3,
15 deals with any and all reports, statements,
16 invoices, bills, cancelled checks, receipts or
17 other documents for the past five years, concerning
18 information related to the monies, wages, expenses,
19 costs, you have paid you any individual providing
20 security services on your behalf or behalf of any
21 entity in which you have--or have had any
22 interests.  Now in that interrogatory--I'm sorry,

JR

60

1    in that request, do you have any documents that are

2    responsive to that?

3        A    I can't recall.

4        Q    Did you look?

5        A    I can't recall.

6        Q    You don't recall if you looked?

7        A    I can't recall.

8        Q    All right.  Request Number 6 asks you

9    about any telephone, cell phone, pager, or two-way

10   that you owned or operated from January 1, 2005 to

11   the present, including but not limited to all phone

12   records for the month of July 2005 and July 2006.

13   Do you have any documents that are responsive to

14   that?

15       A    I can't recall.

16       Q    You don't know if you got a phone bill?

17       A    In January of 2005?

18       Q    From January 2005 to the present.

19       A    I can't recall.

20       Q    You don't recall if you got a phone bill

21   last month?

22       A    I can't recall.

JR

61

1      Q    You don't recall if you got a phone bill a

2  month before?

3      A    I can't recall.

4      Q    You don't recall if you got any phone bill

5  between January 1, 2005 and September 2006?

6      A    I can't recall.

7      Q    Who pays the phone bill?

8      A    My wife.

9      Q    So you have a cell phone, you took it out

10  earlier and looked at it; is that right?

11      A    That's correct.

12      Q    All right.  And that cell phone--you don't

13  know if you've ever gotten a bill for that phone

14  since January 1, 2005; is that right?

15      A    I just stated my wife pays the phone bill.

16      Q    I didn't ask you about who pays it.  I

17  asked you do you know if you got one?

18      A    I don't know.

19      Q    So you don't know--so you think that phone

20  might free?

21      A    No.

22      Q    Okay.  So you know somebody gets a bill;

JR

1   don't know her?

2       A    [No response.]

3       Q    She's a Philadelphia police officer?   You

4   don't know her?

5       A    No--Yes.   Yes.   Yes.

6       Q    So you do know her?

7       A    I don't know her as Tara, no.

8       Q    What do you know her as?

9       A    'T'.

10      Q    'T'.   All right.   So you know 'T'?

11      A    Yes.

12      Q    Philadelphia police officer?

13      A    Yes.

14      Q    And she's Terrance's girlfriend or one of

15  the women that Terrance had intimate relations?

16      A    I don't know anything about that.

17      Q    You don't?   She's known you for over two

18  years, have you known her for over two years?

19      A    I've met her.   I wouldn't say I've known

20  her for over two years.   I've met her a few times.

21      Q    And you met her through Terrance; is that

22  right?

JR

89

1       A    Yes, once with Terrance.  Yes.

2       Q    Once with Terrance?

3       A    Yes.

4       Q    Now she indicated that she knew you when

5    you worked for Genuwine; do you recall that?

6       A    No.

7       Q    Did you ever work for Genuwine?

8       A    I worked for his road manager.

9       Q    Well, doing what?

10      A    Security and assisting.

11      Q    For who?

12      A    White Chocolate.

13      Q    And who were you providing security for?

14      A    White Chocolate.

15      Q    You didn't provide security for Genuwine?

16      A    No.

17      Q    Never?

18      A    No.

19      Q    Okay. So when she says that she knew you

20   from working with Genuwine along with Terrance, you

21   have no recollection of that; is that right?

22      A    No.

JR

90

1      Q    Okay.

2           MR. MARTIN:  Objection to form and

3  foundation. Move to strike.

