**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MARLIN GODFREY, et al.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 05-2044** |
| **v.** | ) | |
| | ) | **(ESH)(DAR)** |
| **ALLEN IVERSON, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM OF POINT AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' OMNIBUS MOTION IN LIMINE**

Comes now the plaintiffs, by and through counsel, and hereby submit their opposition to

the Joint Omnibus, whatever that means, Motion to Exclude Inadmissible Testimony and

Evidence, filed by the defendants in the case.  The reason that defendants' motion is wholly

without merit is summed up in the first two sentences of the memorandum introduction:

> This case involves a bar fight and allegations of a simple assault and battery.  At
> the heart of this matter are four primary issues: who started the fight, who
> participated in the fight, what was the cause of the fight and what damages -if
> any- resulted from the fight.

Mot. Mem. at 1.  It is because the defendants in this case have deluded themselves into believing

that this case ought to be about what they would like it to be about that this groundless motion

was filed.  Plaintiffs' complaint speaks for itself and in this lawsuit, plaintiffs intend to prove that

Mr. Iverson and Mr. Kane are liable for an assault and battery upon the plaintiffs, that Mr.

Iverson and Mr. Kane are liable for the negligent and intentional infliction of emotional distress

upon the plaintiffs, that Mr. Iverson and Mr. Kane, among others, engaged in civil conspiracy by

agreeing to engage in the tortious conduct at issue here and that Mr. Iverson, having full

knowledge of the violent propensities of both Mr. Kane and Terrence Williams, who he knew

were members of notoriously violent group

known as the four horseman, is liable for the negligent hiring and supervision of Mr. Kane,

Terrence Williams and others in his entourage as a result of his failure to take any action to

prevent the tortious conduct of these two individuals among others, against the plaintiffs.

1. **Negligent Hiring and Supervision**

First and foremost is the fact that although framed as a motion in limine, the defendants

in actuality are seeking summary judgment on the issue of negligent hiring and supervision

because plaintiffs will not present an expert to testify regarding that issue. The time for filing a

summary judgment motion has long since passed and this Court specifically advised defendants'

counsel of that fact on December 8, 2006.

Nonetheless, consistent with their practice to see what they want to see, hear what they

want to hear, and do what they want to do, the defendants have filed a motion for summary

judgment and  dressed it up as a motion in limine. One need only read the language used to

confirm that defendants have indeed filed a motion for summary judgment and not a motion in

limine:

> as a result of Plaintiffs inability to establish the requisite duties as a matter of
> law, the Court should exclude all testimony and evidence relating to their
> negligent hiring and supervision and negligent infliction of emotional distress
> claim.

Mot. Mem. at 5.

In reality, however, it matters not how these defendants have clothed their meritless

motion, their position is still meritless. Insightfully, these defendants have submitted a proposed

jury instruction to the Court on the issue of negligent, hiring, training and supervision, and in that

proposed instruction the defendants state as follows:

To establish a negligent hiring claim, in addition to establishing the elements of negligence as previously described in connection with negligent infliction of emotional distress, a plaintiff must show that (1) the employer knew or should have known its employee behaved in a dangerous or incompetent manner; and (2) despite actual or constructive knowledge, the employer failed to adequately supervise the employee. As with the negligence claim, the plaintiff has failed to plead the essential elements of a negligent hiring claim. Thus, to establish a claim of negligent hiring, a plaintiff must prove a that defendants had a duty of ordinary care to plaintiffs; that defendants breached that duty of care; that defendants' breach of their duty was the proximate cause of plaintiffs' cognizable injury; that

**Authority:**    *Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 79 (D.D.C. 2005)(citing *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

Defendants' Request No. 21. This is an accurate statement of the law.

Contradicting themselves in this regard, the defendants argue to the Court in their mislabeled motion for summary judgment that plaintiffs cannot establish a deviation from the standard of care without expert testimony. Mot. Mem. at 4. The defendants obviously know that the law does not support their position, as evidenced by their proposed jury instruction, yet they make such a blatant misrepresentation of fact nonetheless. The fact is that the law in this area is entirely different than what the defendants say it is:

The District's only real challenge to liability for negligent supervision is its claim that proof of the standard of care requires expert testimony, which Daskalea did not offer. **That, however, is not the law of the District of Columbia.** To the contrary, the rule is that "proof of deviation from the applicable standard of care need not include expert testimony where the alleged negligent act is 'within the realm of common knowledge and everyday experience.'"

