**BARBARA GRIFFIN, APPELLANT v. ACACIA LIFE INSURANCE COMPANY, D/B/A THE ACACIA GROUP, APPELLEE**

Nos. 02-CV-1451 and 02-CV-1452

DISTRICT OF COLUMBIA COURT OF APPEALS

2007 D.C. App. LEXIS 266

**February 26, 2004, Argued**
**May 24, 2007, Decided**



PLAINTIFF'S EXHIBIT 1

**NOTICE:**

THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**PRIOR HISTORY:** [*1]
Appeals from the Superior Court of the District of Columbia. (CA-6338-01). (Hon. Zoe A. Bush, Trial Judge).
Griffin v. Acacia Life Ins. Co., 151 F. Supp. 2d 78, 2001 U.S. Dist. LEXIS 10448 (D.D.C., 2001)

**COUNSEL:** Gary T. Brown for appellant.

Henry A. Platt, with whom Anessa Abrams and Katherine Brewer were on the brief, for appellee.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Edward A. Schwab, Deputy Solicitor General, and Alexis P. Taylor, General Counsel, Office of Human Rights, filed a brief for the District of Columbia as amicus curiae.

**JUDGES:** Before WASHINGTON, Chief Judge, FARRELL, Associate Judge, and TERRY, Senior Judge.

   * Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

**OPINION**

PER CURIAM: [1] Barbara Griffin appeals from two orders of the trial court granting summary judgment in favor of Acacia Life Insurance Company, her former employer. On appeal she contends (1) that her claim of retaliation under the District of Columbia Human Rights Act is not barred by the doctrine of election of remedies, and (2) that the trial court erred in granting summary judgment to Acacia on her claim of negligent supervision. We affirm in part and [*2] remand in part.

   1 Parts I and III of this opinion were written by Judge Terry. Part II was written partly by Judge Farrell and partly by Judge Terry.

I

A. *Factual Background*

Appellant, a longtime employee of Acacia, began working under the supervision of Arnold Rexroad, Manager of the Duplicating and Purchasing Department ("the Department"), sometime around March of 1995. On October 25, 1996, appellant informed Leon Stevens, an Acacia supervisor, that Mr. Rexroad had pulled down a co-worker's brassiere strap three weeks earlier. Mr. Stevens then met with Mr. Rexroad to discuss what appellant had told him. After that conversation with Mr. Stevens, Mr. Rexroad told appellant that her co-worker was lying. He also informed appellant that she was now going to be under the direct supervision of Mr. Stevens, and that she would have to move from her office into a cubicle.

Over the next few days, appellant had various meetings with Mr. Stevens, Mr. Rexroad, Acacia's Vice President Richard Fedalen, and Human Resources Specialist Patricia Franklin to discuss the changes that Mr. Rexroad had made in her working environment. At a meeting on October 29, 1996, appellant informed Mr. Fedalen and Ms. Franklin [*3] that she too had been the object of "inappropriate treatment" from Mr. Rexroad, and that the changes he had made in her work environment were made in retaliation for reporting him to Mr. Stevens. [2] Although appellant was eventually required to report to Mr. Stevens after the meetings in October, she did not have to move into a cubicle. [3]

2   Appellant asserted that Mr. Rexroad had flirted with her by (1) often asking her to join him for lunch and to take walks with him, (2) crawling under her desk on one occasion, allegedly to fix her computer, while she sat at the desk, (3) asking her three or four times for a picture of herself in a bathing suit, and (4) trying on one occasion to put his arm around her. These incidents allegedly took place at various times in 1990, 1991, and 1992. Appellant stated in her deposition that Mr. Rexroad's acts of harassment had ceased "a few months" prior to the meetings with Mr. Stevens and others in October of 1996.

3   In December of 1996, Acacia granted appellant's request to be moved out of the Department. Appellant also requested that she be allowed to report to a supervisor other than Mr. Stevens, but that request was not granted.

At some point in 1995, [*4] Acacia began planning both a reorganization of the Department and a move out of the District of Columbia. [4] Before reporting Mr. Rexroad's behavior to Mr. Stevens in October of 1996, appellant had been assured by Mr. Rexroad that she would still have a job after the move. However, because the Department was switching from typographical printing and hard storage of documents to an electronic publishing format, the nature of appellant's job was going to change. Appellant was initially willing to make the switch to a position in the new electronic publishing unit, but she later changed her mind.

4   In 1997 Acacia moved its offices to nearby Bethesda, Maryland, where it remains today.

On March 25, 1997, approximately five months after appellant had complained about Mr. Rexroad's behavior, Mr. Rexroad informed her that her job would be eliminated on August 1 because of the restructuring of the Department. [5] At that time, however, it appears that appellant was again given the opportunity to transfer to an electronic publishing position, but she did not accept it. [6] Acacia then gave the position to another employee, Edward Elko. [7]

5   Approximately one month before appellant's complaint to Mr. Stevens [*5] about Mr. Rexroad's conduct, Messrs. Fedalen and Rexroad had told the Department's employees that some of them might lose their jobs because Acacia was considering a switch to an independent contractor for printing and copying services after the move. In addition to appellant, four other employees eventually lost their jobs as a result of the restructuring and the move to Bethesda.

