IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARLIN GODFREY,** *et al.* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | |
| v. | * | Case No. 1:05-cv-02044 |
| | * | |
| **ALLEN IVERSON,** *et al.* | * | (ESH/DAR) |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION OF DEFENDANTS ALLEN IVERSON AND JASON KANE FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL, OR, IN THE ALTERNATIVE FOR A REMITITUR**

Comes now plaintiff Marlin Godfrey, by and through counsel, and hereby submit his opposition to the motion of defendants Allen Iverson and Jason Kane to set aside the verdict in this matter following a trial on the merits. As will be shown below, the subject motion has no merit whatsoever.

**I. STATEMENT OF RELEVANT FACTS**

As alleged in plaintiff's complaint, on July 20, 2005, at approximately 1:30 a.m. he was a patron of a nightclub called the "Eyebar" who was seated in the VIP section. While in the VIP section, defendant Allen Iverson entered the Eyebar led by his security detail and agents. He and his entourage were directed to the VIP section as well. When defendant Allen Iverson and his security detail and agents arrived at the VIP section, patrons already seated there were told to move in an intimidating manner by members of defendant Iverson's security detail and entourage.

Plaintiff Godfrey in particular was addressed by members of Defendant Allen Iverson's

security detail, entourage and was repeatedly told to leave the area even though he was seated in the VIP area before Defendant Allen Iverson and his entourage arrived and was appropriately seated in that area.

Ansley Grant and Curtiss Fitzgerald were members of the security staff at the Eyebar and were working at the time defendant Allen Iverson and his security detail entered the club. They noticed the hostility being directed by defendant Allen Iverson's security staff toward the other party in the VIP section which included Plaintiff Godfrey.

Because of the threatening manner in which defendant Allen Iverson's security and agents were acting, Mr. Grant and Mr. Fitzgerald decided to move the party of Plaintiff Godfrey to a table away from the Iverson party in an attempt to diffuse a situation that appeared to be tense and escalating within the Iverson party. All the while that the unwarranted actions were being taken by his security detail and agents, defendant Allen Iverson took no action whatsoever to calm his employees and agents and defendant Kane in particular.

Shortly after Grant and Fitzgerald moved the party of plaintiff Godfrey a short distance away from defendant Allen Iverson's party, Mr. Iverson's security detail and his agents initiated an unprovoked attack upon the plaintiff Godfrey that cleared the Eyebar. As opposed to exercising his duty of care and authority to stop the unwarranted attack by his security detail and agents, defendant Allen Iverson acted as if nothing out of the ordinary was occurring. As a result of the actions of defendants Allen Iverson and Jason Kane, plaintiff Godfrey suffered a concussion, a perforated eardrum, a damaged right eye, a torn rotator cuff and assorted contusions and bruises over a great extent of his body.

At all times relevant herein, defendant Jason Kane was acting in furtherance of his

employment, with defendant Allen Iverson and, as such, defendant Allen Iverson was responsible at all relevant times for the actions of Jason Kane under the doctrine of respondeat superior and/or vicarious liability.

## II. ARGUMENT

### A. Standard of Review

#### 1. Judgment As A Matter Of Law

In reviewing a motion for judgment as a matter of law, the Court cannot substitute its judgment for that of the jury, assess witness' credibility nor weigh the evidence. Mackay v. U.S., 8 F.3d 826, 829 (D.C. Cir. 1993). Moreover, in undertaking its review, the Court must review the evidence in the light most favorable to the plaintiff, the non-moving party, and resolve all conflicts in his favor. Id. In sum,

> the jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict.

Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1227 (D.C. Cir. 1984)

#### 2. New Trial

A trial court is entrusted with the discretion to order a new trial and its decision in this regard is reviewed on the basis of abuse of that discretion. Langevine v. District of Columbia, 106 F. 3d 1018, 1023 (D.C. Cir. 1997). When the trial court denies a motion for new trial, the scope of review is particularly narrow because its decision is in accord with the jury's. Id. On the other hand, when a trial court grants a motion for new trial, a more searching inquiry is required because of the concern that a judge's nullification of the jury's verdict may usurp the jury's fact finding function. Hutchinson v. Stuckey, 952 F.2d 1418 (D.C. Cir. 1992).