4           BY MR. LATTIMER:

5      Q    Now, she indicated --

6           MR. MARTIN:  Mr. Lattimer, the only

7  objection I had for bringing another staff up here

8  is I wanted--I need to free him up.  If you're

9  going to play the video, I'd like to play the video

10 and release him.  It's costing me to have somebody

11 sit here while you do your--that's why I wanted to

12 come in here to do the deposition.

13          MS. MORAN: We can go to his office and it

14 won't cost anybody.

15          MR. MARTIN:  Well we're here.  You didn't

16 give us notice.  I'm just asking you to tell me

17 when you're going to play it.  That's why I called

18 him up here, he's got other things he needs to do.

19          MR. LATTIMER:  Well we're going to be

20 playing it for a while.

21          MR. MARTIN: Okay.  We'll call you back.

22 Thank you.

JR

91

1         MR. LATTIMER:  We'll probably start it

2    again in about 90 seconds.  Okay?

3         BY MR. LATTIMER:

4    Q    Now, she indicated that when she saw

5    Terrance, she usually saw you.  Would that be a

6    fair--would that be consistent with your

7    recollection that when you saw Terrance, usually

8    you saw her?

9    A    No.

10   Q    Okay.  So you don't remember seeing her

11   when you saw Terrance; is that right?  'T' that is.

12   A    I saw her once.

13   Q    You saw her once?

14   A    With Terrance.

15   Q    Right.  You didn't see her at the Eyebar

16   that night, right?  With Terrance.

17   A    No.

18   Q    So, when she says that she was at the

19   Eyebar, you didn't see her, right?

20   A    No.

21   Q    When she says that she was sitting with

22   Terrance at the Eyebar, you didn't see her, right?

JR

114

1    Various artists.

2        Q    Interscope Records?

3        A    Yes.

4        Q    Okay. Who?

5        A    Various artists.

6        Q    Okay.  Who?

7        A    Different music people.

8        Q    All right.  I got that part.  Who?

9        A    I can't recall everybody.

10       Q    I didn't ask you about everybody.  Give me

11   one person you worked with.

12       A    Limp Biskit.

13       Q    Okay. How about another one?

14       A    I can't recall.

15       Q    So the only person you remember working

16   for in 2005, other than Mr. Iverson, is Limp

17   Biskit?

18       A    Various artists from Interscope.

19       Q    I understand the various, but various

20   doesn't answer the question of who.  Who?  When you

21   say who, you're referring to a person.  Who did you

22   work for?

JR

1      A    I don't remember.

2      Q    So the only person that you recall working

3  for in 2005, other than Mr. Iverson, is Limp

4  Biskit; is that correct?

5      A    Yes.

6      Q    Now you ever work for 50 Cent?

7      A    Repeat your question.

8      Q    You ever work for 50 Cent?

9          MR. MARTIN: By that question you mean the

10 entertainer 50 cent?

11         MR. LATTIMER:  Yeah.  He knows what I'm

12 talking about.

13         MR. MARTIN:  For the record, just to make-

14 -

15         MS. MORAN: Everybody in the world knows.

16         MR. MARTIN: For the record.

17         BY MR. LATTIMER:

18     Q    Don't you?  You know who I'm talking

19 about. Have you ever worked for him?

20     A    Yes.

21     Q    When?

22     A    I don't recall the time.

JR

116

1    Q    Was it this year?

2    A    No.

3    Q    Last year?

4    A    I can't recall.

5    Q    You don't recall if you worked for

6    somebody last year?

7    A    I don't recall.

8    Q    Ever work with G Unit?

9    A    That is 50 Cent.

10   Q    Okay. Did you work for G Unit?

11   A    I worked for 50 Cent.

12   Q    Okay. And G unit?  Who were you paid by,

13   50 Cent or G Unit?

14   A    50 Cent.

15   Q    Okay. And when were you paid?

16   A    I can't recall.

17   Q    Was it 2006?

18   A    No.

19   Q    Was it 2005?

20   A    I can't recall.

21   Q    Was it 2004?

22   A    I can't recall.

1        Q     All right.  So he just--when he showed up,

2    you were surprised; is that right?