*Daskalea v. District of Columbia*, 227 F.3d, 433, 445 (D.C. Cir. 2000).

Recently, the District of Columbia of Appeals has noted that:

The cause of action for negligent supervision . . . recognizes that an employer owes specific duties to third persons based on the conduct of its employees:

One dealing with the public is bound to use **reasonable care** to select employees competent and fit for the work assigned to them

3

and to refrain from retaining the services of an unfit employee. When as employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. [Citations omitted.].

*Griffin v. Acacia Life Insurance Company*, 2007 D.C. App. Lexis 266 (May 24, 2007), Exhibit 1.

There are no contrary authorities in the District of Columbia

Aside from the question of vicarious liability, appellee may be directly liable if it failed to **exercise reasonable care** to avoid harm under the circumstances. Under the approach to liability, the employer's duty to supervise is not merely to be judged by the concept of respondeat superior.

*Murphy v. The Army Distaff Foundation, Inc.*, 458 A.2d 61, 63 (D.C. 1983).

                    *          *          *          *          *

To establish negligent supervision, "it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."

*Daka v. McCrae*, 839 A.2d 602, 689 (D.C. 2003).

Notwithstanding the fact that the law in the District of Columbia is clear, consistent and unequivocal, the defendants contend that *Edwards v. Okie Dokie, Inc.*, 473 F.Supp.2d 31 (D.D.C. 2007), somehow supports their position. It does not. The Edwards Court noted the following:

Whether the specific action by these security personnel were reasonable under the circumstances, i.e., whether they used excessive force, is not the issue with regard to Plaintiffs' false arrest/false imprisonment claim. The question is whether the Nightclub security acted lawfully when they detained the Plaintiffs and reported on their actions to the MPD. The answer to that question is inevitably "yes . . " Given the facts in the record, those was no "unlawful detention" and thus no false arrest.

*Id.* at 44-45. Clearly, the facts of *Edwards* are far different here and the *Edwards* court made a number of statements in "dicta" that simply were not correct statements of the law. For instance,

4

the following statement is indicative of that

> Under D.C. law, expert testimony is required to prove deviation from the applicable standard of care in a negligence action.

*Id.* Unquestionably, that is not the law in the District of Columbia. *Daskalea*, supra at 227 F.3d

445. Moreover, *Parker v. Grand Hyatt Hotel*, 124 F.Supp.2d 79 (D.D.C. 2000), which the

*Edwards* court relies upon as authority for the requirement of expert testimony, merely stands

for the proposition that expert testimony is required to support a negligent supervision claims

premised on inadequate training of Hyatt security personnel and District of Columbia police

officers:

> In this case, expert testimony would be necessary to assist a jury in establishing the following: (a) the standard of care which Hyatt and the District of Columbia are subject to in the training of their security personnel and police officer; (b) whether the officers and Mr. Ricalde breached their duty of care; and ( c) whether such breach contributed to the plaintiffs' damages . . . A jury evaluating this count of negligent supervision, having only the facts and arguments submitted by the plaintiffs in front of them would be forced to engage in "idle speculation" regarding the duty of care governing Hyatt and the District of Columbia in the training of their employees . . .

*Parker*, supra at 89-90.

The fact of the matter is that expert testimony is not necessary in this case as there are no

issues that are beyond the ken of the average layman, insofar as plaintiffs' claim of negligent

supervision is concerned.

### 2. <u>Negligent Infliction of Emotional Distress</u>

In *David v. District of Columbia*, 436 F.Supp.2d 83 (D.D.C. 2006), Judge Roberts of this

Court fully discussed and set forth the applicable law regarding the claim of negligent infliction

of emotional distress:

> In the District of Columbia, a plaintiff may recover for negligent infliction of

5

emotional distress if the plaintiff proves (1) that the plaintiff suffered either a physical impact or was within the zone of danger of the defendant's actions, (2) that the plaintiff suffered emotional distress that was serious and verifiable, and (3) that the defendant acted negligently . . . With regard to establishing a serious and verifiable injury, the D.C. Court of Appeals has said:

> The fact that the different forms of emotional disturbance are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomoting , and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm.  On the other hand, long-continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character . . .