6   In her brief, appellant denies that she was offered the electronic publishing position.

7   Appellant asserts that Mr. Fedalen and Mr. Rexroad chose to terminate her even though they knew that she was better suited for the electronic job than Mr. Elko. Mr. Fedalen stated in his deposition that Mr. Rexroad felt that appellant was better suited for the position, and that, if appellant had taken the job, they would have had to fire Mr. Elko.

Appellant decided not to wait until her August 1 termination date. On May 5, 1997, she ceased working at Acacia. [8]

8   At a meeting on May 2, 1997, appellant was given a written warning because some customers had complained about her. Mr. Rexroad, Ms. Franklin, and appellant were present at that meeting. Thereafter, on May 5, appellant decided to use her accumulated sick leave so [*6] that she could remain on the payroll until her termination date in August. She also stated in a letter to Ms. Franklin that she did not want to return to work at Acacia and "wonder what further acts of retaliation I will have to face each day."

B. *Procedural History*

1. *Appellant's EEOC Claim*

On May 12, 1997, appellant filed a charge against Acacia with the United States Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. [9] On July 31, 1997, the EEOC dismissed that charge, concluding that it would "not be able to prove that [appellant was] discriminated against because of [her] sex (female) and in retaliation for protesting actions made unlawful by Title VII." It sent a right-to-sue letter to appellant which pointed out that she had been "made aware of [the pending] reorganization and potential job elimination, and [that she had been] offered an alternative position prior to [her] complaint to Respondent [Acacia]." Furthermore, according to the letter, "four other employees, three males and one female, lost their jobs as a result of the reorganization." The letter also stated that appellant's [*7] charge was "untimely" because she "could provide no specific incidents of sexual harassment that occurred after 1995."

9   42 U.S.C. §§ 2000e *et seq.* (2000).

2. *Proceedings in the District Court*

Almost four months later, on November 24, 1997, appellant filed a complaint against Acacia and Mr.

Rexroad in the United States District Court for the District of Columbia. Her complaint, as later amended, contained five counts alleging: (1) sex discrimination, in violation of Title VII, (2) retaliation, in violation of Title VII, (3) sex discrimination, in violation of the District of Columbia Human Rights Act ("DCHRA"), [10] (4) retaliation, in violation of the DCHRA, and (5) negligent supervision of Mr. Rexroad. [11] The defendants filed a motion to dismiss the amended complaint, and on July 13, 1998, Judge Thomas F. Hogan of the United States District Court issued a Memorandum Opinion granting in part and denying in part the motion to dismiss. [12]

> 10    D.C. Code §§ 1-2501 et seq. (1992) (recodified as D.C. Code §§ 2-1401.01 et seq. (2001)).
>
> 11    With respect to the last claim, appellant's amended complaint stated that "after being informed of the discriminatory and retaliatory conduct of Mr. Rexroad, Defendant [*8] [Acacia] negligently failed to supervise its Employee/Agent resulting in continued preventible harm to Plaintiff."
>
> 12    The District Court's Memorandum Opinion is included in the record on appeal. It may also be found at Griffin v. The Acacia Group, 1998 U.S. Dist. LEXIS 10854 (D.D.C. July 13, 1998).

The first argument presented by the defendants in their motion to dismiss was that appellant's Title VII sex discrimination claim against Acacia was not timely. Title VII states that a charge filed with the EEOC "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5 (e)(1). Appellant filed her claim with the EEOC on May 12, 1997, and the defendants argued that appellant missed the 180-day deadline because the last alleged incident of discriminatory conduct occurred on October 23, 1996. Appellant asserted in response that she had not 180 but 300 days to file with the EEOC, relying on an exception in Title VII and on the worksharing agreement between the EEOC and the District of Columbia Office of Human Rights ("OHR"). [13] Title VII does contain an exception to the 180-day filing period, which states that if the complainant [*9] has "initially instituted proceedings with a State or local agency ... such charge shall be filed ... within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5 (e)(1). The District Court concluded that "[e]ven though plaintiff did not file a claim with the D.C. agency, claims were instituted with the state agency on her behalf, by virtue of the work-share agreement ...." The court went on to say, "When plaintiff filed her claim with the EEOC, it was automatically cross-claimed with the [OHR]; therefore, plaintiff instituted a claim with the state agency, and the 300-day filing period applies." [14] As a result, the District Court held that "[s]ince plaintiff filed her claim with the EEOC within 300 days of the alleged unlawful conduct, plaintiff's claims are timely under Title VII."

> 13    Such worksharing agreements between the EEOC and state agencies are permissible and widespread. See EEOC v. Commercial Office Products Co., 486 U.S. 107, 112, 108 S. Ct. 1666, 100 L. Ed. 2d 96 (1988) ("the EEOC has used its statutory authority to enter into worksharing agreements with approximately three-quarters of the 109 state and local agencies authorized to enforce state and local employment discrimination [*10] laws"); see also 42 U.S.C. § 2000e-8 (b) ("the Commission may enter into written agreements with such State and local agencies"). In addition to extending the time for filing a complaint to 300 days, such agreements are also designed to overcome Title VII's requirement that "no charge may be filed [with the EEOC] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated ...." 42 U.S.C. § 2000e-5 (c).
>
> 14    The worksharing agreement between the EEOC and OHR for Fiscal Year 1998, of which we take judicial notice, see Fowler v. District of Columbia, 122 F. Supp. 2d 37, 40 n.4 (D.D.C. 2000) ("the D.C. Worksharing Agreement ... is a public record of which the court may take judicial notice"), provides in pertinent part:
>
>> In order to facilitate the assertion of employment rights, the EEOC and the [OHR] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the Agency that initially receives the charge. EEOC's receipt of charges on the [OHR's] behalf will automatically initiate proceedings of both [*11] the EEOC and the [OHR] for the purpose of Section 706 (c) and (e)(1) of Title VII. This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge. Charges can be transferred from one Agency to another in accordance with the

terms of this agreement or by other mutual agreement.