### 3. Remititur

A trial court may only label a verdict excessive if, and only if, it is "beyond all reason" or "so great as to shock the conscience." Williams v. Steuart Motor Co., 494 F.2d 1074, 1085 (D.C. Cir. 1974). A "generous" verdict may only be set aside if it is so unreasonable that it results in a miscarriage of justice. Langevine, supra., at 1024.

> Therefore, a jury's determination of damages may only be disturbed if it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate. [citations omitted]

Id.

**B. Based Upon The Facts Of Record, That Must Be Viewed In the Light Most Favorable To The Plaintiff, It Is Not Possible For The Defendants Here To Make Any Thing Resembling A Legitimate Argument That No Reasonable Juror Could Have Found In Favor Of The Plaintiff**

Incongruously, defendants claim that this Court should set aside the jury's verdict and enter judgment in their favor because 1) "There is neither substantial evidence nor a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff Godfrey on his claims; and 2)There is no evidence in support of key elements of intentional infliction of emotional distress and negligent supervision." Mot. Mem. at 5. It appears that the author of defendants' motion was either not present at the trial proceedings, and has not been afforded an opportunity to review the transcripts of the trial proceedings or is simply out of touch with reality. The evidence produced at trial that is favorable to the plaintiff is presented below in summary fashion:

**Sean Sturdevant** - Transcript of June 27, 2007 p.m.

- Mr. Godfrey did not appear to be intoxicated. Tr. at 32.

- He observed Jason Kane in Iverson's entourage. Tr. at 34-35.

- He had seen Jason Kane on previous occasions acting as a bodyguard.  Tr. at 37.

- He observed Mr. Kane punch, kick and hit Marlin Godfrey with a bottle.  Tr. at 42.

- He also saw Mr. Kane and another gentlemen striking Mr. Godfrey.  Tr. at 44.

- At no time did Mr. Iverson take any action to stop Mr. Kane.  Tr. at 45.

- At no time was Mr. Godfrey confrontational with Mr. Kane.  Tr. at 73.

- He observed Mr. Kane squaring off with everybody - - at no time did he see Marlin Godfrey square off with Mr. Kane.  Tr. at 74.

**Andre DeMoya** - June 28, 2007 Transcript a.m.

- He recognized Jason Kane in Allen Iverson's group.  Tr. at 28.

- Five or ten minutes after he observed Iverson and his entourage, he noticed that there was tension between Mr. Kittrell's party and Mr. Iverson's party.  As a result, he decided that because Mr. Kittrell was a regular, he would move his party over one table in an attempt to diffuse the situation.  Tr. at 32-33.

- He left the area to go to his office, when he returned he saw people fighting and his security was involved.  Subsequently, he noticed a gentleman on the ground bleeding from his head and that individual was Marlin Godfrey.  Tr. at 40-41.

- An ambulance was called for Mr. Godfrey because he was "beat up pretty bad."  Tr. at 43.

**Curtis Fitzgerald** - June 28, 2007 Transcript a.m.

- He has known Jason Kane for about 15 years.

- On July 17, 2005, he was working as security at the Eyebar.  Tr. at 100.

- He first saw Jason Kane with Mr. Iverson and he had a secuirty staff.  Tr. at 101.

- He and Jason Kane had words.  Tr. at 106.

• Jason Kane told him "you need to let these punk fags know when we come through to step out of the section" and he was talking about Marlin. Tr. at 107-08.

• He then stepped between Mr. Kane and M. Godfrey. At that point, Mr. Kane pushed him - - he fell - - after being pushed he went about 3 feet - - he fell into a wall. Tr. at 108-09.