3        A     He was already there.

4        Q     I'm saying, when you saw--well let me

5    rephrase it.  When you saw him there, you were

6    surprised; is that right?

7        A     I wasn't thinking about it.

8        Q     You weren't thinking about it?

9        A     Unh-unh.

10       Q     You didn't expect to see him though?

11       A     I wasn't thinking about it.

12       Q     You didn't think about it.  Did you see

13   his girlfriend, Tara?

14       A     I wasn't looking for her.

15       Q     I didn't ask you that.  Did you see her?

16       A     No.

17       Q     Okay.

18             MR. MILSTEIN:  Did you say Cara?

19             MR. LATTIMER:  No, I didn't.

20             MR. MILSTEIN:  Okay.

21             BY MR. LATTIMER:

22       Q     All right.  So at that point, what

JR

146

1  happened?

2      A    We're inside the club.  Robin and the

3  owner of the club asked this guy to move.

4      Q    All right.

5          MR. LATTIMER: [To videographer]   You need

6  to stop to change the tape?

7          [Off the record.]

8          BY MR. LATTIMER:

9      Q    Mr. Kane, when we stopped, we were talking

10 about you and Mr. Iverson having been escorted to

11 the VIP area of the Eyebar Night Club, and I think

12 you told me that Robin and the owner of the club

13 then asked the--some people who were already there

14 to move; is that correct?

15     A    yes.

16     Q    All right.  And then what happened?

17     A    They asked the guy to move --

18     Q    What guy?

19     A    The bald-headed guy.

20     Q    They asked the bald-headed gut to move?

21     A    Yes.

22     Q    And you don't know his name?

JR

147

1    A    No, I don't know that type of guy.

2    Q    Okay. And then what happened?

3    A    They asked the bald-headed guy to move and

4    they said, "Look, we'll comp you a bottle."

5    Q    Will who?

6    A    We'll give you a bottle.  Comp you a

7    bottle.

8    Q    A bottle of what?

9         MR. MARTIN:  Objection.  I ask that you

10   let the witness finish his entire --

11        MR. LATTIMER:  I thought he was finished.

12        MR. MARTIN:  No, he was still talking.

13        BY MR. LATTIMER:

14   Q    Okay. What else did you want to say?

15   A    They said they'll, "Comp you a bottle if

16   you please move, of anything you want."

17   Q    Who said that?

18   A    That's what Andre said to him.

19   Q    Said to the bald-headed guy?

20   A    Yeah.

21   Q    That, "We'll comp you a bottle if you

22   would move"?

JR

152

1  the club before.

2      Q    Okay.   That's the only way you know him?

3      A    Yes.

4      Q    You used to work for him, didn't you?

5      A    I don't recall that.

6      Q    You don't recall working for him at the

7  Spy--at the Spy Club?

8      A    No, I didn't know he owned the Spy Club.

9  No.

10      Q    So you don't remember working for him in

11  1996 and 1997 at the Spy Club?

12      A    I didn't know he owned the Spy Club.  No.

13      Q    But you don't remember working for him

14  even if he didn't own it, right?

15      A    No.

16      Q    And you don't know why he would refer to

17  you as one of the Horsemen, correct?

18      A    No.

19      Q    Now, we talked to Mr. Demoyer and Mr.

20  Demoyer indicated that he thought that there were

21  four people working security for Mr. Iverson that

22  night.  Would that be inconsistent with your

JR

154

1    assisted Mr. Kittrell in moving his party over and

2    that they were all agreeable to doing that.  That

3    would be inconsistent with your recollection,

4    right?

5         A    Yes.

6         Q    And Mr. Demoyer said that he moved, in

7    fact, some of the bottles from their table over one

8    to create a buffer between you and the party that

9    Mr. Kittrell had because you were being aggressive.

10   Would that be consistent or inconsistent with your

11   recollection?