> *          *          *          *          *

> Contrary to defendants' assertion, Pourshayegan presented sufficient evidence for a reasonable jury to conclude that she suffered a serious and verifiable injury.  Pourshayegan testified that incident at the hospital "affects me to this day.  I dream about it.  I can't sleep."  In addition, David testified that Pourshayegan "cries a lot" because of the incident.  From this testimony, the jury could have reasonably inferred that Pourshayegan had experienced recurring nightmares, sleeplessness, and crying spells since the night of the incident on June 11, 2001.  As the D.C. Court of Appeals explained, long-lasting physical phenomena - - in this case, recurring nightmares, accompanying sleeplessness, and crying spells over four years- -may amount to a cognizable injury under the tort of negligent infliction of emotional distress. [Citations omitted.].

*Id.* at 89-90.

And as to the alleged requirement of expert testimony:

Defendants note that "there were no medical experts who testified on [Pourshayegan's] behalf at trial."  This is of no moment.  The D.C. Court of Appeals has not required that expert testimony be presented to establish a serious and verifiable injury, so it was not necessary for Pourshayegan to do so.  Pourshayegan's emotional distress was serious and verifiable and caused by defendants' negligence on June 11, 2001 Cf. *Daskalea v. District of Columbia*, 343 U.S.App. D.C. 261, 227 F.3d 433, 444 (D.C. Cir. 2000)(noting that "it does not take an expert to confirm the jury's common sense with respect to both [the]

existence and cause" of plaintiff's emotional distress).

*Id.* at n 3.

Once more, the defendants appear to be oblivious to the actual state of the law and instead posit that it is something different. *Jones v. Miller*, 290 A.2d 587 (D.C. 1972), a case cited by the defendants has absolutely no applicability to the case at bar. It was an automobile accident case that in no way supports the proposition that expert testimony is required to support a claim of negligent infliction of emotional distress. In fact, *Jones* did not even involve a claim for the infliction of emotional distress.

The defendants next cite *Jefferson v. Mil Vets Systems Technology, Inc.*, 1999 WL66027 (D.C. Cir. Jan. 26, 1999). Notwithstanding, the fact that this unpublished opinion has no precedential value, it simply does not support the defendants' position. What the D.C. Circuit actually said was:

> Whereas testimony from lay witnesses may be sufficient to establish that an individual is "distressed" in some fashion, it may not be sufficient to establish that an individual suffers from a particular medical condition such as **alcoholism or depression** which only professional medical care providers may be qualified to diagnose. [Emphasis added.]

The defendants intentionally omitted the highlighted language from their Memorandum. And while the defendants' omission is certainly understandable, it also demonstrates a rather disconcerting demonstration of desperation that is troubling to say the least.

Along this same line, the defendants suggest that *Edwards, supra*, supports their position as well. The defendants have to know that such is not the case. Judge Colyer was clear in *Edwards* that she was referring to the underlying conduct and the need for expert testimony in that regard.

> Similarly, expert testimony is needed to prove a claim for negligent infliction of emotional distress. *Fletcher v. District of Columbia*, No. 01-0297 2005 U.S. Dist. Lexis 5013, *23 (D.D.C. Mar. 22, 2005). In *Fletcher*, the plaintiff sued D.C. police officers who shot plaintiffs as he (sic) left the scene of a liquor store he had robbed. *Id.* at *4. The court found that the plaintiff was required to name an expert to testify that the officers had deviated from the proper standard of care in using their firearms. *Id.* at *23-24.

*Edwards*, *supra* at 45.

The defendants are wrong about when an expert is needed. Moreover, there is going to be medical testimony in this case in any event by treating physicians who, while not experts, will testify as to diagnosis, treatment, prognosis and causation. The injuries suffered by the plaintiffs are not complex at all. They can and will fully articulate what they are and should that testimony demonstrate a long-lasting phenomena, they will be entitled to the jury's verdict on this issue.

*David*, *supra* at 90.

### 3.  Other Alleged Incidents Involving The Defendants' Acts Are Admissible, As They Will Be Offered For Reasons Other Than To Show Bad Character

In order to prove their negligent hiring and supervision claims,

> it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and with that actual or constructive knowledge, failed to adequately supervise the employee.