* * * *

For charges originally received by the EEOC and/or to be initially processed by the EEOC, the [OHR] waives its right of exclusive jurisdiction to initially process such charges for a period of 60 days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

The defendants' next argument in their motion to dismiss was that the Title VII retaliation claim was time-barred. [15] The defendants asserted that the time for filing started to run on the date when the alleged retaliatory action began, which was October 28, 1996. Appellant countered by arguing that there was a continuing violation for approximately six months, and that the retaliatory action did not end until she was terminated. The District Court agreed with appellant, concluding that "plaintiff has alleged [*12] a continuing violation, and that the last retaliatory act occurred in March 1997, when plaintiff learned that her position was being eliminated." [16] Furthermore, the court explained in a footnote that "[b]ecause the Court already decided that the 300-day time limitation was applicable here, this claim would be timely anyway; however, a decision on the proper date of retaliation is relevant to the DCHRA claims." With respect to the DCHRA retaliation claim, the District Court disagreed with the defendants' assertion that it was untimely. The court concluded that "[e]mploying March 1997 as the date from which to start the running of the statute of limitations [for the retaliation claim], plaintiff's filing of the complaint on November 24, 1997, satisfies the one-year time restriction for this filing under D.C. Code § 1-2556." [17]

15   The defendants also maintained that appellant did not sufficiently state a claim of retaliatory discharge, but the District Court ruled that "plaintiff has stated sufficient facts to maintain her claim for retaliatory discharge."

16   The District Court also pointed out that although appellant alleged that retaliatory actions had been taken against her until May [*13] of 1997, "[t]he Court need not decide whether the period began in March or May ... since plaintiff meets the filing deadline either way."

17   A one-year statute of limitations for a private cause of action was added to D.C. Code § 1-2556 (a) in 1997 and became effective on October 23, 1997, one month before appellant filed her complaint in the District Court. See D.C. Code § 1-2556 (a) (1998 Supp.); Historical and Statutory Notes to D.C. Code § 2-1403.04 (2001); *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 891 n.25 (D.C. 2003) (en banc).

The defendants also asserted that appellant's DCHRA sex discrimination claim was time-barred because appellant had failed to file suit within one year of the last alleged incident of discrimination. Since the date of that incident was October 23, 1996, they maintained, appellant should have filed her complaint in the District Court by October 23, 1997. [18] Appellant responded with the argument that the one-year statute of limitations period is tolled "while the complaint is pending [before the OHR]." [19] According to the District Court, appellant "argue[d] that since her filing with the EEOC caused an automatic cross-filing with the D.C. Office, that [*14] cross-filing should constitute tolled time because her complaint was technically 'pending before the Office.'" The District Court disagreed with appellant and dismissed her DCHRA sex discrimination claim, relying on the worksharing agreement:

Under the work-share agreement that exists between the EEOC and the DCOHR, the EEOC cross-claims with the DCOHR when a claimant files, in order to inform the DCOHR that a claim has been filed. The DCOHR may take jurisdiction within 60 days; if it does not, it defers jurisdiction to the EEOC. *Because the DCOHR did not assume jurisdiction in this case, it must have deferred jurisdiction to the EEOC.* Therefore, the DCOHR never had plaintiff's case, and there never was any action "pending before" the DCOHR which would allow tolling. [Emphasis added.]

Furthermore, the court said in a footnote:

Even if the mere cross-claim itself provides grounds for some tolling, DCOHR never accepted jurisdiction, so the action was in effect initiated and terminated in the DCOHR on the same day. A one-day tolling would not assist plaintiff's timeliness claim, so the Court need not decide the issue.

18  Appellant did not file her complaint until November 24, 1997.

19  The [*15] 1997 amendment to D.C. Code § 1-2556 (a), *supra* note 17, also included a sentence stating, "The timely filing of a complaint with the Office [of Human Rights] shall toll the running of the one year statute of limitations while the complaint is pending before the Office."

The defendants' final argument was that the DCHRA retaliation charge against Mr. Rexroad should be dismissed because individuals cannot be found liable under the statute. The District Court agreed with the defendants and dismissed the retaliation claim against Mr. Rexroad, concluding that "plaintiff cannot maintain a claim against defendant Rexroad in his individual capacity as a supervisor" because "DCHRA liability does not extend to individual employees."