• When he and Mr. Kane began having words, Mr. Iverson "stood up, stepped back and stepped over the top of the couch as if get out of the way. Tr. at 110.

• When he got up and charged at Mr. Kane, three people attacked him, one guy grabbed him and put him in a choke hold, one guy punched him in the face and one guy charged him from his right side. Tr. at 110.

• After having three (3) conversations with Jason Kane about the case, one of which occurred during the week of the trial, Tr. at 120-21, Mr. Fitzgerald denied that the testimony in his deposition regarding his observations of Jason Kane striking Godfrey, "Yeah, I known Jason punched him because I watched him," was something that he never said. Tr. at 118.

• When the altercation was about to begin at the Eyebar, Allen Iverson stepped up on the couch and smirked. Tr. at 148.

**Dr. Perry Alexion** - June 28, 2007 Transcript a.m.

• He began treating M. Godfrey on July 28, 2005 when he presented with a right ruptured eardrum. Tr. At 10.

• Mr. Godfrey's history was that he was assaulted and received a blow to the head. Tr. at 11.

• His injury was consistent with the history he provided. Tr. at 12.

• His initial hearing test demonstrated a mild hearing loss in the right ear. Tr. at 12.

• Mr. Godfrey's injury would be associated with "intense pain" "like a knife in the ear, a

sharp blast type of pain." Tr. at 14.

• At the time of Mr. Godfrey's last visit in September 2005, the ruptured eardrum had healed, however, he still had a slight loss of hearing in the right ear. Tr. at 15.

**Raymond Carnegie, Ph.d.** - June 28 , 2007 Transcript a.m.

• He first saw M. Godfrey on August 17, 2005. Tr. at 24.

• Initial assessment was that M. Godfrey was suffering from depression and Post Traumatic Stress Disorder. Tr. at 25, 29.

• When he first saw M. Godfrey, he was suffering from depression at a level of 9 on a scale of 1-10. Tr. at 29-30.

• He treated Mr. Godfrey for anxiety, uncertainty, fearfulness, helplessness and hopelessness from August 2005 to May 2006. Tr. at 30.

• In October 2006, M. Godfrey had improved, however, he had not gotten over the whole ordeal. Tr. at 32.

**Saul Simington** - June 28, 2007 Transcript a.m.

• He got to the Eyebar at approximately 12:00 a.m.. Tr. at 53.

• Allen Iverson arrived approximately five to ten minutes later. Tr. at 53-54.

• He knew Iverson's bodyguard to be "Jay." Tr. at 56.

• He observed Jay push the bouncer from the Club, Curtis , who flipped over a chair. Tr. at 58.

• Immediately after pushing the Club Bouncer, Jay grabbed a carafe bottle and hit M. Godfrey in the head several times until he went down. Tr. at 59.

**Marlin Godfrey** - June 28, 2007 Transcript p.m.

- He is 37 years old, has a BS degree in economics from North Carolina A&T University and he owns a martial arts school.  Tr. at 79.

- He arrived at the Eyebar around 12-12:30 a.m.  Tr. at 82.

- He was neither drunk nor intoxicated.  Tr. at 84.

- While talking to Club security he was verbally accosted by Terrence Williams and Jason Kane.  Tr. at 85-86.

- He tried to calm the situation with Jason Kane but was rudely rebuffed.  Tr. at 88.

- He observed Jason Kane shove Curtis, the Club's security, to the ground.  Tr. at 89.

- He observed Curtis Fitzgerald get jumped by a lot of people and when he stepped in the direction of where Mr. Fitzgerald was being attacked, things got very dark for him - - he knew he was being beaten but he couldn't understand why.  Tr. at 90.

- He never struck anyone, kicked anyone, nor swung at anyone, and he never got into a fighting stance.  Tr. at 92.

- After he was beaten, M. Godfrey went to George Washington Hospital's emergency room.  Tr. at 92.