12        A    Be inconsistent.

13        Q    Now, Mr. Fitzgerald, you know him too,

14   right?

15        A    [No response.]

16        Q    You know Mr. Fitzgerald, right?

17        A    Yes.

18        Q    We talked to him and he said that you

19   pushed him and that's what started the ruckus.

20   Would that be consistent or inconsistent with your

21   recollection?

22        A    I touched him.  We was talking.  I touched

JR

155

1  him.

2      Q    My question is:  He indicates that you

3  pushed him and that that is what started the

4  ruckus.  Would that be consistent or inconsistent

5  with your recollection?

6          MR. MILSTEIN:  Objection.  That's not what

7  he said.

8          MR. MARTIN:  Objection.

9  Mischaracterization of the witness' statement.

10         MR. KANE:  Inconsistent.

11         BY MR. LATTIMER:

12     Q    Inconsistent.  All right.  Now, did you

13  see Ansley Grant get hit in the eye with a bottle?

14     A    No.

15     Q    You didn't see him get the gash over his

16  head--over his eye?

17     A    No.

18     Q    No?

19     A    No.

20     Q    That would be inconsistent with your

21  recollection of what happened that night, right?

22     A    Yes.

JR

1      A      They wrote them themselves.

2      Q      On the phone?

3      A      No. I met with them and they wrote the

4   statements.

5      Q      Okay. You just said that you--they call

6   you on the phone and you got the statements.

7      A      Excuse me. Excuse me.  They called me on

8   the phone to tell me they--Curtiss--they were going

9   to give me the statements.  So I met them and I got

10   the statements.

11      Q      Okay. Where did you meet them?

12      A      I met up with Curtiss outside of the

13   Eyebar.  I met Nightmare outside of Play.

14      Q      Nightmare is Mr. Ansley --

15      A      Ansley Grant.  Yes.

16      Q      So you went to get the statements?

17      A      Yes.

18      Q      And then you gave them to who?

19      A      [No response.]

20          MR. MARTIN:  Did you understand that?

21          MR. KANE: No.

22          MR. MARTIN: If you could break it down,

JR

212

1    Production.

2              MR. MARTIN:  Objections to the --

3              MR. LATTIMER:  No, Supplemental.

4              [Witness reading documents.]

5              MR. MARTIN:  How much more time do we

6    have, Mr. Lattimer?

7              MR. LATTIMER:  Depends on Mr. Kane.

8              MS. MORAN:  Is he done looking through

9    those?

10             MR. LATTIMER:  Are you done, Mr. Kane?

11             MR. KANE:  Almost.

12             MR. MARTIN:  How many documents do you

13   have?

14             MR. LATTIMER:  It's just two, the

15   Supplemental Responses to David A. Kittrell's

16   Request for Production, and the Objections to

17   Godfrey's Request for Production.

18             MR. MARTIN:  Objections to Kittrell,

19   that's what you said?

20             MR. LATTIMER:  No, no, no.  Supplemental

21   Response to Kittrell, Objections to Godfrey.

22             MR. KANE: I'm ready.

JR

213

1          MR. LATTIMER:  All right.

2          BY MR. LATTIMER:

3     Q    Anything else, based upon your having

4  reviewed that.  Any other documents that you have

5  but you have not produced that are responsive to

6  the requests there?

7          MR. MARTIN:  Object to the

8  mischaracterization of the documents that he has,

9  as to form and foundation.

10         MR. LATTIMER:  You can answer.

11         MR. KANE:  I don't understand the

12  question.

13         BY MR. LATTIMER:

14    Q    Okay.  All right.  Do you own a car?

15    A    No.

16    Q    You don't own a car?

17    A    No.

18    Q    How did you get here today?

19    A    Pardon?  I got dropped--I got dropped off.

20    Q    So you don't own any automobiles?

21    A    No.

22    Q    Do you own a house?