*Giles v. Shell Oil Corporation*, 487 A.2d 610, 613 (D.C. 1985). Mr. Kane is a convicted felon, who served a prison sentence for malicious wounding. He is a member of a notorious group called the Four Horsemen known throughout the Metropolitan area for their violent propensities. Mr. Kane has been involved in a number of altercations some of which Mr. Iverson witnessed. Indeed, Mr. Iverson and Mr. Kane were involved in a strikingly similar physical altercation in Virginia just a few days prior to the subject incident. All of these facts are clearly admissible to

8

prove plaintiffs' claim for negligent supervision.

Specifically regarding the matters referenced by the defendants:

1.  The plaintiffs do not intend to introduce evidence of a shooting at a party hosted by Lavar Arrington;

2.  The plaintiffs do not intend to introduce evidence regarding a fight at Republic Gardens;

3.  The plaintiffs do not intend to introduce evidence regarding a shooting at the Zanzibar nightclub;

4.  The plaintiffs do not intend to introduce evidence, in their case in chief, regarding alleged misconduct by Mr. Iverson at the Zanibar nightclub

5.  The plaintiffs do not intend to introduce evidence in their case in chief, regarding defendant Kane and Lloyd Banks;

6.  Mr. Kane is a well known member of the Four Horsemen.  That group is well known for its violent propensities.  This evidence is admissible to establish negligent hiring and supervision on the part of Mr. Iverson;

7.  Ms. Isman, Mr. Brown, Mr. Cooper and Mr. Simmons are expected to testify in this case regarding the incident at Crabbers Restaurant in Virginia which occurred a few days before the incident which is the subject of this lawsuit.  Mr. Iverson and Mr. Kane were involved in that physical altercation.  This evidence is extremely probative of negligent supervision as Mr. Kane's actions were observed by Mr. Iverson.

8.  Mr. Iverson's tattoos are probative of his state of mind.  As to the word gang, Mr. Iverson refers to the members of Dynasty Raiders as  a "group," the plaintiffs intend to do the same.

The defendants also take issue with a videotape of the television show called "Punk'd," which was aired on MTV.  In that video, Mr. Iverson and his entourage arrive at a Los Angeles nightclub for a birthday party for Mr. Iverson.  As part of a prank, Mr. Iverson is told that he cannot enter the club because the President's daughters are about to enter.  Mr. Iverson and his entourage are advised of this fact by individuals posing as Secret Service Officers.  What occurs

at this point is an aggressive verbal confrontation in which Mr. Iverson participates. The significance of this video is threefold. First, it shows how Mr. Iverson responds to matters with which he disagrees, second it shows untoward conduct on the part of Mr. Kane and other members of Mr. Iverson's entourage which is condoned by Mr. Iverson and third, it places Terrance Williams at the event and acting on Mr. Iverson's behalf, with Mr. Iverson's acquiescence, which is important because Mr. Williams admits that he "whipped" plaintiff Godfrey's "ass," and because at no point did Mr. Iverson take any steps to stop the inappropriate conduct on the part of Mr. Williams in California or on the night of the subject incident.

In sum, the Punk'd video establishes that Mr. Iverson was fully aware of the fact that his employees, agents and/or members of his entourage over whom he exercised control "behaved in a dangerous or otherwise incompetent manner," and that Mr. Iverson failed to adequately supervise them. *Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 79 (D.D.C. 2005).

*          *          *          *          *

> One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.

*Griffin*, *supra* at *30-31. Thus, plaintiffs purpose in showing the Punk'd video is not as defendants argue to show "some sort of indictment on Defendants' character," Mot. Mem. at 11, instead, the plaintiffs' purpose for showing the video is in order to meet their burden for establishing their claim of negligent supervision. *Murphy*, *supra*, at 458 A.2d 63.[1]

---

[1]/ On pages 11, 12, 13 and 14 of their motion, the defendants complain that evidence of other incidents is irrelevant, does not relate to this case, is not material, is not probative and is

**4.  Evidence of Defendants' Arrest Records and Police Investigation**

•  Plaintiffs have no intention of seeking to introduce the record of the police investigation of this incident.

•  Plaintiffs have no intention of seeking to introduce the criminal history of defendant Iverson into the record of this proceeding unless it becomes an issue because of the defendants' testimony.