After further proceedings, Acacia filed a motion for summary judgment on the Title VII claims, asserting that appellant had failed to file her complaint within ninety days after receiving the EEOC's right-to-sue letter. On July 23, 2001, Judge Richard W. Roberts of the United States District Court, to whom the case had been reassigned, issued a Memorandum Opinion granting the motion. *Griffin v. Acacia Life Insurance Co.*, 151 F. Supp. 2d 78 (D.D.C. 2001). Under Title [*16] VII, a plaintiff seeking to file a civil action must do so within ninety days of receiving the EEOC's right-to-sue letter. *See* 42 U.S.C. § 2000e-5 (f)(1). The court held that "[w]here, as here, the plaintiff does not know when she received the Right to Sue letter, Federal Rule of Civil Procedure 6 (e) creates a presumption that the letter was received three days after it was mailed." 151 F. Supp. 2d at 80 (citations omitted). Because the letter was mailed to appellant on August 7, 1997, the court ruled that appellant "presumptively received" it on August 11. *Id.* Appellant did not file her complaint until November 24, 1997, which was more than ninety days after the date of receipt. [20] Accordingly, the court granted Acacia's motion for summary judgment. The District Court also declined to exercise supplemental jurisdiction over the remaining DCHRA claims and dismissed those claims without prejudice pursuant to 28 U.S.C. § 1367 (c)(3). [21]

20  Since the actual third day after mailing, August 10, was a Sunday, the court extended the "presumptive" date of receipt until Monday, August 11. *See* 151 F. Supp. 2d at 80 n.2.

It appears that the court may have made a slight mistake in its calculations [*17] and that the presumptive date of receipt was actually Tuesday, August 12. See FED. R. CIV. P. 6 (a) (when the time to be determined is less than eleven days from the date of a given act, such as mailing, intermediate Saturdays and Sundays "shall be excluded in the computation"). Any such error, if it occurred, was harmless because appellant's complaint was filed more than ninety days after August 12.

21  28 U.S.C. § 1367 (c)(3) (2000) provides:

> The district court[ ] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .

3. *Proceedings in the Superior Court*

Appellant did not appeal from the District Court's decision. Instead, on August 22, 2001, less than a month after the District Court entered judgment against her, appellant filed a complaint in the Superior Court of the District of Columbia, alleging three counts against Acacia: (1) sex discrimination, in violation of the DCHRA, (2) retaliation, in violation of the DCHRA, and (3) common-law negligent supervision. [22] Some time later, Acacia filed a motion for summary judgment, contending (1) that appellant's DCHRA sex discrimination [*18] claim was "barred by the statute of limitations, res judicata and/or collateral estoppel," (2) that her DCHRA retaliation claim was "barred by the election of remedies," [23] and (3) that "a claim for negligent supervision cannot be based on alleged statutory violations."

22  Acacia was the only defendant named in the complaint which appellant filed in the Superior Court. One may reasonably infer that she took into account the District Court's ruling that "DCHRA liability does not extend to individual employees" and thus did not name Mr. Rexroad as a defendant.

23  The last act of retaliation alleged by appellant occurred on May 2, 1997, when appellant was given a written warning by Mr. Rexroad as a result of customer complaints. Appellant filed her initial complaint in the District Court on November 24, 1997, well within one year from this last alleged act of retaliation. Thus Acacia could not argue that her DCHRA retaliation claim was barred by the one-year statute of limitations.

On August 8, 2002, the trial court issued an order granting in part and denying in part Acacia's motion for

summary judgment. The court granted Acacia's motion with respect to appellant's DCHRA sex discrimination [*19] claim. [24] As for the DCHRA retaliation claim (Count II of the complaint), the court ruled that "[b]ecause plaintiff has taken the position in District Court that by filing a claim with the EEOC, she instituted a claim with the DHR, she may not now argue to the contrary." The court explained that "in U.S. District Court, Plaintiff took the position that her Title VII sex discrimination claim was timely filed because, when she filed a formal complaint with the Washington Field Office of the [EEOC], her claim was 'instituted' with the [OHR]." Thus the court concluded that appellant "elected an administrative remedy, [and] she is barred by the doctrine of election of remedies from pursuing the same claim before this Court." As a result, the trial court granted summary judgment in favor of Acacia on Count II. However, the court denied Acacia's motion with respect to Count III, concluding that appellant had "sufficiently pled an action for common law negligent supervision."

> [24] In its order the court ruled that appellant's "claims of sex discrimination alleged to have occurred subsequent to October 23, 1996, were not before the District Court and thus not tolled by 28 U.S.C. § 1367 (c), and [*20] are therefore untimely." Appellant has not challenged this ruling in the present appeal; consequently, this opinion will not address Count I of appellant's Superior Court complaint, and the judgment on Count I will be affirmed.

About two weeks later, Acacia filed a motion for reconsideration of the denial of its request for summary judgment on Count III. After responsive pleadings were filed, the court entered an order on November 15, 2002, granting summary judgment in favor of Acacia on the claim of negligent supervision. [25] This order terminated the case in the Superior Court. Appellant filed timely notices of appeal from the August 8 and November 15 orders.

> [25] The court stated that it understood Acacia to be arguing that "assuming that Plaintiff sufficiently pled an action for common law negligent supervision in her complaint, a common law claim for negligent supervision cannot be based upon an alleged violation of the [DCHRA] or Title VII ... as a matter of law."