- At the hospital, he received x-rays, CT scans and he had fluid drained from his ear.  Tr. at 93.

- When he went to the hospital he was bleeding from the head and ear, he couldn't breath because of a bruise to his right ribs, he couldn't move his right arm and he was disoriented.  Tr. at 93.

- By the time he left George Washington Hospital the next morning, a blood vessel had burst in his eye, his vision was impaired and he had a migraine headache.  Tr. at 93.

- He was subsequently treated at Sibley Hospital, with his primary physician, Dr. Chung who referred him to several other doctors. Tr. at 95.

- M. Godfrey suffered a ruptured eardrum, bruises and lacerations to the head and shoulders, a torn rotator cuff, a concussion, a ruptured vessel in his eye and bruises to his ribs. Tr. at 95.

- He continued to have bleeding from his head and pain from the injuries to his head for 6 months. Tr. at 99.

**Jamal Daniels** - June 29, 2007 Transcript p.m.

- Jason Kane had Marlin Godfrey and he was kicking him and throwing glasses and thing like that at him. Tr. at 87.

- He recognized Jason Kane from the show Punk'd. Tr. at 85-86.

**David Kittrell** - June 29, 2007 Transcript p.m.

- He saw Jason Kane hit Marlin Godfrey in the head with a bottle and knock him down. Tr. at 43.

- He saw Jason Kane hit Marlin Godfrey in the head with a bottle. Tr. at 67.

- Marlin Godfrey was beaten for about five (5) minutes by Jason Kane, Terrence Williams and other members of Allen Iverson's entourage. Tr. at 70.

Based on the foregoing, it is most apparent that a reasonable jury could and more importantly, did in fact find in favor of Mr. Godfrey. The law in this regard is abundantly clear. Federal Rule of Civil Procedure 50 permits a court to grant a motion for judgment as a matter of law if "a party has been fully heard on an essential issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). A defendant seeking judgment as a matter of law under Rule 50 must demonstrate that "the evidence and all reasonable

inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *McGill v. Munoz,* 203 F.3d 843, 845 (D.C. Cir. 2000). "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence," *Hayman v. Nat'l Academy of Sciences,* 23 F.3d 535, 537 (D.C. Cir. 1994), nor "substitute its judgment for that of the jury," *Boodoo v. Cary,* 21 F.3d 1157, 1161 (D.C. Cir. 1994). The evidence must be viewed in the light most favorable to the non-moving party and all conflicts must be resolved in that party's favor. *Mackey v. United States,* 8 F.3d 826, 829 (D.C. Cir. 1993). In sum, the "jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom[,] is so one-sided that reasonable men could not disagree on the verdict." *Carter v. Duncan-Huggins Ltd.,* 727 F.2d 1225, 1227 (D.C. Cir. 1984).

Under any reading of the applicable law, the facts favorable to the plaintiff preclude judgment in favor of the defendants. Conspicuously, the defendants do not attempt to demonstrate how the evidence in this case, when viewed in the light most favorable to the plaintiff, consistent with applicable law, fails to establish an assault and battery. The testimony of Sean Sturdevant, Saul Simington, Jamal Daniels and David Kittrell clearly establish that Jason Kane committed an assault and battery upon Marlin Godfrey. Any suggestion to the contrary is just absurd.

        **C.    The Conduct Of Jason Kane Was Nothing If Not Extreme And Outrageous And Every Element Of That Cause Of Action Was Irrefutedly Established**

Incredulously, the defendants after correctly noting that in order to prove intentional infliction of emotional distress one has to present evidence of (1) "extreme and outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." *Joyner v. Sibley Memorial Hosp.*, 826 A.2d 362, 272 (D.C. 2003), nonetheless conclude that there was no legally

-10-

sufficient evidentiary basis for the jury to find that Defendant Kane intentionally inflicted emotional distress on Plaintiff Godfrey even when construing the evidence and all reasonable inferences in Godfrey's favor.  Mot. Mem. at 5.