•  Plaintiffs do, however, intend to introduce evidence regarding defendant Kane's criminal history as it is probative of the issue of negligent supervision.  In fact, Mr. Kane is a convicted felon and served a prison sentence for "malicious wounding."  This is a fact that Mr. Iverson knew or should have known, and is clearly probative of the issue of negligent supervision.  This evidence is not being offered to show character or to impeach, it is being offered in support of a specific claim, negligent supervision.  Thus, neither F.R.E. 608, or 609

---

prejudicial.  However, the plaintiffs' burden on the issue of negligent supervision is to demonstrate that Mr. Iverson knew or should have known of the inappropriate conduct of his employees and that he failed to adequately supervise them.  By the very nature of the burden, plaintiffs must introduce evidence regarding prior incidents.  Thus, as a matter of law, these other incidents are relevant, material, probative, and while they are certainly prejudicial, they are not unduly prejudicial, nor is the probative value of the evidence outweighed by its prejudice. *Griffin*, *supra*; *Daka*, *supra*.

To be sure, the plaintiffs are mindful of the fact that "Federal Rule of Evidence 403 prohibits the admission of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice…."  However, as noted in *Cassel,* "Rule 403 "tilts, as do the rules as a whole, toward the admission of evidence in close cases," even when other crimes evidence is involved. *United States v. Moore,* 732 F.2d 983, 989 (D.C. Cir. 1984).  In performing the balancing test required under Rule 403, " 'it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged.' " Id. (quoting *United States v. Day,* 591 F.2d 861, 878 (D.C. Cir. 1978)).

are applicable.  Yet, even if Rule 609 were implicated, Mr. Kane does not recall when he was arrested, convicted, incarcerated or released from prison.  Accordingly, and contrary to the assertions of the defendants, there is no record evidence that supports the contention that such evidence should be excluded pursuant to F.R.E. 609(b).

**5.  Mr. Iverson's Tattoos**

The defendants contend that no evidence regarding Mr. Iverson's tattoos should be admitted into evidence because it is irrelevant, qualifies as inadmissible hearsay, and because the probative value of the tattoos is outweighed by their propensity to prejudice Mr. Iverson.  Mot. Mem. at 16.

Anyone who has ever watched Mr. Iverson in the televised basketball game knows that he has a number of tattoos.  Moreover, some of his tattoos are particularly relevant as they demonstrate his state of mind.  The following excerpts are insightful:

> Q.    Now, you have a number of tattoos that are visible.  Could you go through then and explain what each of them mean?
>
> A.    Panther mean a panther.
>
> Q.    Where's money?
>
> A.    Moeney.
>
> Q.    The bill?
>
> A.    Yes.  VA means Virginia.
>
> Q.    Where the VA?
>
> A.    Right here.
>
> Q.    I can't - - it's upside down, that's why?
>
> A.    Yes.