II

Our standard of review of an order granting a motion for summary judgment is well settled. "This court reviews the grant of a motion for summary judgment *de novo*, [*21] applying the same standard as that utilized by the trial court." *Hollins v. Federal National Mortgage Corp.*, 760 A.2d 563, 570 (D.C. 2000) (citation omitted). "A motion for summary judgment should be granted whenever the court concludes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Joeckel v. Disabled American Veterans*, 793 A.2d 1279, 1282 (D.C. 2002) (citations omitted); *accord, e.g., Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Furthermore, we view the evidence "in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in that party's favor." *Woodland v. District Council 20*, 777 A.2d 795, 798 (D.C. 2001) (citation omitted). With these basic principles in mind, we turn to appellant's first claim of error.

The DCHRA's election of remedies provision states that a person seeking relief must choose between filing a complaint with the OHR and filing a complaint in court. D.C. Code § 1-2556 (a) (1992) (recodified as D.C. Code § 2-1403.16 (a) (2001)), states in part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action [*22] in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder; Provided, that where the Office [of Human Rights] has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed. No person who maintains, in a court of competent jurisdiction any action based upon an act which would be an unlawful discriminatory practice under this chapter may file the same complaint with the Office.

Under this statute, "[t]he filing of a complaint with the OHR constitutes an election of remedies." *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 397 (D.C. 1991). "Thus, where one opts to file with the OHR, he or she generally may not also file a complaint in court." *Brown v. Capitol Hill Club*, 425 A.2d 1309, 1311 (D.C. 1981).

Appellant's first argument on appeal is that the trial court erred in concluding that she elected an administrative remedy for her DCHRA retaliation claim. She maintains that the court erred because her filing with the EEOC was [*23] not a filing with the OHR. In the alternative, she contends that even if she did file with the OHR, the OHR dismissed her complaint for

administrative convenience, and thus her complaint "was never processed" by the OHR.

We need not address the first of these arguments, [26] because we conclude that the OHR's automatic dismissal of appellant's complaint in accordance with the worksharing agreement amounted to a dismissal "on the grounds of administrative convenience," D.C. Code § 1-2556 (a) (2001), with the result that she still had a right to sue in court "as if no complaint had been filed." *Id.*

> 26  Although appellant contends that she did not file a complaint with the OHR, in the District Court she argued (in explaining why she should benefit from Title VII's 300-day filing period) that she had indeed filed a claim with the OHR by virtue of the worksharing agreement. Acacia fairly argues that appellant "cannot have it both ways," and that collateral estoppel, *see, e.g., Kovach v. District of Columbia*, 805 A.2d 957, 962 (D.C. 2002), or perhaps equitable estoppel, *see Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1212 (D.C. 2002), should bar her from asserting the contrary now. Given our [*24] conclusion that appellant's OHR complaint was dismissed for "administrative convenience," as set forth in the text, we need not resolve this question.

It is important to remember how the worksharing agreement operates. Although it provides that the EEOC's receipt of charges automatically initiates proceedings simultaneously with the OHR, it further states that for charges initially received by the EEOC, the OHR "waives its right of exclusive jurisdiction to initially process such charges" in order to allow the EEOC to investigate the charges immediately. See note 14, *supra*. This meant, as Judge Hogan pointed out in the District Court, that the OHR effectively "never had [appellant's] case" because, rather than "assum[ing] jurisdiction," it "deferred jurisdiction to the EEOC."

It is clear, then, that the OHR never considered the merits of appellant's complaint of retaliation; rather, presumably exercising the choice given to it by the worksharing agreement to devote its investigative resources to complaints other than those lodged originally with the EEOC, it "constructively terminated" the complaint in favor of an EEOC investigation of it. *See, e.g., Nichols v. Muskingum College*, 318 F.3d 674, 682 (6th Cir. 2003) [*25] (complaint filed with state agency "was constructively terminated pursuant to the worksharing agreement and should be deemed filed with the EEOC on that same date"); *Puryear v. County of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000) ("[a] state's waiver of its right to initially process a charge thus constitutes a 'termination' of its proceedings"). [27] An automatic termination of this kind plainly entails no decision on the merits of the complaint; it is, instead, a housekeeping decision by the agency, important but strictly administrative, about how best to expend its scarce resources. [28] And that, in turn, is the sort of exercise of "prosecutorial discretion" that our decisions identify as a key element of the OHR's authority to dismiss on the ground of administrative convenience. *Honig v. District of Columbia Office of Human Rights*, 388 A.2d 887, 888 (D.C. 1978); *see also Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 760 (D.C. 1993) (en banc).

> 27  Accord, e.g., *Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3d Cir.), *cert. denied*, 522 U.S. 914, 118 S. Ct. 299, 139 L. Ed. 2d 230 (1997); *Hong v. Children's Memorial Hospital*, 936 F.2d 967, 970-971 (7th Cir. 1991); *Griffin v. Air Products & Chemicals, Inc.*, 883 F.2d 940, 943 (11th Cir. 1989).

> 28  Cf. [*26] *Universal Packaging Corp. v. New York State Division of Human Rights*, 270 A.D.2d 586, 588, 704 N.Y.S.2d 332, 334 (2000) (under state statute similar to D.C. Code § 1-2556, "state administrative dismissals are permitted to avoid duplicative proceedings and conserve scarce state resources"); *Kordich v. Povill*, 244 A.D.2d 112, 115, 676 N.Y.S.2d 331, 333 (1998) (same).