The evidence most favorable to the plaintiff regarding Mr. Kane's conduct was that he beat Mr. Godfrey about the head with a bottle, beat him with his fists, kicked him in the body and head, and that at no time did Mr. Godfrey take any aggressive action against Mr. Kane, or strike Mr. Kane in any manner.  The further testimony at trial was that Mr. Kane suffered from post traumatic stress disorder and has yet to fully recover from the entire ordeal.  In describing Mr. Godfrey's depression following the assault, Dr. Carnegie testified that Mr. Godfrey's condition was 9 on a scale of 1-10. There is no question that Mr. Godfrey suffered emotional distress, there is no question that such distress was severe and caused by the beating that he received at the hands of Jason Kane, and there is no question that the actions of Mr. Kane were both intentional and outrageous.  The tort of intentional infliction of emotional distress was established and that fact is not changed by the rantings of the defendants to the contrary who have made no attempt to support their position with an analysis of the evidence favorable to the plaintiff.

Typical of the liberties that the defendants take with the truth, they have cited a number of authorities for the proposition that the law in the District requires that a finding of intentional infliction of emotional distress requires a "pattern" of conduct.  That, in a nutshell, is a false representation.  There is no case anywhere that stands for that proposition.  Under that warped logic, one could set another on fire causing him extreme pain and discomfort for an extended period of time. But, because he never did that before, he would not be subject to a claim of intentional infliction of emotional distress, notwithstanding the psychological damage inflicted upon the victim by such a vile

-11-

act.

### D. The Evidence of Negligent Supervision On The Part Of Allen Iverson Was Uncontradicted

At trial, the evidence as noted above is that Allen Iverson took no action whatsoever to supervise Jason Kane before or after he attacked Curtis Fitzgerald or before or after he attacked Marlin Godfrey. The law in this regard is clear.

> The cause of action for negligent supervision . . . recognizes that an employer owes specific duties to third persons based on the conduct of its employees:
>
>> One dealing with the public is bound to use **reasonable care** to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When as employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. [Citations omitted.].

*Griffin v. Acacia Life Insurance Company*, 2007 D.C. App. Lexis 266 (May 24, 2007). There are no contrary authorities in the District of Columbia

> Aside from the question of vicarious liability, appellee may be directly liable if it failed to **exercise reasonable care** to avoid harm under the circumstances. Under the approach to liability, the employer's duty to supervise is not merely to be judged by the concept of respondeat superior.

*Murphy v. The Army Distaff Foundation, Inc.*, 458 A.2d 61, 63 (D.C. 1983).

   \*   \*   \*   \*   \*

> To establish negligent supervision, "it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."

*Daka v. McCrae*, 839 A.2d 602, 689 (D.C. 2003).

Notwithstanding the fact that the law in the District of Columbia is clear, consistent and

unequivocal, the defendants contend that *Edwards v. Okie Dokie, Inc.*, 473 F.Supp.2d 31 (D.D.C. 2007), somehow supports their position. It does not. The Edwards Court noted the following:

> Whether the specific action by these security personnel were reasonable under the circumstances, i.e., whether they used excessive force, is not the issue with regard to Plaintiffs' false arrest/false imprisonment claim. The question is whether the Nightclub security acted lawfully when they detained the Plaintiffs and reported on their actions to the MPD. The answer to that question is inevitably "yes . . " Given the facts in the record, those was no "unlawful detention" and thus no false arrest.

*Id.* at 44-45. Clearly, the facts of *Edwards* are far different here and the *Edwards* court made a number of statements in "dicta" that simply were not correct statements of the law. For instance, the following statement is indicative of that

> Under D.C. law, expert testimony is required to prove deviation from the applicable standard of care in a negligence action.