Q.    Now, wait a minute, could you hold it up?

A.    Yes.

Q.    There you go.
       VA?

A.    Finest.

Q.    Underneath it says finest.  What does that mean?

A.    Va's finest.

Q.    Okay, VA's finest.
       And the other one underneath that?

A.    Bad news.

Q.    Where is the bad news?

A.    Right here.

Q.    What's in between bad news?

A.    Respect.

Q.    Is that words?

A.    No.

Q.    What is that?

A.    It's a symbol.

Q.    What's the symbol?

A.    It's Chinese.

Q.    Okay, Chinese.
       And the bad news, what does that man?

A.    I'm from Newport News.  They call it the bad news.

13

\*          \*          \*          \*          \*

Q.      Now, is there any other on the hand, that arm, that we've missed?

A.      Soldier and hold my own.

Q.      What is the - - you have a drawing above soldier?

A.      Yes.

Q.      What is that?

A.      A skull with a helmet on.

Q.      What is the significance of that?

A.      Just a soldier.

Q.      A dead solider?
A.      No, a live soldier.

Q.      Without skin?

A.      It's alive.  If it's on a person that's alive, its alive.

Q.      Then above that was what now?

A.      Hold my own.

Q.      What does that mean?

A.      Hold my own.  Handle myself.

Q.      Handle yourself.
        Now, the other arm?

\*          \*          \*          \*          \*

Q.      Then under your watch is there another one?

A.      Yes.

14

Q.    What's that one?

A.    Fear no one.

Q.    And there is a drawing?

A.    Yes.

Q.    What is the supposed to be?

A.    Somebody scared.

Q.    What's the significance of fear no one?

A.    I fear no one.

Q.    Is that personal to you?

A.    Is it personal to me?

Q.     Yes.  Does it depict what you actually believe?

A.    Yes.  I don't fear nobody.

Q.    And then let's start here at the - - you have NBN on the outside?

A.    Yes.

Q.    What is that?

A.    Newport bad news.

Q.    Newport bad news.  The same as the other one?

A.    Yes.

Q.    And next to that?

A.    Right here?

Q.    Yes.

A.    Cruthik.

15

Q.    I think you discussed that earlier.  That was another name for the Dynasty Raiders; is that right?

A.    Yes.

Q.    Underneath that is what?

A.    Underneath it?

Q.    Yes.  Underneath Cruthik, what is that?

A.    Dynasty Raiders.

Q.    Dynasty Raiders, so it's all of it in one?

A.    Yes.

Defendants' Exhibit A at 116-126.

And in explaining the significance of Dynasty Raiders and Cruthik, Mr. Iverson said the following:

Q.    How long were you a member of Dynasty Raiders?

A.    All of my life.

Q.    Since birth?

A.    Since I was like 14, 15.

Q.    Until what time?

A.    Right now.

Q.    You're still a member?

A.    A member of what?

Q.    Dynasty Raiders.

A.    Its just a name that we call ourselves friends.

16

Q.    So you still go by that name?

A.    Yes.

                    *          *          *          *          *

Q.    What's Cruthick?

A.    Same thing.

Q.    How do you spell that ?

A.    C-R-U-T-H-I-K

Q.    What do you mean the same thing?

A.    Same thing as Dynasty Raiders.

Q.    So you're saying those two names are synonymous?

A.    Yes.

Q.    When did you use the name Dynasty Raiders versus when you began to
      use the name Cruthik?

A.    Same time.

Q.    Since you were 14 or 15?

A.    Yes.

Q.    Today you still refer to yourself as part of that group?

A.    Yes.

Q.    Have any of the members or people refer themselves as Dynasty Raiders
      been arrested?

A.    Yes.

Q.    Who?

17

A.    All of them

Defendants' Exhibit A at 16-19.

It is the plaintiffs' position in this case that Mr. Iverson lives a life based upon image, intimidation and perception.  Indeed, despite his wealth, Mr. Iverson's appeal is that of a wanna be gangster or thug.  He advances this persona by his disdain for authority and other anti-social behavior which includes aggressive physical behavior.  Mr. Iverson's tattoos reflect that persona and plaintiffs should be allowed to present that evidence to a jury.

Defendants failed to explain how a tattoo on the body of a party constitutes hearsay.  It matters not, however, since plaintiffs are not seeking to introduce the tattoos for the truth of what they depict, they are being introduce to show the state of mind of the owner of the tattoos.

### 6.  Mr. Iverson's Financial Status

The evidence of Mr. Iverson's financial status would only be introduced for purposes of establishing net worth for purposes of punitive damages.

### 7.  Media Accounts Of The Incident

The plaintiffs have no intention of introducing news accounts of the incident.  The News Channel 4 tape referenced by the defendants does, however, show plaintiff Godfrey shortly after the event and the injuries he received.  The tape would only be used for that purpose.

### 8.  Alleged Threats

The plaintiffs have no intention of introducing any evidence regarding any alleged threats in their case in chief.

### 9.  Diminished Value or Revenue

The plaintiffs do not intend to introduce any evidence regarding the "diminished value"

of their respective businesses.  They do, however, intend to testify about the losses they suffered as a result of the injuries they suffered.

Wherefore, for the reasons set forth herein and in the record of this proceeding, it is respectfully requested that defendants' motion be summarily denied.

Respectfully submitted,

Gregory L. Lattimer [371926]
1100 H Street, N.W.
Suite 920
Washington, D.C. 20005
(202) 638-0095

Stephanie Moran [471555]
Gregory Watson
Watson & Moran, LLC
8401 Corporate Drive
Suite 110
Landover, MD 20785
(301) 429-0505

Attorneys for the Plaintiffs

19