Indeed, were we to refuse to characterize the termination of appellant's complaint in this way, the effect would be to deny her any forum in which to pursue her retaliation claim. The federal court declined to exercise pendent jurisdiction over it, the OHR similarly declined to hear it pursuant to the worksharing agreement, and the election of remedies provision of section 1-2556 (a) would bar a court action unless the termination by the OHR were deemed a dismissal for administrative convenience. We hold accordingly that, when the OHR invokes the automatic termination provision of the worksharing agreement for complaints filed originally with the EEOC, that ruling constitutes a dismissal on the ground of administrative convenience under the statute, leaving the complainant free to pursue her cause of action in the Superior [*27] Court.

Because the trial judge erroneously ruled that appellant's retaliation claim was barred by the statutory election of remedies provision, summary judgment may not be sustained on that ground. Acacia nevertheless argues that the judgment can be affirmed on other grounds not reached by the trial court, namely, that appellant failed to establish a triable causal nexus between her complaints to the employer about Mr. Rexroad's behavior and her alleged retaliatory dismissal, and similarly failed to raise a genuine issue of whether the reasons for her termination were a pretext for retaliation.

Ordinarily, because the availability of summary judgment on particular facts is an issue of law, we would not be precluded from examining the record ourselves and evaluating these arguments without benefit of the trial court's prior consideration of them. In this case, however, we decline to do so. The main focus of the parties' legal analysis concerning the retaliation claim, both in the trial court and on appeal, has so far been on the issues of election of remedies, estoppel, and dismissal for administrative convenience which we have discussed. For summary judgment purposes, the evidence relevant [*28] to issues such as causation and pretext, essential to the retaliation claim, has not been marshaled by either side in a way that enables us to dispense with an initial, and thorough, ventilation of them by the trial court aided by the parties. We will therefore vacate the grant of summary judgment on appellant's claim of retaliation under the DCHRA (Count II of the complaint) and remand the case to the trial court for further consideration of that issue.

III

After Acacia filed a motion for reconsideration, the trial court granted summary judgment for Acacia on appellant's negligent supervision claim. Count III of the complaint asserted "that Ms. Griffin ... suffered injuries by Acacia's failure to properly supervise Mr. Rexroad, that Acacia failed to exercise reasonable care in its supervision of Mr. Rexroad, and that Acacia's improper supervision of Mr. Rexroad was the proximate cause of the injuries she suffered after she complained." The trial court, on reconsideration, granted the motion for summary judgment on Count III. It held that, "assuming that Plaintiff sufficiently pled an action for common law negligent supervision in her complaint, a common law claim for negligent supervision [*29] cannot be based upon an alleged violation of the D.C. Human Rights Act or Title VII of the Civil Rights Act of 1964 as a matter of law." We agree and affirm the grant of summary judgment on Count III.

This court has never squarely decided whether a common law claim of negligent supervision could be based on a statutory violation of the DCHRA. In *Daka, Inc. v. McCrae*, 839 A.2d 682 (D.C. 2003), we allowed a claim of negligent supervision to proceed on a theory that the employer engaged in sexual harassment of the plaintiff; however, the issue presented here was never raised by the parties or considered by the court. In a somewhat analogous context, we declined to decide whether a civil conspiracy claim could be predicated on a DCHRA violation, instead remanding the case because the issue had not been fully presented to the trial court. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000) (citing a New York case, *Monsanto v. Electronic Data Systems Corp.*, 141 A.D.2d 514, 529 N.Y.S.2d 512 (1988), which answered the question in the negative, applying New York law). Thus we consider the issue to be one of first impression in this case. [29]

29 After oral argument, [*30] the District of Columbia, at the court's request, filed a brief as *amicus curiae* "addressing the question of whether, assuming the factual posture as stated by the trial court, a plaintiff may allege a common-law cause of action for negligent supervision by an employer jointly with a claim of retaliation by the employer under the Human Rights Act." We are grateful to the District and its attorneys for their assistance in dealing with this difficult issue.

We begin our discussion by considering the nature of a negligent supervision action under the common law of the District of Columbia. In a traditional negligence action, a plaintiff must prove the existence of a duty of care owed by the defendant to him (or to a class of which he is a member), a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach. *E.g., District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). The cause of action for negligent supervision, derived from this standard negligence tort, recognizes that an employer owes specific duties to third persons based on the conduct of its employees:

> One dealing with the public is bound to use reasonable care to [*31] select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.

*Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951) (collecting cases from six states); *accord, Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002); *Morgan v. Psychiatric Institute of Washington*, 692 A.2d 417, 423 (D.C. 1997); *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985); *Murphy v. Army Distaff Foundation*, 458 A.2d 61, 63 (D.C. 1983). See generally RESTATEMENT (SECOND) OF TORTS § 317 (1965); RESTATEMENT (SECOND) OF AGENCY § 213 (1958). See also *Daka*, 839 A.2d at 693 (suggesting that an independent tortious act of an employee is likely necessary for employer liability under a negligent supervision theory).

The common law also imposed on employers

specific duties toward their employees, commonly classified as follows:

> 1. The duty to provide a safe place to work.
>
> 2. The duty to provide safe appliances, tools, and [*32] equipment for the work.
>
> 3. The duty to give warning of dangers of which the employee might reasonably be expected to remain in ignorance.
>
> 4. The duty to provide a sufficient number of suitable fellow servants.
>
> 5. The duty to promulgate and enforce rules for the conduct of employees which would make the work safe.