*Id.* Unquestionably, that is not the law in the District of Columbia. *Daskalea*, supra at 227 F.3d 445. Moreover, *Parker v. Grand Hyatt Hotel*, 124 F.Supp.2d 79 (D.D.C. 2000), which the *Edwards* court relies upon as authority for the requirement of expert testimony, merely stands for the proposition that expert testimony is required to support a negligent supervision claims premised on inadequate training of Hyatt security personnel and District of Columbia police officers:

> In this case, expert testimony would be necessary to assist a jury in establishing the following: (a) the standard of care which Hyatt and the District of Columbia are subject to in the training of their security personnel and police officer; (b) whether the officers and Mr. Ricalde breached their duty of care; and ( c) whether such breach contributed to the plaintiffs' damages . . . A jury evaluating this count of negligent supervision, having only the facts and arguments submitted by the plaintiffs in front of them would be forced to engage in "idle speculation" regarding the duty of care governing Hyatt and the District of Columbia in the training of their employees . . .

*Parker*, supra at 89-90.

The fact of the matter is that expert testimony was not necessary in this case as there are no

issues that were beyond the ken of the average layman, insofar as plaintiff's claim of negligent supervision is concerned. The jury instruction read by the Court clearly, and rightly sets forth the applicable law. The problem here is not the Court's instruction, the problem is simply that the defendants do not agree with the Jury's verdict.

As to the assertion that there was no evidence establishing a standard of care or duty owed by defendant Iverson to Marlin Godfrey, the duty is one of ordinary care. The defendants position in this regard simply makes no sense.

### E. The Court Made No Erroneous Evidentiary Rulings Directed Toward The Defendants That Were Anything Other Than Harmless

The suggestion that cross-examination should have been allowed of Marlin Godfrey regarding an alleged restraining order that was withdrawn, to somehow challenge his character for truthfulness or untruthfulness is utterly ridiculous. The Court properly ruled that the probative value of such inquiry was seriously outweighed by the prejudice, and there was no abuse of discretion in that regard As to the other alleged erroneous evidentiary rulings, each of those matters were addressed pretrial and the plaintiff incorporates the pleadings associated with those issues herein.

### F. There Is No Basis For A New Trial That Exists In This Case

Federal Rule of Civil Procedure 59 provides that "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). "Discretion to grant a new trial has generally been understood to include actions rendering the trial unfair." *Sparshott v. Feld Entm't Inc.,* 311 F.3d 425, 433 (D.C. Cir. 2002). A new trial should be granted "if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was

not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions." *Nyman v. FDIC,* 967 F. Supp. 1562, 1569 (D.D.C. 1997) (citing 11 C. Wright, A. Miller & Cooper, Federal Practice and Procedure § 2805 (1973)). Although the standard under Rule 59 is "less onerous" than under Rule 50, *id.* (citing *Lewis v. Elliott,* 628 F. Supp. 512, 516 (D.D.C. 1986)), a Rule 59 motion should generally be granted "only where the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice,'" *Sedgwick v. Giant Food Inc.,* 110 F.R.D. 175, 176 (D.D.C. 1986) (quoting *Chedd-Angier Prod. Co. v. Omni Publ'n Int'l,* 756 F.2d 930, 934 (1st Cir. 1985)).

When tested against the standards set forth above, there is not a single fact that the defendants can identify that would entitle them to a new trial. In sum, no new trial is warranted on the false facts being advanced by the defendants. None of the other arguments raised by the defendants have not been previously addressed and ruled upon by the Court.