PROSSER & KEETON ON TORTS § 80, at 569 (5th ed. 1984) (footnotes omitted); *accord, Merchants' & Miners' Transportation Co. v. Maryland*, 108 Md. 564, 569, 70 A. 413, 415 (1908); *Wonder v. Baltimore & Ohio R.R.*, 32 Md. 411, 417 (1870). [30] *See also* RESTATEMENT (SECOND) OF TORTS § 314B (1) (1965) (duty to protect endangered employee).

> 30  This court may take notice of the common law of Maryland in the absence of contrary District of Columbia law. *See* D.C. Code § 45-401 (2001); *Day v. United States*, 682 A.2d 1125, 1129 (D.C. 1996); *Linkins v. Protestant Episcopal Cathedral Foundation*, 87 U.S. App. D.C. 351, 354, 187 F.2d 357, 360 (1950).

Notably not included among the duties of an employer that were recognized at common law is any duty to prevent the sexual harassment of an employee, when such conduct was not independently actionable under the common law prior to the enactment of the [*33] DCHRA. Put another way, the common law did not recognize an employer's duty to prevent the sort of sexual harassment alleged in appellant's complaint. [31] *See Hays v. Patton-Tully Transportation Co.*, 844 F. Supp. 1221, 1223 (W.D. Tenn. 1993) ("Sexual harassment has never been a common law tort; as a cause of action, it is a statutory creation" (discussing liability under Title VII and the Tennessee Human Rights Act)).

> 31  Appellant's claims of sexual harassment, while potentially actionable under the DCHRA, did not include any allegations of conduct independently tortious under the common law-- such as, for example, assault and battery or intentional infliction of emotional distress. See note 2, *supra*.

Guided by these principles, we conclude that a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law. [32] "A claim that an employer negligently supervised an employee who has sexually harassed a co-employee does not transmute sexual harassment into a common law tort." *Hays*, 844 F. Supp. at 1223. To hold otherwise "would be to impose liability on employers for failing to prevent a harm that is not a cognizable [*34] injury under the common law." *Id.*; *accord, Demby v. Preston Trucking Co.*, 961 F. Supp. 873, 881-882 (D. Md. 1997) (no negligent supervision claim for violations of Title VII); *Bryant v. Better Business Bureau*, 923 F. Supp. 720, 751 (D. Md. 1996) (no negligent supervision claim for violations of Title VII and the Americans with Disabilities Act); *cf. Monsanto*, 141 A.D.2d at 515, 529 N.Y.S.2d at 514 (no civil conspiracy claim for violation of the New York Human Rights Law). "The specific public policy involved here--prohibiting sexual harassment--is entirely a creature of statute except to the extent that it is manifested by other actionable wrongful conduct, e.g., assault and battery. ... Thus, respect for the legislature and its enactments requires that the rights of a victim of non-physical sexual harassment be limited by the remedies which the legislature has provided in the [Human Rights Act]." *Maxey v. M.H.M., Inc.*, 828 F. Supp. 376, 378 (D. Md. 1993) (discussing the Maryland Human Rights Act).

> 32  We have suggested--but not decided--that in an action seeking damages for negligent supervision, the conduct of the servant must be independently tortious. *See Daka*, 839 A.2d at 693 (citing, [*35] among other cases, *Rogala v. District of Columbia*, 333 U.S. App. D.C. 145, 157 n.9, 161 F.3d 44, 56 n.9 (1998), and *Schoff v. Combined Insurance Co. of America*, 604 N.W.2d 43, 53 (Iowa 1999)). Although we have never conclusively held that an independent tort of the employee is required to sustain a negligent supervision action, we find it unnecessary to decide that point in this case. For present purposes, it is sufficient to say that a negligent supervision action requires a breach by the employer of a duty owed to the plaintiff, and that this duty must be one imposed by the common law and not by statute.

This is not to say that a claim for negligent supervision cannot be based on a separate common law tort, which might also be grounds for a statutory claim under the DCHRA. "Sexual harassment ... may include misconduct by a co-employee that is independently actionable under the common law, such as battery or

intentional infliction of emotional distress." *Hays*, 844 F. Supp. at 1223. For example, a negligent supervision claim predicated on a battery might be pursued under a theory that the employer was negligent in allowing the battery to happen. Such tort actions are predicated on policy [*36] rationales separate and apart from the DCHRA. "Long antedating Title VII and the Act, public policy, as manifested in civil and criminal law, provided sanctions against attempted and consummated harmful and offensive touching of the person, whether or not sexually motivated. Had Title VII or the Act never been enacted, a clear mandate of public policy still supported [plaintiff's] recourse to legal redress ...." *Watson v. Peoples Security Life Insurance Co.*, 322 Md. 467, 485-486, 588 A.2d 760, 769 (1991) (discussing the Maryland Fair Employment Practices Law). Thus a negligent supervision claim could lie in a sexual harassment case if supported by a viable claim of independent tortious conduct as recognized at common law. But no evidence of independent tortious conduct of that kind was proffered or presented here.