### G.    The Defendants' Cannot Articulate A Basis For A Remititur

In the D.C. Circuit, a remititur of a jury verdict is only appropriate if the reduction gives to the plaintiff the highest amount the jury tolerably could have awarded. *Carter v. District of Columbia*, 795 F.2d 116, 135 n. 13 (D.C. Cir. 1986). Moreover, the Court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries. *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997). No basis exists in this case for a remititur let alone a new trial. There was nothing excessive about the damages awarded in this case. A man was beaten to a bloody pulp by Jason Kane and other members of Mr. Iverson's entourage. It would be a miscarriage of justice if the plaintiffs was deprived of any portion of the jury's award. What happened to this plaintiff shocks the conscience, the jury's award was nothing

short of justice. Comparing this case with the facts and analysis of *Langevine*:

>Verdicts may be labeled excessive, however, only when they are "beyond all reason" or "so great as to shock the conscience." *Williams v. Steuart Motor Co.,* 161 U.S. App. D.C. 155, 494 F.2d 1074, 1085 (D.C. Cir. 1974). Courts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice. *See Barry v. Edmunds,* 116 U.S. 550, 565, 29 L. Ed. 729, 6 S. Ct. 501 (1886). Therefore, a jury's determination of damages may only be disturbed if it "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Jeffries v. Potomac Dev. Corp.,* 261 U.S. App. D.C. 355, 822 F.2d 87, 96 (D.C. Cir. 1987). Indeed, because the Seventh Amendment right to a jury trial pervades the realm of jury verdict decisions, this circuit allows [**17] remittitur of jury verdicts only if the reduction "permits recovery of the highest amount the jury tolerably could have awarded." *Carter v. District of Columbia,* 254 U.S. App. D.C. 71, 795 F.2d 116, 135 n.13 (D.C. Cir. 1986). A court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries. *See Ruiz v. Gonzalez Caraballo,* 929 F.2d 31, 34 (1st Cir. 1991) ("Translating legal damage into money damages--especially in cases which involve few significant items of measurable economic loss--is a matter peculiarly within a jury's ken.") (quoting *Wagenmann v. Adams,* 829 F.2d 196, 215 (1st Cir. 1987).
>
>In this case, the jury awarded Langevine $ 1,500 for property damage to her car and glasses and $ 200,000 for "bodily injury, physical pain and suffering, [and] mental anguish." App. 43. The award was supported by evidence that: (1) Langevine's glasses were broken during her arrest and her car was damaged when Officers Kelsey and Johnson left it unattended on the street rather than impounding it for safekeeping; (2) Langevine's arms were wrenched behind her and her face slammed into the hood of the police car at the time of her arrest; [**18] (3) Langevine's wrists were bruised by the handcuffs, and the bruises were still visible at trial, more than three years after her arrest; (4) Langevine suffered headaches and neck pain after the incident; (5) Langevine was humiliated in front of her daughters; (6) Langevine suffered emotional distress during her arrest and incarceration and feared for her safety; (7) Langevine suffered humiliation and loss of reputation when she was forced to explain to her church and an elderly woman for whom she cares that she was absent from services because she had been arrested; (8) long after her arrest, Langevine continued to feel "spiritually wounded" and to fear police officers. Although the jury found against Langevine on her assault and battery claim, the import, if any, of that verdict was before Judge Robinson at the time he ruled. For the damages awarded for the liability found, it surely was not an abuse of discretion for Judge Robinson to conclude that the verdict was not so unreasonably high as to result in a miscarriage of justice.
>
>We find that Judge Robinson did not abuse his discretion in reinstating the

> jury's verdict. The jury obviously believed that Langevine's emotional and [**19] other intangible damages were significant. The jury's valuation of those damages was neither "beyond all reason" nor "so great as to shock the conscience." *See Williams,* 494 F.2d at 1085.

*Id*., unequivocally demonstrates that a remitittur is wholly unwarranted.

Wherefore, for the reasons set forth herein and in the record of this proceeding, and in particular the evidence adduced at trial, it is submitted that the defendants' motions for post trial relief are wholly without merit and should be summarily denied.

Respectfully submitted,

Gregory L. Lattimer [371926]
1100 H Street, N.W.
Suite 920
Washington, D.C.  20005
(202) 638-0095

Stephanie D. Moran [471555]
E. Gregory Watson
Watson & Moran, LLC
8401 Corporate Drive
Suite 110
Landover, MD 20785
(301) 429-0505
Counsel for the Plaintiffs