By holding that a negligent supervision claim cannot be predicated on the DCHRA, we do not intend to suggest that the DCHRA pre-empts or otherwise abolishes common law causes of action based on the same set of operative facts. The issue presented here is distinct from the question of pre-emption. Our cases generally have accepted the notion (or assumed) that the DCHRA does not [*37] pre-empt traditional common law actions. For instance, we said in *Newman v. District of Columbia*, 518 A.2d 698 (D.C. 1986):

> The District makes no argument that the Human Rights Act ... abrogates the common law rights of injured individuals. Nor could that argument persuade. The Human Rights Act was designed to expand the remedies available to victims of discrimination, not merely to divert their grievances into a new channel.

*Id.* at 702 n.8 (citation omitted) (analogizing to Title VII); *see also Locklear v. Dubliner, Inc.*, 721 F. Supp. 1342, 1342 (D.D.C. 1989) ("common-law claims are not pre-empted by the [DCHRA]" (citing *Newman*)). The language of the DCHRA contains no explicit pre-emption of common law claims, and this court generally "follow[s] the presumption that the legislature does not intend to take away common law rights unless that purpose is clearly expressed in the statute." *Newman*, 518 A.2d at 703; *see also* D.C. Code § 2-1403.16 (2001) (authorizing private causes of action under the DCHRA); *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C. 1991) ("Civil rights statutes are remedial and must be generously construed"); *Dell v. Department of Employment Services*, 499 A.2d 102, 107 (D.C. 1985) [*38] ("No statute is to be construed as altering the common law, farther than its words import" (quoting *Shaw v. Merchants Nat'l Bank*, 101 U.S. 557, 565, 25 L. Ed. 892, 8 Week. Notes Cas. 221 (1879)). Furthermore, we have consistently permitted many mixed DCHRA and common law actions without even suggesting the possibility of pre-emption. *See, e.g., Pardue v. Center City Consortium Schools of the Archdiocese of Washington*, 875 A.2d 669, 670 & n.1 (D.C. 2005) (DCHRA claim combined with common law claims of breach of contract and defamation, the latter subsequently withdrawn); *Joyner v. Sibley Memorial Hospital*, 826 A.2d 362, 366 (D.C. 2003) (DCHRA claim combined with claims of assault and battery, false imprisonment, intentional infliction of emotional distress, and other alleged torts); *Knight v. Georgetown University*, 725 A.2d 472, 475 (D.C. 1999) (suit for wrongful discharge based on DCHRA and alleged promissory estoppel); *Roache v. District of Columbia*, 654 A.2d 1283, 1284 (D.C. 1995) (DCHRA claims joined with "unspecified common law claims"); *King v. Kidd*, 640 A.2d 656, 658 (D.C. 1993) (sexual harassment claim under DCHRA joined with common law claim of intentional infliction of emotional distress); *Howard University v. Best*, 484 A.2d 958, 985-986 (D.C. 1984) [*39] (DCHRA claim joined with contract and tort claims); *see also Green v. American Broadcasting Cos.*, 647 F. Supp. 1359, 1361 (D.D.C. 1986) (DCHRA claims joined with emotional distress claim); *Schoen v. Consumers United Group, Inc.*, 670 F. Supp. 367 (D.D.C. 1986) (DCHRA claims joined with contract and tort claims). We reach no new conclusion today on the subject of pre-emption.

Our holding in this case, moreover, is limited to the tort of negligent supervision. We recognize that previous cases have allowed common law claims for intentional infliction of emotional distress to be predicated on violations of the DCHRA. *E.g., Howard University v. Best*, 484 A.2d at 985-986. Our divergent approach to these two torts--negligent supervision and intentional infliction of emotional distress--is entirely appropriate. One of the hallmarks of an emotional distress claim is that conduct not generally actionable in individual instances can be made actionable through prolongation or repetition. *See, e.g.,* PROSSER & KEETON ON TORTS § 12, at 60-61. In *Best*, for example, we reversed a trial court's directed verdict, holding:

> [The plaintiff] made out a prima facie case of intentional infliction of emotional [*40] distress insofar as she demonstrated repeated "sexual harassment" by the man who was her supervisor. This evidence of a pattern of harassment was sufficient for the jury to find that [the supervisor]

intentionally and recklessly subjected [the plaintiff] to outrageous conduct which impaired her health. Creation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress.

484 A.2d at 986 (citation omitted). In such a case, the conduct is actionable at common law under an emotional distress theory, not because it happens to fall within the definition of sexual harassment in the DCHRA, but because the blatant and repeated instances of inappropriate conduct have risen to such a level that they may properly be regarded as extreme and outrageous. *See id.* at 985. Accordingly, although an emotional distress claim may be predicated on the same conduct as a DCHRA claim, it does not impose liability for "a harm that is not a cognizable injury under the common law."

*Hays*, 844 F. Supp. at 1223.

To sum up, we hold that a common law negligent supervision claim cannot be predicated on a violation [*41] of the DCHRA. It necessarily follows that the trial court did not err in granting summary judgment for Acacia on Count III.

IV

For the reasons stated in this opinion, the judgment is affirmed as to Counts I and III of the complaint and vacated as to Count II. The case is remanded to the trial court for further proceedings with respect to Count II of the complaint consistent with part II of this opinion.

*Affirmed in part, vacated in part, and remanded for further proceedings.*