UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


MARLIN GODFREY, et al.,           .
                                  .
        Plaintiffs,               .
                                  .  CA No. 05-2044 (ESH)
    v.                            .
                                  .  Washington, D.C.
ALLEN IVERSON, et al.,            .  Tuesday, July 3, 2007
                                  .  2:24 p.m.
        Defendants.               .
                                  .  Afternoon Session
. . . . . . . . . . . . . . . .



DAY 5
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs          GREGORY L. LATTIMER, ESQ.
                            Law Offices of Gregory L. Lattimer
                            1100 H Street, NW
                            Suite 920
                            Washington, D.C. 20005
                            202-638-0095

                            STEPHANIE D. MORAN, ESQ.
                            EDWARD G. WATSON, ESQ.
                            Watson & Moran, LLC
                            8401 Corporate Drive
                            Suite 110
                            Landover, Maryland 20785
                            301-429-0505

For the Defendants:         WILLIAM R. MARTIN, ESQ.
                            THOMAS R. BUNDY, III, ESQ.
                            Sutherland, Asbill & Brennan, LLP
                            1275 Pennsylvania Avenue, NW
                            Washington, D.C. 20004
                            202-383-0100

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
APPEARANCES (Continued)        ALAN C. MILSTEIN, ESQ.
                               Sherman, Silverstein, Kohl,
                               Rose & Podoski
                               Fairway Corporate Center
                               4300 Haddonfield Road
                               Suite 311
                               Pennsauken, New Jersey 08109
                               856-661-2067


Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               Official Court Reporter
                               U.S. Courthouse, Room 4808-B
                               333 Constitution Avenue, NW
                               Washington, D.C. 20001
                               202-216-0313
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1                    P R O C E E D I N G S
2         THE COURT:  Okay.  Are we ready?
3         MR. MARTIN:  Yes, Your Honor.
4         THE COURT:  Want to get your witness?  Okay.  Anything
5    else before we bring in the jury?  Okay.  You all had a chance
6    to look at the instructions?
7         MR. MARTIN:  We looked at them, yes.
8         THE COURT:  Mr. Lattimer did, too?
9         MR. LATTIMER:  I looked at them yesterday, Your Honor.
10        THE COURT:  It's my best student, Mr. Lattimer.
11        MR. LATTIMER:  There you go.
12        THE COURT:  All right.
13      (The witness resumes the stand.)
14      (Jury in at 2:25 p.m.)
15        THE COURT:  Okay.  Good afternoon, ladies and
16   gentlemen.  Hope you had a good lunch and nobody bothered you.
17   You didn't have any discussions with anybody about anything
18   important?  Okay.  Very good.
19      Sir, you're still under oath.  Go ahead, Mr. Martin.
20               DIRECT EXAMINATION - Continued
21   BY MR. MARTIN:
22   Q.   Mr. Williams, before the lunch break I had asked you some
23   questions about the softball game out at Bowie complex.
24   A.   That's correct.
25   Q.   I'd asked you some questions about the work that you were
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   doing.  I'd like to move from the softball game now, and to the
2   night of the July 19th and the early morning hours of July 20th,
3   2005, at the Eyebar.
4        Did you go to the Eyebar that night?
5   A.   Yes.
6   Q.   Can you tell the jury what your plans were?  What did you
7   intend to do, or who did you intend to meet at the Eyebar?
8   A.   I was meeting two associates, Jerry Vines and Tara, at the
9   Eyebar that evening.
10  Q.   What were you going to do with Mr. Vines?
11  A.   Well, me and Mr. Vines, we were planning a tour.  It was a
12  Lady's Night Out tour with Ginuwine, Ginuwine Joe, Avant, and
13  Jagged Edge.  So we had some major details we were trying to
14  tweak before --
15  Q.   I'm going to show you down a minute and go back over that.
16       First, who was Jerry Vines?
17  A.   Jerry Vines was Ginuwine's manager at the time.
18  Q.   What discussions were you planning on having with Mr. Vines
19  that night?
20  A.   Just really everything about our tour coming up.  We really
21  had to set a lot of details:  Routing, we was trying to --
22  payment, staff.  So things of that nature.
23  Q.   You said something about Ladies Night Out.  What was that?
24  A.   That's the name of the tour, Ladies Night Out.
25  Q.   That was Ginuwine's tour, Ladies Night Out?

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    A.    That was the tour that those four groups were on.

2    Q.    And that was in '05?

3    A.    Yes, it was.

4    Q.    If you recall, when did you make arrangements or when did

5    you talk to Mr. Vines, to arrange to get together that night at

6    the Eyebar?

7    A.    We actually talked Monday night, the night before -- day

8    before, actually.

9    Q.    And for Ms. Barrows, Tara Barrows, when did you make

10    arrangements with her?

11    A.    She was coming down anyway to see family.  So probably, day

12    before also, that Monday.

13    Q.    Did any of your plans include -- have anything to do with

14    Jason Kane?

15    A.    No.

16    Q.    Did any of the plans you had for the Eyebar have anything

17    to do with either Jason Kane or Allen Iverson?

18    A.    No.

19    Q.    Now, I asked you some questions earlier about Mr. Kane ever

20    hiring you, or Mr. Kane ever supervising you as -- in a security

21    position.  At any time, any time, has Allen Iverson ever

22    supervised you while you were doing security work?

23    A.    No.

24    Q.    Did he do anything in any way to tell you what to do

25    regarding security?

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    A.    No.

2    Q.    And that would be at Crabbers, correct?

3    A.    Correct.

4    Q.    The answer would be no for Crabbers?

5    A.    Correct.

6    Q.    The softball game?

7    A.    The answer would be no.

8    Q.    And for the Eyebar?

9    A.    The answer would be no.

10   Q.    No supervision?

11   A.    No supervision at all.

12   Q.    Do you know a young lady by the name of Robin at the

13   Eyebar?

14   A.    That is correct.

15   Q.    Who is Robin?

16   A.    Robin is a promoter.

17   Q.    Did you have occasion to speak with Robin the night of

18   July 19th?

19   A.    Yes.

20   Q.    Can you tell the jury what the conversation was that you

21   had with Robin?

22   A.    Conversation was that she didn't have a table for us when I

23   arrived, which she was supposed to have a table for us.  She

24   didn't have a table for us.

25              THE COURT:  She did or did not?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE WITNESS:  Did not.

 2         So it was like, okay.  And then she informed me that Jason

 3    and Mr. Iverson will be attending the same event that I was at,

 4    also.

 5    BY MR. MARTIN:

 6    Q.   Had you heard that Mr. Iverson or Mr. Kane would be coming

 7    to the Eyebar prior to Robin telling you?

 8    A.   No.

 9              THE COURT:  And did you learn from Robin when you were

10    at the Eyebar, or before?

11              THE WITNESS:  When I was at the Eyebar, when I didn't

12    receive my table.

13    BY MR. MARTIN:

14    Q.   Approximately what time was this?

15    A.   I really can't recall, so I'm going to say about 11:30,

16    11:45, somewhere in that area.

17    Q.   Can you tell the jury what happened when you got to the

18    Eyebar after you spoke with Robin?

19    A.   Spoke to Robin.  Me and Jerry proceeded to go in, went to

20    the bar to get a drink.  I don't drink, so just give me

21    cranberry and orange juice.  Jerry wanted a drink.  Went to the

22    bar area, talked for a little bit.

23    Q.   Do you drink alcohol at all?

24    A.   No.

25    Q.   Not at all?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

 1    A.   No.  So, continue?

 2    Q.   Please continue.

 3    A.   Stayed at the bar for a little bit.  It was very crowded at

 4    the bar, very crowded.  So we seen there was another area where

 5    it was not as crowded as where we were, so we could conduct our

 6    business.  At that time, we was going back to that area.

 7    Q.   What area are you describing now?

 8    A.   Towards the VIP area.

 9    Q.   Who was going back to that VIP area?

10    A.   Myself and Jason.  I mean, excuse me.  Myself and Jerry.

11    Q.   Can you tell the jury what if anything occurred as you were

12    going to that area?

13    A.   At that time we was walking over to that area, that's when

14    I seen Jason and Mr. Iverson come in, gave him a what's up,

15    continued with what I was doing.

16    Q.   For the record, Your Honor, I think the witness gave a nod;

17    is that correct?

18    A.   That is correct.

19    Q.   And what did the nod imply?

20    A.   "What's up?"

21    Q.   Did you make eye contact with Mr. Kane?

22    A.   Yeah:  How you doing?  Another nod when they were walking

23    in, "What's up?"

24    Q.   He responded the same way that you responded to him?

25    A.   Same, with the head nod.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   Can you tell the jury, if you know, had there been any type

 2   of disturbances or confrontations at the Eyebar while you were,

 3   there prior to Mr. Kane and Mr. Iverson arriving?

 4   A.   No.

 5   Q.   Anything unusual that you observed at the Eyebar before

 6   Mr. Kane and Mr. Iverson arrived?

 7   A.   No.

 8   Q.   Do you know Mr. Godfrey?

 9   A.   Yes.

10   Q.   What's the first time you ever saw the one of the

11   plaintiffs in this case Mr. Marlin Godfrey?  When's the first

12   time you ever saw that man?

13   A.   The night of the event, at the Eyebar.

14   Q.   July 19th of 2005?

15   A.   That's correct.

16   Q.   And can you tell the jury where he was when you first saw

17   him?

18   A.   When I first saw him, he was closer to the VIP area,

19   standing.

20   Q.   What was he doing?

21   A.   Just standing there.

22   Q.   How did you happen to notice him?

23   A.   Because he was standing near Curtiss, the security that

24   works there.  And he was actually near the VIP area where it was

25   less crowded at.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1     Q.    Any particular reason why you were attracted -- your
2     attention was attract in the direction of Mr. Godfrey?
3     A.    Not at all.  Just because it was in the clear area, but
4     that's it.
5     Q.    Did you have occasion to speak to Mr. Godfrey?
6     A.    No.
7     Q.    Did anything happen between you and Mr. Godfrey at that
8     moment?
9     A.    At that moment, when Jason walked past, gave him a what's
10    up, I was going back to the bar to actually just grab another
11    juice.  And that's when I noticed he was staring at me, very
12    weirdly.  Very weirdly.
13    Q.    What did you do?
14              THE COURT:  Mr. Godfrey?
15              THE WITNESS:  Mr. Godfrey, correct.
16    BY MR. MARTIN:
17    Q.    Mr. Godfrey was staring at you?
18    A.    I stared back at him.  Like, I wanted to know, did he know
19    me?  Did he know me from somewhere?  Did he know me or
20    something?  That's the look I -- perceiving that he knew me, or
21    I did something to him or something.
22    Q.    Did you know him?
23    A.    No.
24    Q.    Had you ever done anything to him?
25    A.    Never seen the man a day in my life.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   So after the staring, how long did he stare at you and you

 2   stare back at him?

 3   A.   Right.

 4   Q.   How long?

 5   A.   It was real brief, nothing traumatic.  But it did stand out

 6   to me like, "Why you looking at me?"  I'm look at him.  I just

 7   kept it moving, went to the bar, did what I had to do.

 8   Q.   Did you have occasion to look at Mr. Godfrey any other

 9   times that night?

10   A.   Right.  On the way back, going back to where my friends

11   were, at that time that's when I ran into T.  I call her T.  Her

12   name is Tara.  Ran into T.

13   Q.   Ms. Barrows?

14   A.   Ms. Barrows.  Excuse me, Ms. Barrows.

15        I proceeded to go back to where Jerry and Ms. Barrows and

16   her friends were.

17   Q.   Did you have occasion to see Mr. Godfrey again?

18   A.   I seen him again, continually.

19   Q.   What was going on when you saw him this time?

20   A.   Still staring at me like he knew he, or he wanted to do

21   something, however he felt.

22   Q.   What did you perceive the stare to be?

23             MR. LATTIMER:  Objection.

24             THE COURT:  Sustained.

25   BY MR. MARTIN:
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Q.   In response to the stare, the second time, what did you do?

2    A.   I was like, "What up?"  Like, "What up?"

3    Q.   What did that mean?

4    A.   Like, "What's up?  You want to do something, or you got a

5    problem with me, or you got an issue with me?"  Like, "What's

6    up?"

7    Q.   Why did you do that?

8    A.   Because the staring was too much.  I'm like, You don't know

9    me.  I didn't say nothing to you.  But what's up.  Like, you

10   want to do something.  What's up?

11   Q.   Did he say or do anything?

12   A.   No.

13   Q.   What did you do?

14   A.   Continued on with what I was doing.

15   Q.   Where did you go?

16   A.   I just went back over to where my friends Jerry and

17   Ms. Barrows were.

18   Q.   Did there come a time, after you got back over to that

19   area, that you saw Mr. Kane talking in the area of Curtiss, the

20   security person Curtiss?

21           MR. LATTIMER:  Leading.

22           MR. MARTIN:  I'll rephrase the question.

23   BY MR. MARTIN:

24   Q.   Did there come a time when you saw Curtiss in the club?

25   A.   Yes.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   Did there come a time when you saw Mr. Kane near Curtiss?

 2   A.   Yes.

 3   Q.   What were they doing?

 4   A.   Looked like they was having a very intense discussion.

 5   Q.   What about that discussion made you feel it was intense?

 6   A.   It just seemed like it was something there.  It was

 7   something.  I could tell by Curtiss' face, I could tell by

 8   Jason's face; it was something.  It was just very intense.

 9   Q.   When you saw that, what did you do?

10   A.   I just paid attention a little bit more.

11   Q.   Did anything happen?

12   A.   Well, it just got intense a little bit more.  And then I

13   seen the other guy, Lee Graham or Nightmare, come towards Jason.

14   And when he came towards Jason, he was coming, like, coming.  So

15   when I seen that, I left from where I was at, coming towards to

16   see what was going on.  And when I got to him, I'm like, "Yo,

17   what's going on?"

18   Q.   When you say "him," who are you referring to?

19   A.   Nightmare.

20   Q.   What happened when you reached Nightmare?

21   A.   When I reached Nightmare, it was like, "Yo, what's going

22   on?"  Like that, I got sucker-punched.

23   Q.   Could you see who sucker-punched you?

24   A.   The gentleman sitting right there.

25   Q.   That night, could you see the person who sucker-punched
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    you?

2    A.    Right at that particular time, yes.

3    Q.    When you got sucker-punched, what did you do?

4    A.    I had to regroup myself, because he caught me very, very

5    good, very good.  And then I proceed to defend myself.

6    Q.    And when you say he caught you very good, what does that

7    mean?

8    A.    It was a nice, nice punch.

9    Q.    Where did he punch you?

10    A.    In my face.

11    Q.    And when you turned to first see him, what was he doing?

12    A.    He was like squared up, like, "Let's get it."  So once he

13    hit me, he squared up because he knew what was coming.  He knew

14    I was coming.  I was coming.

15    Q.    And why were you coming?

16    A.    Because I had to defend myself.  Like, he hit me -- I'm

17    like this:  You hit me, blind-sided like, come on.  I was

18    coming.  I was upset.

19    Q.    Tell the jury what if anything happened after he

20    sucker-punched you.

21    A.    After he sucker-punched me, I proceeded to defend myself,

22    and it was a fight.  It was on.

23    Q.    When you say it was a fight --

24    A.    It was a fight.

25    Q.    Was he defending -- was he fighting?

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   A.   He had to.  He was defending himself.  When he hit me, I
 2   went at him, and I was getting him.  He hit me like two or three
 3   times.  But after I was in my rhythm, it was over.
 4   Q.   When you say it was over, what happened?
 5   A.   I proceeded to defend myself, and we was in a fight.
 6   Q.   Were you able to land any blows on him?
 7   A.   Yes.
 8   Q.   How many times did you hit him?
 9   A.   Probably hit him roughly -- I can't say roughly, but I
10   probably hit him at least six or seven times, easily.
11   Q.   Was he still fighting as you hit him those six or seven
12   times?
13   A.   Exactly.  He was fighting all the way till security broke
14   it up.
15   Q.   Was he trying to hit you?
16   A.   Of course.  He hit me at least two or three times.  He got
17   off a couple.
18   Q.   Could he fight?
19   A.   He could fight a little bit.
20   Q.   What did you hit him with?
21   A.   My fists.  My hands.  My two hands.
22   Q.   Did you knock him down?
23   A.   Yes, with my two hands.
24   Q.   Tell the jury, as best you can, what happened with
25   Mr. Godfrey when you hit him.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    A.    When I hit him, he fell back, and then we got into it.    And

2    then my hands proceeded to do what I do.    And he fell, and we

3    were fighting and we was tumbling, and that's when security

4    came.

5    Q.    Did you ever see Jason Kane touch Mr. Godfrey?

6    A.    Not to my knowledge.    It was me and Godfrey.    We was on.

7    It was us engaged.    We were engaged.

8    Q.    If he hadn't hit you, would you have hit him?

9    A.    It wouldn't have been a fight.    We wouldn't be here today.

10    Q.    What happened after security broke up the fight?

11    A.    After security broke up the fight, it was just pandemonium.

12    It was people running, people trying to get out the way.    I just

13    became small.    What I mean by that, I became small and exit the

14    building.

15    Q.    Did you see Jason and Mr. Iverson?

16    A.    I didn't see anybody.    I was heading out the door, but I

17    did not see Jason or Mr. Iverson at all.

18    Q.    Could you tell if there were other -- what other patrons

19    were doing at that time?

20    A.    Not really.    My concern was to exit the building.    It was

21    too much going on.

22    Q.    Were other people leaving the club?

23    A.    Yes, they were.

24    Q.    Can you tell the jury what if anything you saw when you got

25    outside, outside the club?

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   A.    Once I made it outside, I went straight to my car, and I

 2   left.

 3   Q.    Now, do you know Mr. Kittrell, Tony Kittrell?

 4   A.    I know him from this.

 5   Q.    From this case?

 6   A.    Yes.

 7   Q.    Did you see him the night of July 19th, 2005?  Do you

 8   recall seeing him?  You have to answer.

 9   A.    I don't recall seeing him.

10   Q.    Let me ask you this specifically:  Did you ever strike this

11   man or punch him?

12   A.    Never.  No.

13   Q.    Did you ever attempt to grab a chair or a table outside to

14   assault him?

15   A.    No.  It was police outside, actually.

16   Q.    Did you ever see anybody outside strike Mr. Kittrell?

17   A.    No.

18   Q.    Other than Mr. Godfrey, who you've testified you were

19   engaged in a fight with, did you throw a punch at anybody else?

20   A.    No.

21   Q.    During the time that you were engaged in the fight with

22   Mr. Godfrey, did you see anybody throwing glasses or anything

23   else at Mr. Kittrell?

24   A.    No.

25   Q.    Did you throw any glasses?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    A.    No.   I was engaged with Mr. Godfrey.

2    Q.    Who won that fight?  Who won the fight between you and

3    Mr. Godfrey?

4    A.    Me.

5              MR. MARTIN:  May I have a moment, Your Honor?

6              THE COURT:  Sure.

7         (Defense counsel conferring.)

8              MR. MARTIN:  Thank you, Your Honor.  Mr. Williams,

9    thank you.  I have no further questions.

10                       DIRECT EXAMINATION

11   BY MR. MILSTEIN:

12   Q.    Just a few questions, Mr. Williams.  Have you ever worked

13   for Allen Iverson?

14   A.    No.

15   Q.    Have you ever worked security for Allen Iverson?

16   A.    No.

17   Q.    Has Mr. Iverson ever supervised you in any way?

18   A.    Never.

19   Q.    Has he ever tried to control your actions?

20   A.    Never.  No.

21             MR. MILSTEIN:  Thank you.  Nothing further.

22             THE COURT:  Mr. Lattimer?

23                       CROSS-EXAMINATION

24   BY MR. LATTIMER:

25   Q.    Good afternoon, Mr. Williams.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    A.    Good afternoon.

2    Q.    Let me hand you a copy of your deposition.  I'm sure we'll

3    be talking about that.

4    A.    Appreciate it.  Thank you.

5    Q.    You're welcome.  You do recall giving a deposition in this

6    case, right?

7    A.    I do recall that, yes, I do.

8    Q.    What was that?  October 5th, 2006.

9    A.    That is correct.

10   Q.    Actually, two weeks before that you met with Mr. Martin and

11   Jason Kane, correct?

12   A.    Two weeks prior to this?

13   Q.    Prior to your deposition.

14   A.    I think so, yes.

15   Q.    Okay.  And then 20 minutes before you actually did your

16   deposition, you met with Mr. Martin, right?  Or you talked with

17   Mr. Martin?

18   A.    I didn't meet with him.  I was in Houston.

19   Q.    I said you talked with him, correct?

20   A.    I talked with him briefly.

21   Q.    All right.  Now, how many times did you talk with these

22   lawyers over here before you testified today?

23   A.    Probably three times.

24   Q.    Three times?

25   A.    That's correct.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.    Okay.  Now, you started off your testimony talking about

 2   Los Angeles.  Do you remember that?

 3   A.    Yes, I do remember.

 4   Q.    Said you were working with Ginuwine in LA, right?

 5   A.    That's correct.

 6   Q.    And that you were there for the BET awards, right?

 7   A.    That's correct.

 8   Q.    And Ginuwine was supposed to be Punk'd, right?

 9   A.    That's correct.

10   Q.    And Kerry is the person that you learned about the Punk'd

11   situation from, right?

12   A.    That's correct.

13   Q.    And Kerry is supposedly one of the executive producers for

14   Punk'd?

15   A.    I don't know if he's an executive producer, but he works

16   along with the show.

17   Q.    Well, didn't you say he was executive producer?

18   A.    I said he worked along with the show, and he's very good

19   friends with Mr. Kutcher.

20           THE COURT:  How do we spell his name, please?  Is it

21   C-A-R-E-Y or something?  Do you know?  Don't know?

22   BY MR. LATTIMER:

23   Q.    It is a man, right?

24   A.    That is correct.

25   Q.    Would you turn to page 27 in your deposition?  And could
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    you read lines 17 through 21 to yourself?

2    A.    "Actually, I know the executive producer Kerry."

3    Q.    To yourself.

4    A.    Oh, to myself.  Okay.

5          (Witness reviewing document.)

6          Okay.  I read it.

7    Q.    So you did say in your deposition that Kerry was the

8    executive producer, right?

9    A.    I did say that.

10   Q.    And that was true, right?

11   A.    I don't know his position, but I was assuming the executive

12   producer.  So yes, I said it and I stand by it.

13   Q.    All right.

14           MR. LATTIMER:  What number are we up to?

15           THE DEPUTY CLERK:  The next number is 27.

16   BY MR. LATTIMER:

17   Q.    Now, you do know in fact --

18           MR. MARTIN:  I'm going to object, Your Honor.

19           MR. LATTIMER:  I haven't even asked the question.

20           MR. MARTIN:  Well, before you use the exhibit, there's

21   an objection.

22           MR. LATTIMER:  Can I get the question out, Your Honor?

23   BY MR. LATTIMER:

24   Q.    You do know in fact that Kerry is not an executive

25   producer.  There is no Kerry who is an executive producer for
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Punk'd.  You know that, right?
 2    A.   Now that you're saying that.  But I know that he worked
 3    there.  So it was fine.
 4    Q.   But you know that there is no Kerry who's an executive
 5    producer for Punk'd?
 6    A.   Well, now I know, yes.
 7    Q.   Now you know?
 8    A.   Yes, sir.
 9    Q.   All right.  Now, you talked about why you were in Los
10    Angeles.  Do you remember that?
11    A.   Yes.
12    Q.   I'm going to ask you to turn to page 109 of your
13    deposition, and I'm going to ask you to take a look at line 16
14    through -- let's see.  Why don't we stop at --
15             THE COURT:  What page again?
16             MR. LATTIMER:  Line 109, Your Honor, line 16 through
17    -- why don't we stop at 16 on page 110.
18             THE COURT:  We're starting on page 109?
19             MR. LATTIMER:  Yes.
20    BY MR. LATTIMER:
21    Q.   Beginning at 16, ending at 110.
22    A.   Right.
23    Q.   Line 16?
24    A.   Correct.  I read it.
25    Q.   You read it?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    A.    Yeah.

 2    Q.    And there, you --

 3              MR. MARTIN:  Objection, Your Honor.

 4              MR. LATTIMER:  Can I finish the question before the

 5    objection is made?

 6              THE COURT:  Uh-huh.

 7              MR. MARTIN:  Judge, he's reading the transcript into

 8    the record.

 9              MR. LATTIMER:  I'm not reading a transcript.

10              THE COURT:  I haven't heard what he did.

11    BY MR. LATTIMER:

12    Q.    Now, in your deposition, you indicated that you were going

13    there to meet a personal friend; isn't that right?

14    A.    Correct.

15              MR. MARTIN:  Judge, he's not allowed to repeat what's

16    in the deposition.  He can ask him today.  He's just repeating

17    what's in the deposition.

18              THE COURT:  I think he's getting there.  I think I

19    know where he's going.

20    BY MR. LATTIMER:

21    Q.    And you weren't working for anyone; isn't that right?

22    A.    Yeah, I was.

23    Q.    Who?

24    A.    Ginuwine.

25    Q.    Okay.  You didn't even go to the BET awards, did you?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    A.    Did I?

 2    Q.    Yes.

 3    A.    Are you asking me?

 4    Q.    Yes.

 5    A.    No.

 6    Q.    Because you were running late; isn't that right?

 7    A.    I can't even recall why I didn't go to the BET awards.  But

 8    I didn't make it.

 9    Q.    Now, who was the personal friend that you were meeting?

10    A.    A personal friend of mine.

11    Q.    My question was, who was the personal friend you were

12    meeting?

13    A.    You want me to describe -- her name is Nicky Barnes.

14    Q.    So you were meeting a female?

15    A.    That's correct.

16    Q.    And the female you were meeting is the reason that you

17    missed the BET awards?

18    A.    No.

19          MR. MARTIN:  Objection.  Relevance to these

20    proceedings, Judge.

21          THE COURT:  I think so.  Go on to something else.

22    BY MR. LATTIMER:

23    Q.    Now, when you went to the Punk'd session, I believe that

24    was going to happen at a restaurant; is that right?

25    A.    It was at a club.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

 1    Q.   At a club.  And you indicate that you were in on it.  Is

 2    that right?

 3    A.   Correct.

 4    Q.   And you knew it was going to happen because you had talked

 5    to this person named Kerry, right?

 6    A.   I talked to Kerry, but I knew when Ginuwine was going to

 7    get Punk'd and Allen was going to get Punk'd, yes.

 8    Q.   Now, you didn't know what time Mr. Iverson was going to be

 9    there; is that right?

10    A.   Correct.

11    Q.   You just stood outside and waited?

12    A.   Just came outside, yeah.

13    Q.   And when Mr. Iverson arrived, I think you said that you

14    went over the top; is that right?

15    A.   No.  In my performance, I went over the top.

16    Q.   In your performance?

17    A.   In my performance.

18    Q.   That one?  That performance?

19    A.   Yeah, in that performance of Punk'd I went over the top.

20    Q.   Because you were basically, as you said, who in their right

21    mind would act that way?

22    A.   Please.  Who would?

23    Q.   That's the question.

24    A.   Yeah.  Who would?

25    Q.   Because normally --

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. MARTIN:  Objection, Your Honor.  I'll withdraw it.

 2    BY MR. LATTIMER:

 3    Q.   Normally, you certainly would not act like that, right?

 4    A.   Why would I?

 5    Q.   Normally, you certainly wouldn't act like that, right?

 6    A.   No, sir.

 7    Q.   That was an act you put on.

 8    A.   That's correct.

 9    Q.   Because for you to act like that would be disrespectful,

10    correct?

11    A.   Correct.

12    Q.   Unwise, correct?

13    A.   Correct.

14    Q.   Absolutely stupid, wouldn't you agree?

15    A.   Correct.

16    Q.   And so you would never do that.

17    A.   Correct.

18    Q.   Is that right?

19    A.   Correct.

20    Q.   And of course, if you were in Crabbers Restaurant and you

21    choked somebody and drug them outside, that too would be stupid,

22    wouldn't it?

23    A.   That would be absolutely stupid.

24    Q.   And you would never do that?

25    A.   Ever.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1   Q.   Now, you've never heard of a guy named Michael Persons?

2   A.   Never.

3   Q.   Never.  So Michael Persons did not receive a phone call

4   from you asking him to come work --

5            MR. MARTIN:  Objection, Your Honor.

6            MR. LATTIMER:  Let me finish --

7            THE COURT:  No, but this one, I don't know that

8   there's any foundation for that.

9            MR. LATTIMER:  Michael Persons testified yesterday.

10           MR. MARTIN:  Objection, Judge.

11           THE COURT:  He did.  That's just the point.  If you

12  want us to look, we can.  I don't recall it, and I think it

13  would get awfully confusing.

14      Did you ever receive a call from Michael Persons?

15           MR. LATTIMER:  No, did Michael P. ever call --

16           MR. MARTIN:  Objection.

17           THE COURT:  Either way.  Did you ever call Michael

18  Persons?

19           THE WITNESS:  No, ma'am.

20           THE COURT:  Okay.  Before we go any further, I'll have

21  to look it up, if you want me to.

22           MR. LATTIMER:  Well, yes.  Why don't we look it up,

23  Judge?

24           THE COURT:  All right.  Ask the next question.  I'll

25  be --
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    BY MR. LATTIMER:

2    Q.   Now, you indicated, I believe through Mr. Martin, that you

3    became aware of the Crabbers incident because the detective came

4    and grabbed you and talked to you --

5              MR. MARTIN:  Objection, Your Honor.  He was not

6    grabbed.

7              MR. LATTIMER:  Oh, my goodness.  Judge, can I finish

8    one question without an objection?

9              MR. MARTIN:  But he was grabbed --

10             MR. LATTIMER:  Can it wait till the question's out.

11             THE COURT:  Yeah, but we already know this has got a

12   problem, so don't bother.  Start another one.

13       He didn't grab him.

14             MR. LATTIMER:  You -- well, he grabbed him and put him

15   in a line.

16             MR. MARTIN:  He didn't grab him, Judge.

17             MR. LATTIMER:  He said he took him to a lockup.  He

18   put him to a station, he kept him for six hours, right?

19   BY MR. LATTIMER:

20   Q.   All that was what you said.

21             MR. MARTIN:  It was voluntary.

22             THE WITNESS:  That's all what I said.  But he didn't

23   grab me.  We were voluntary --

24             THE COURT:  All right.  Wait a minute.  Can you wait

25   just minute while we finish?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE WITNESS:  Yes, ma'am.

 2              THE COURT:  Counsel can't fight with each other.  If

 3     you want to object, you object.  I'll rule.  And I will sustain

 4     the objection.

 5     BY MR. LATTIMER:

 6     Q.  Now, turn to page 107 of your deposition.  And I'd like you

 7     to read from line 13 to line 22.

 8              THE COURT:  To yourself.

 9     BY MR. LATTIMER:

10     Q.  To yourself.  Where you talk about how you became aware of

11     the Crabbers incident.

12          (Witness reviewing document.)

13     A.  Okay.

14     Q.  Now, in your deposition, you said something very different,

15     did you not?

16     A.  Correct.

17     Q.  You said that you became aware of it because your mother

18     gave you a newspaper article, right?

19              MR. MARTIN:  Objection, Your Honor.

20              THE COURT:  Sustain -- no, overruled.

21              MR. MARTIN:  Your Honor, may I be heard?

22              THE COURT:  No.

23              MR. MARTIN:  Judge, it talks about the lawsuit.

24     That's a different question.  The deposition asked him when he

25     learned of the lawsuit.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE COURT:  Hold on.  It says, "How did you become
 2    aware that you were accused of being in an altercation?"
 3              MR. MARTIN:  Line 21, Judge.
 4              THE COURT:  Okay.  Wait a minute.  Yes, he's right
 5    about that.  Sorry, my mistake.  Sustained.  It's not quite the
 6    same.
 7              MR. LATTIMER:  Your Honor, the question was:  "How did
 8    you become aware of the incident?"  And the answer is --
 9              MR. MARTIN:  Objection, Judge.  Your Honor --
10              THE COURT:  Where?  Are you pointing me to a line?
11              MR. LATTIMER:  17.  "How are you aware of that?"
12              THE COURT:  No --
13              MR. MARTIN:  Your Honor, can you read it without
14    Mr. Lattimer reading it to the jury?
15              THE COURT:  Yeah.  But I sustained it because that's
16    not what it says.  Okay.
17              MR. LATTIMER:  All right.
18    BY MR. LATTIMER:
19    Q.   Do you remember me -- do you remember being asked, "Are you
20    aware of any --
21              MR. MARTIN:  Objection, Judge.
22              THE COURT:  Sustained.  You can use it to impeach him,
23    but you're not impeaching him.  So you can't use it.
24              MR. LATTIMER:  Let me put it this way.
25    BY MR. LATTIMER:
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   Today you indicated that you became aware of the incident

 2   at the Crabbers because of the police coming to you, correct?

 3   A.   Correct.

 4   Q.   In your deposition you testified otherwise, did you not?

 5   A.   No.

 6   Q.   No?  In your deposition, were you not asked how you became

 7   aware of anyone accused of being involved in a physical

 8   altercation at Crabbers in July 2005?  And you answered yes.

 9        Were you not asked that question and gave that answer?

10   A.   Accused.

11   Q.   Yes.

12   A.   Accused.  He didn't ask me that earlier.

13   Q.   Mr. Williams, were you not asked that question, and you

14   gave that answer?

15   A.   In the deposition, yes.

16   Q.   Yes.

17             MR. MARTIN:  Judge, objection.

18             THE COURT:  Yes, I sustained that.

19             MR. MARTIN:  It's sustained.

20             THE COURT:  I know.  So therefore --

21             MR. MARTIN:  Would you ask Mr. Lattimer not to ask the

22   same question, Judge?  You sustained it.

23             THE COURT:  I don't think it's the same question he's

24   asking.  So therefore, it's not impeachment and I sustained it.

25        So move on.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1          MR. LATTIMER:  Your Honor, may we approach?

2          THE COURT:  No.

3          MR. LATTIMER:  Well, may I understand what the Court

4    is saying that's different?

5          THE COURT:  The difference is --

6          MR. LATTIMER:  If your answer, "How you became aware

7    of the incident at Crabbers then," and your answer is the same

8    thing today.

9          THE COURT:  No.  It's not the same thing.  There's a

10   slight difference here.

11         MR. LATTIMER:  Well, that's what I'm trying to find

12   out.  What am I missing?  Maybe your transcript's different than

13   mine.

14         THE COURT:  I'll be happy to tell you.

15         MR. LATTIMER:  Okay.  Can we approach so you can do

16   that?

17         THE COURT:  No, I'll do it right now.  Mr. Lattimer,

18   you asked him how he became aware of the incident.  He told you

19   about a police officer and being at the basketball court in the

20   lineup, and then he went down to the police station.

21       In the deposition, you asked him, "Are you aware at all

22   that anyone accused you?"  That's different.  That is very

23   different.  There was an accusation, he read about it through

24   his mother, what she read in the press.  So let's not --

25         MR. LATTIMER:  Let me rephrase.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE COURT:  All right.
 2    BY MR. LATTIMER:
 3    Q.   When you talked to the police, they asked you to come down
 4    because you had been accused of something; is that right?
 5    A.   They asked me to voluntarily come down.
 6    Q.   Right.  Because somebody had accused you of something,
 7    right?
 8    A.   No.
 9    Q.   No one had accused you of nothing?
10    A.   No.
11    Q.   So you were kept for six hours because you weren't accused?
12    A.   Voluntarily.
13    Q.   You were kept for six hours because you weren't accused?
14    A.   Voluntarily.
15    Q.   And they asked you to stand up in a lineup because you
16    weren't accused?
17    A.   Voluntarily.
18    Q.   Voluntarily.  And if it's voluntary, it's not accused.  If
19    it's involuntary, it is.
20              THE COURT:  No, you don't --
21              THE WITNESS:  If I was accused, I would have been
22    locked up, right?
23    BY MR. LATTIMER:
24    Q.   If you were accused, you would have been locked up.  All
25    right.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. LATTIMER:  Now, are we ready for Persons?

 2              THE COURT:  Oh.  Here we go.  What page?

 3              MR. MARTIN:  What page?

 4              THE COURT:  Okay.  You want to approach before it goes

 5      back to this?

 6         (Bench conference on the record.)

 7              THE COURT:  This is Persons?

 8              MR. MARTIN:  Yes, Your Honor.

 9              THE COURT:  Okay.  72 and 3 of Mr. Persons.  You're

10      right.

11              MR. LATTIMER:  Who's right?

12              THE COURT:  You.

13              MR. LATTIMER:  I know.

14              THE COURT:  I didn't remember it, but you're right.

15      Persons said he got into -- can you step over there, please?

16              THE WITNESS:  Yes, ma'am.

17              MR. MARTIN:  It wasn't a phone call.  He asked him

18      about a phone call.

19              MR. LATTIMER:  All right, I'll change it.

20              MR. MARTIN:  It was a phone call.  Big difference.

21              THE COURT:  All right.

22              MR. LATTIMER:  It is.

23              THE COURT:  Fine.

24              MR. LATTIMER:  It's like "voluntary."

25              MR. MARTIN:  Whatever, Mr. Lattimer.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE COURT:  I agree with him on that, entirely.  Being
 2      accused is a heck of a lot different.  When you're accused,
 3      you'll know it.  You have constitutional rights then.
 4              MR. LATTIMER:  So can I ask this question now?
 5              THE COURT:  About Terrence?
 6              MR. LATTIMER:  Yes.
 7              THE COURT:  Yes, but use the right words.
 8              MR. LATTIMER:  What are the right words?
 9              THE COURT:  Whatever it is, but go with the testimony.
10      Don't put in your own words.  Then you run into trouble with
11      impeachment.
12              MR. LATTIMER:  All right, that's fine.
13              THE COURT:  All right, sir.
14          (End of bench conference.)
15      BY MR. LATTIMER:
16      Q.   Now Mr. Williams, you never contacted Michael Persons to
17      have him come work at the stadium on behalf of Mr. Iverson?
18      A.   No.
19      Q.   That's because you don't know a Mr. Persons; is that right?
20      A.   Correct.
21      Q.   Never heard of him before, right?
22      A.   Correct.
23      Q.   All right.  Now, you were at the Crabber's Restaurant, I
24      think in Virginia, right?
25      A.   Correct.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Q.    This is the place that's near your father's home, I think

2    you said.

3    A.    Correct.

4    Q.    And -- but you were there just for a short time?

5    A.    Correct.

6    Q.    Because you went with your brothers?  Your brother and a

7    friend.

8    A.    Correct.

9    Q.    And you decided to leave after not having seen your brother

10   for a while and wanting to spend some time with him, right?

11   A.    Correct.

12   Q.    So you went and you paid the money for them to get in, and

13   then you left.

14   A.    Correct.

15   Q.    And that was enough time spent with your brother, right?

16   A.    I was there the entire weekend, so yes.  At that particular

17   time, yes.  I had another engagement.

18   Q.    And you didn't see Mr. Iverson there, right?

19   A.    No.

20   Q.    And you didn't see Mr. Kane there, right?

21   A.    Correct.

22   Q.    And you certainly did not, as you said, you didn't choke

23   anybody, right?

24   A.    No.

25   Q.    And you didn't have a conversation with Mr. Iverson where

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    you held up one finger, and held up two fingers, and then held

2    up then fingers and did the sleep sign, right?

3    A.    Correct.

4    Q.    You didn't do that?

5    A.    Correct.

6    Q.    And you didn't drag somebody out and hit them in the head

7    with a chair, and then come back in to be with Mr. Iverson,

8    right?

9    A.    No.

10   Q.    Because you was just there for a little bit of time, right?

11   Just a few minutes.  I think you said about 20, or 15?

12   A.    About 15.

13   Q.    15 minutes.  Right?

14   A.    Correct.

15   Q.    Now, we're at the Eyebar.  And Night, or Mr. Lee Graham,

16   who was the head of security --

17              THE COURT:  Nightmare.

18              MR. LATTIMER:  Nightmare.  Nightmare.

19              THE COURT:  That's different than Night.

20              MR. LATTIMER:  Well, they called him Night and

21   Nightmare.  So we'll use Nightmare, since that's what he used.

22   BY MR. LATTIMER:

23   Q.    Nightmare, the head of security, right?

24   A.    Correct.

25   Q.    And he's having a conver -- Curtiss, who works for

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    security, is having a conversation, that you said was intense,

 2    with Jason, right?

 3    A.    Correct.

 4    Q.    Now, you don't know what's going on.  But you decided,

 5    since this is your friend, you're going to go and see what's

 6    happening, right?

 7    A.    Correct.

 8    Q.    Because this is your friend.

 9    A.    Correct.

10    Q.    And even though this is security, you went over.  And when

11    you saw Nightmare come over and touch Jason, you then decided to

12    intervene, correct?

13    A.    Correct.

14    Q.    And you grabbed Nightmare, right?

15    A.    Correct.

16    Q.    And so then Marlin Godfrey sucker-punches you out of the

17    blue, right?

18    A.    Correct.

19    Q.    Now, sucker-punch usually suggests that the person doesn't

20    see who punches him.

21           MR. MARTIN:  Objection, Your Honor.

22    BY MR. LATTIMER:

23    Q.    Would you -- is that your characterization --

24           MR. MARTIN:  Objection.

25           THE COURT:  He can ask him.  But I don't know.  What's
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    sucker-punch mean?

 2    BY MR. LATTIMER:

 3    Q.   Right?  That's your characterization?

 4    A.   You can say that.

 5    Q.   But in this case, he sucker-punched you and you saw him.

 6    A.   Correct.

 7    Q.   So it wasn't a sucker punch.

 8    A.   It was a punch, then.

 9    Q.   It was a punch.

10    A.   There you go.

11    Q.   So Marlin Godfrey --

12          MR. LATTIMER:  Stand up, please.

13       (Mr. Godfrey stands.)

14    BY MR. LATTIMER:

15    Q.   -- who is all of 160, 165 pounds soaking wet --

16          MR. MARTIN:  Is Mr. Lattimer testifying?

17    BY MR. LATTIMER:

18    Q.   -- or he's that size.

19    A.   Correct.

20    Q.   Walked up on you at 6'3", 330, and out of the blue decides,

21    "I need to hit somebody.  Let me look around.  He's the one to

22    do it to."

23    A.   Correct.

24    Q.   Right?

25    A.   Correct.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.    That's what Marlin Godfrey did?

 2    A.    Correct.

 3    Q.    Now, this place is packed, right?  That's what you said.

 4    A.    Correct.

 5    Q.    A whole lot of people, right?

 6    A.    Correct.

 7    Q.    I'll bet you there was two or three just a little bit

 8    smaller than you.  You willing to go with me on that one?

 9    A.    Correct.

10    Q.    But of all the people in here, he decides, "I need to get

11    some satisfaction.  Let me find the biggest guy I can find and

12    punch him."

13            MR. MARTIN:  Objection, Judge.  How does he know

14    what's on Mr. Godfrey's mind?  He's testifying that --

15            MR. LATTIMER:  I'll withdraw that, Your Honor.

16            THE COURT:  He will.  Thank you.

17    BY MR. LATTIMER:

18    Q.    So he decides you're the one to punch.

19    A.    Correct.

20    Q.    So at that point, it's on.

21    A.    Correct.

22    Q.    And you, 330 pounds, hit him, knock him down.  And the

23    first time he makes the decision, you knocking him down did not

24    straighten him out, he come back for more.  That's your

25    testimony?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    A.   My testimony is, he hit me, I defended myself, and we got

 2    in an altercation.  We were fighting.

 3         So yes.  Yes, I knocked him down.

 4    Q.   You knocked him down?

 5    A.   He wanted some more.

 6    Q.   He wanted some more?

 7    A.   And we did what we had to do.

 8    Q.   "And we did what we had to do"?

 9    A.   Yes, sir.

10    Q.   That's what happened?

11    A.   You don't believe it?

12              THE COURT:  No, no, no, no.  Don't ask him questions.

13              MR. LATTIMER:  You definitely don't want my answer.

14              THE COURT:  And I won't let you answer.

15              THE WITNESS:  But yes, that's my testimony.  Yes, it

16    is.

17              THE COURT:  Okay.  All right.

18    BY MR. LATTIMER:

19    Q.   So at this point, you get to pound on him for a minute to a

20    minute and a half, right?

21    A.   We get to fighting, correct.

22    Q.   Security's standing right there?

23    A.   I don't know where security -- they wasn't standing there

24    when we was fighting.

25    Q.   Well, wait a minute.  Wait a minute.  What did I miss?  You
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    got over there because you was grabbing security.

2    A.    Correct.

3    Q.    So, what, security left when you started hitting him?

4    A.    They didn't stop us.  We fought --

5    Q.    I understand.  But you didn't see them leave?

6    A.    We was engaged, so how could I see them at all?

7    Q.    Okay.  So security let you pound on this man, because

8    that's what you did, right?

9    A.    That's what I did.  We was --

10   Q.    That's what you did?

11   A.    That's what I did.

12   Q.    They let you pound on this man for a minute to a minute and

13   a half before they intervened.

14   A.    If I pound on him for a minute and a minute and a half --

15   Q.    Yes, sir.

16   A.    Straight:  If I pound on him at 320, he's 160, he would

17   have a broken everything.  Eyes would be --

18   Q.    He did.

19   A.    He face -- he had eyes --

20         MR. MARTIN:  Objection, Your Honor.

21         THE WITNESS:  He'd have blood -- he will be in the

22   hospital --

23       (Simultaneous conversation.)

24         THE COURT:  Wait a minute.  Wait a minute.  Sir, hold

25   on.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. MARTIN:  Objection, Your Honor.

 2              MR. LATTIMER:  Let me get this straight.

 3              THE COURT:  Wait a minute.  What's your objection?

 4              MR. MARTIN:  There's no testimony he had anything

 5      broken.

 6              THE COURT:  Oh, okay.  We'll go back to that.

 7              MR. LATTIMER:  Let's go back.

 8      BY MR. LATTIMER:

 9      Q.   If you pounded him for a minute, and a minute and a half,

10      he would have been in the hospital?

11      A.   Hurt.

12      Q.   He was.

13              THE COURT:  Wait a minute.

14              MR. MARTIN:  Objection.  Mr. Lattimer can't testify.

15              THE WITNESS:  Hurt.  And I will be in jail.

16              THE COURT:  Sir.

17              THE WITNESS:  I'm sorry.

18      BY MR. LATTIMER:

19      Q.   So let me get this.

20              MR. MARTIN:  Your Honor, we move to strike.

21      BY MR. LATTIMER:

22      Q.   A torn rotator cuff is not hurt.

23              MR. MARTIN:  Judge, will you ask Mr. Lattimer to quit

24      testifying?

25              MR. LATTIMER:  This is cross-examination.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. MARTIN:  You're testifying.

 2              MR. LATTIMER:  Okay.

 3    BY MR. LATTIMER:

 4    Q.   He had a torn rotator cuff.  Is that hurt?

 5    A.   You'd consider that hurt.

 6    Q.   Okay.  He had --

 7    A.   Pounded.

 8              THE COURT:  Sorry.  Can you wait?

 9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  Wait a long time, because he's getting all

11    riled up.

12              THE WITNESS:  Yes, ma'am.  No worries, no worries.

13              THE COURT:  Mr. Lattimer, stop screaming.

14              MR. LATTIMER:  I certainly shall.

15              THE COURT:  Calm down.  All you're doing is riling him

16    up.

17              MR. LATTIMER:  I understand.

18              THE COURT:  I know.

19    BY MR. LATTIMER:

20    Q.   He had a busted eardrum.  Did you consider that hurt?

21    A.   Yes.

22    Q.   He had damaged ribs.

23              THE COURT:  You're shouting.

24    BY MR. LATTIMER:

25    Q.   Did you consider that hurt?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    A.    Yes.

 2    Q.    He had broken blood vessels in his eyes.  Did you consider

 3    that hurt?

 4    A.    Yes.

 5    Q.    He lost his hearing.

 6              MR. MARTIN:  Objection, Your Honor.

 7    BY MR. LATTIMER:

 8    Q.    Does that hurt?

 9              MR. MARTIN:  Objection, Your Honor.

10              THE COURT:  Sustained.

11              MR. MARTIN:  There's no testimony.

12              MR. LATTIMER:  There is absolutely testimony, Your

13    Honor.

14              THE COURT:  But it's not permanent.

15              MR. MARTIN:  He did not lose his hearing.

16

17    BY MR. LATTIMER:

18    Q.    So, back to what we was talking about.

19    A.    Okay.

20    Q.    Security let this go on for a minute, a minute and a half,

21    before they intervened, correct?

22    A.    I don't know if it was a minute and a half, but yes, we was

23    engaged for a minute, for a while.  For a while.

24    Q.    Why don't we do this?  Here's a clock.

25    A.    Exactly.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   Why don't we do a minute and a half, and we'll start at --

 2             MR. MARTIN:  Objection, Your Honor.

 3             THE WITNESS:  160, right?

 4             MR. MARTIN:  There's no testimony --

 5             THE WITNESS:  160, right?

 6             MR. LATTIMER:  Excuse me.  Would the witness --

 7             THE COURT:  When he stands up, you have to be quiet.

 8             THE WITNESS:  Okay.

 9             THE COURT:  What's your problem?

10             MR. MARTIN:  Your Honor, there's no testimony from

11   this witness that it was a minute to minute and a half.

12   Mr. Lattimer --

13             MR. LATTIMER:  He did testify to that.  He said, "Yes,

14   it was a minute, to a minute and a half."

15             THE COURT:  I think he did.

16             MR. LATTIMER:  He did.

17             THE COURT:  Okay.

18             MR. LATTIMER:  Let's do this.

19             THE COURT:  Start at the quarter past.

20             MR. LATTIMER:  I missed it, Your Honor.

21             THE COURT:  What are you doing?

22             THE WITNESS:  I'm just demonstrating for a minute and

23   a half.  He said I'm pounding him, right?  So I'm pounding him

24   (demonstrating), for a minute and a half now.  For a minute and

25   a half now, for a minute and a half, 360.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1                THE COURT:  No, no.  He's not asking you to do that.

 2      You just sit.

 3          (Pause)

 4                MR. LATTIMER:  It's 30 seconds.

 5                THE WITNESS:  That's a long time, right there.

 6                MR. LATTIMER:  Okay.  Let's keep going.

 7                THE WITNESS:  Let's keep going.

 8          (Pause)

 9                MR. LATTIMER:  One minute.

10                THE WITNESS:  One minute.

11                THE COURT:  Okay.  What's your question?

12      BY MR. LATTIMER:

13      Q.   Now, security is standing right there, was letting you beat

14      this man for that long, right?

15      A.   That's what you saying.

16                THE COURT:  No, no, no.

17      BY MR. LATTIMER:

18      Q.   I'm asking you.  I wasn't there.

19                THE COURT:  Did you -- did security stand by for

20      approximately that length of time while you were engaged in a

21      fight with Mr. Godfrey?

22                THE WITNESS:  I don't know.  I was engaged.  I can't

23      tell you the time.

24      BY MR. LATTIMER:

25      Q.   I understand.  You didn't see Mr. Kane push Curtiss.  Is
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   that what you saying?

 2   A.   Excuse me?

 3   Q.   You didn't hear my question?

 4   A.   No.  Can you say it --

 5   Q.   You did not see Mr. Kane push Curtiss?

 6   A.   No.

 7   Q.   You didn't see him push him up against the wall?

 8   A.   No.

 9   Q.   You was standing right there, but you did not see that?

10   A.   I was not standing right there.

11   Q.   Well, when you grabbed Night, Curtiss and Mr. Kane were in

12   an intense conversation, correct?

13   A.   Correct.

14   Q.   And you never saw Curtiss put his hands -- I'm sorry, you

15   never saw Mr. Kane put his hands on Curtiss, right?

16   A.   No.  Where we was facing at no, I couldn't see it.

17   Q.   You couldn't see it?

18   A.   No.

19   Q.   Well, wait a minute.  I thought Mr. Nightmare grabbed

20   Mr. Kane.

21   A.   From behind.

22   Q.   And then you grabbed Mr. Nightmare.

23   A.   Correct.

24   Q.   Which means that Curtiss -- I'm sorry, Mr. Kane was in

25   front of you, right?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   A.   Yeah.  Exactly.

 2   Q.   So Mr. Kane is in front of you?

 3   A.   In front of me, correct.

 4   Q.   So you don't see what's in front of you?

 5   A.   Not the way Jason was -- the way he was, he was -- Curtiss

 6   was in front of him, so I couldn't see Curtiss.

 7   Q.   All right.  And then you left?

 8   A.   After the physical altercation, yes.

 9   Q.   After the physical altercation?

10   A.   I did.

11   Q.   Now, you never saw anybody throwing anything, right?

12   Right?

13   A.   No, I did not.

14   Q.   You never called Tony Kittrell "clown-ass nigger"?

15   A.   No.

16   Q.   Standing up on the couch.  You never said that?

17   A.   No.

18   Q.   You never said, "Look at this clown-ass nigger"?

19   A.   No.

20   Q.   Never came out your mouth?

21   A.   No.

22   Q.   You never tried to get at him.  You never asked, "Where is

23   he, where is he," and try to get at him, right?

24   A.   Why would I do that?  I'm --

25            THE COURT:  Just answer.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE WITNESS:  Oh.  No, ma'am, no.

 2    BY MR. LATTIMER:

 3    Q.   And you never saw anybody do that, right?

 4    A.   No.

 5    Q.   Now, did you go to the White Linen event?

 6    A.   No.

 7    Q.   You did not?

 8    A.   No.

 9    Q.   You were not there?

10    A.   No.

11    Q.   So if I got it straight, in June 2005 you, Mr. Kane, and

12    Mr. Iverson were at the Punk'd event in LA, correct?

13    A.   Correct.

14    Q.   On July 10th, you and at least Mr. Iverson were at the

15    Crabbers -- were at Crabbers in Virginia; is that right?

16              MR. MARTIN:  Objection, Your Honor.  He said he never

17    saw Mr. Iverson.

18              MR. LATTIMER:  I didn't ask him who he saw.  I asked

19    him where he was.

20              MR. MARTIN:  How could he say he was --

21              THE COURT:  Did you see Iverson at Crabbers?  I'm

22    sorry.

23              THE WITNESS:  No.

24              MR. MARTIN:  He said no.

25    BY MR. LATTIMER:
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.    On July 10th you were at Crabbers, right?

 2    A.    Yes.

 3    Q.    And Mr. Iverson was there.  That would have been at the

 4    same time you were there, right?

 5              MR. MARTIN:  Objection, Your Honor.

 6              THE COURT:  No, that's sustained.  If he didn't see

 7    him, he didn't see him.  How could he say he was there at the

 8    same time?

 9    BY MR. LATTIMER:

10    Q.    On July 11th, you and Mr. Iverson were at the basketball

11    game --

12              MR. MARTIN:  Objection, Your Honor.  I'll withdraw my

13    objection.

14    BY MR. LATTIMER:

15    Q.    -- in Virginia; is that right?

16    A.    Correct.

17    Q.    On July 16th, you, Mr. Kane, Mr. Iverson, were at Bowie

18    Baysox Stadium, correct?

19    A.    Correct.

20    Q.    And on July 19th/20th, you, Mr. Kane, and Mr. Iverson were

21    at the Eyebar together, right?

22    A.    Not together, but --

23    Q.    You were there at the same time?

24    A.    Correct.

25    Q.    And all of those are coincidences, right?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. MARTIN:  Objection, Your Honor.

 2              MR. MILSTEIN:  Objection, Your Honor.

 3              MR. MARTIN:  It's argumentative.

 4              THE COURT:  Overruled.

 5     BY MR. LATTIMER:

 6     Q.   Correct?

 7              THE COURT:  Coincidence?

 8              THE WITNESS:  Correct.

 9     BY MR. LATTIMER:

10     Q.   They weren't planned, right?

11     A.   No.

12     Q.   And you didn't work for Mr. Iverson, right?

13     A.   No.

14     Q.   And the reason that you intervened with Jason in security

15     at Eyebar had nothing to do with you providing security, right?

16     A.   Correct.

17     Q.   You were just an interested patron?

18     A.   And a friend.

19     Q.   And a friend intervening, correct?

20     A.   Correct.

21     Q.   Now, let me ask you to turn to page 128 of your deposition.

22     A.   128?

23     Q.   Yeah.

24     A.   Okay.

25     Q.   Now, with regard to the Punk'd incident, you don't recall
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    how you got there, right?  To the club.  Is that fair to say?

 2              MR. MARTIN:  Objection.  Relevance, Your Honor.

 3              THE COURT:  No, overruled.

 4              THE WITNESS:  Yeah.  I really can't recall, did I

 5    drive myself or did I ride with someone?

 6    BY MR. LATTIMER:

 7    Q.   All right.  And where were you supposed to meet Ginuwine?

 8    A.   At the club.

 9    Q.   Where?

10    A.   At the club.

11    Q.   Inside?

12    A.   No, actually at the front door.

13    Q.   Okay.  And what time was that?

14    A.   I can't recall what time we set to plan to meet.

15    Q.   But you weren't providing security for him, right?

16    A.   No.

17              THE COURT:  Ginuwine?

18              MR. LATTIMER:  Ginuwine.

19    BY MR. LATTIMER:

20    Q.   Is that right?

21    A.   Right.  I stopped doing security for Ginuwine in '99.  I've

22    been his tour manager since.

23    Q.   Well, didn't you provide security in 2005?

24              THE COURT:  For Ginuwine?  Ginuwine?

25    BY MR. LATTIMER:
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.    Anyone.

 2    A.    I was a tour manager.

 3    Q.    My question is, didn't you provide security in 2005?

 4    A.    I was a tour manager, so no.

 5    Q.    Is that yes or no?

 6    A.    No.

 7    Q.    All right.  Didn't you provide security for 50 Cent at

 8    Jacob the Jeweler in 2006?

 9    A.    No.

10    Q.    Now, I understood you to say that you were in the Eyebar to

11    discuss business with Mr. Vines; is that right?

12    A.    Correct.

13    Q.    And you were going to discuss -- what was it, the details

14    of the Ladies Night Out tour?

15    A.    Correct.

16    Q.    Did you have like a briefcase or something?

17    A.    No.

18    Q.    So these details you were going to -- they were supposed to

19    be written down, or you were going to remember them, or what?

20    A.    We was getting them together, go over them, and then we had

21    a discuss the next day.

22    Q.    And the club was crowded, right?

23    A.    Correct.

24    Q.    And it was noisy, right?

25    A.    Correct.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   Q.   And you and he were going to discuss details?

 2   A.   Correct.

 3   Q.   And you were supposed to be meeting Tara Barrows, right?

 4   A.   Correct.

 5   Q.   A police officer from Philadelphia, right?

 6   A.   Correct.

 7   Q.   Who's coming down to meet you, right?

 8   A.   Meet some friends.

 9   Q.   I'm sorry?

10   A.   Meet some of her other friends here also.

11   Q.   Meet some of her other friends?

12   A.   Correct.

13   Q.   So she wasn't coming down because you-all were making or

14   had made a sex date?

15              MR. MILSTEIN:  Objection, Your Honor.

16              MR. MARTIN:  Objection, Your Honor.  What's the

17   relevance?

18              THE COURT:  Overruled.

19   BY MR. LATTIMER:

20   Q.   Right?  That wasn't the reason?

21   A.   No, we didn't make a sex date.

22   Q.   You didn't make a sex date?

23   A.   No.

24   Q.   If she said that, you don't know what she's talking about?

25              MR. MARTIN:  Objection, Your Honor.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              THE COURT:  Sustained as to that.  The jury, their
 2      recollection of what she said will control.
 3          Go on.
 4      BY MR. LATTIMER:
 5      Q.   So she wasn't just coming down to see you?
 6      A.   No.
 7      Q.   And after this incident happened, she didn't get in her car
 8      and compose herself and then drive back home?
 9              MR. MARTIN:  Objection, Your Honor.  How would he
10      know?
11              THE COURT:  Yes, as to foundation.  Sustained.
12      BY MR. LATTIMER:
13      Q.   Didn't she call you on the way home, when she was driving
14      home?
15      A.   No.  I didn't talk to her that evening, actually.
16      Q.   You didn't talk to her?
17      A.   No.
18      Q.   She didn't call you?
19      A.   No.
20      Q.   She didn't call to see how you were doing?
21      A.   I didn't talk to her that evening.
22      Q.   Did you ever talk to her after that?
23      A.   I haven't talk to her since.
24      Q.   You haven't talked to her since?
25      A.   No.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.    So Tara Barrow, the police officer who was supposed to come

 2    to be with you, you have not talked to her since, right?

 3    A.    Correct.

 4    Q.    And Jerry Vines, he's not with Ginuwine anymore, right?

 5    A.    That's correct.

 6    Q.    You are.

 7    A.    Correct.

 8    Q.    Now, what about CVS?  You were working for them, weren't

 9    you?

10    A.    Correct.

11              THE COURT:  Who?

12              MR. LATTIMER:  CVS, the drug store.

13              THE WITNESS:  Pharmacy.

14              THE COURT:  You're talking about a pharmacy, not a

15    rapper?

16              MR. LATTIMER:  Yeah, the drugstore.  No, that's not a

17    rapper, at least that I know of.

18         (Laughter)

19              THE WITNESS:  Correct.

20    BY MR. LATTIMER:

21    Q.    So you were working for CVS?

22    A.    Loss prevention.

23    Q.    Loss prevention.  And then you worked for who else?

24    A.    Ginuwine.

25    Q.    And didn't you work for another company?
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1          That's a question.

 2   A.    Another company, no.

 3   Q.    Nobody else?

 4   A.    Not another company, no.

 5   Q.    Okay.  So when were you working for CVS?

 6   A.    I can't really recall the date, but it was probably around

 7   2003.  Ginuwine was slow.  I have a family to take care of.  I'm

 8   not ashamed of it.  I worked at CVS loss prevention.

 9   Q.    It's nothing to be ashamed of.  It's honest work.

10   A.    Yeah, honest work.

11   Q.    That's right.  Any time you work honestly.

12   A.    That's right, 9 to 5.

13   Q.    Now, you do have a family, right?

14   A.    That's correct.

15   Q.    But it was Hecht's you were working at?

16   A.    I worked at Hecht's when I was in Bowie.

17   Q.    When you were in Bowie?

18   A.    Right.  When I was going to Bowie State.  But I did work

19   part time when I was working at CVS also, correct.  Correct.

20   Correct.

21   Q.    Now, let me get this straight.  You were working at

22   Hecht's?

23   A.    Part time.  Loss prevention.

24   Q.    And CVS?

25   A.    Correct.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Q.    And Ginuwine?

2    A.    Correct.

3    Q.    On the road, tour manager.

4    A.    Correct.  When he had shows, correct.

5    Q.    When he had shows?

6    A.    Correct.

7    Q.    Now, you talked about family.

8    A.    Correct.

9    Q.    Now, when -- well, are you married?

10   A.    Correct.

11   Q.    Is that yes?

12   A.    Yes.

13   Q.    I thought I understood you to say you were meeting a friend

14   in California.

15   A.    Correct.

16   Q.    And you were meeting Ms. Barrow here.

17   A.    Correct.

18   Q.    Now, I asked you about security in 2005, and you said that

19   you didn't do that.  Right?

20   A.    Tour manager, correct.

21   Q.    All right.  Let's look at page 53 of your deposition.

22   A.    53.

23   Q.    Lines 21 to 22.  Do you remember being asked, "So you were

24   doing security in 2005?"  And your answering, "That is correct"?

25   A.    Tour manager/security.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.   Do you remember -- let me try one more time.

 2              THE COURT:  No, no.  Read it in context.  He said

 3    that.  "I was doing the same thing I'm doing now:  Tour

 4    manager/security."

 5         "So you were doing security in 2005?"

 6         "That's correct."

 7              MR. LATTIMER:  Okay.

 8    BY MR. LATTIMER:

 9    Q.   Right?

10    A.   Yes, but tour managing.

11              MR. MARTIN:  Your Honor, may I ask if you look at page

12    54, the top two lines, they also respond --

13              MR. LATTIMER:  That's called redirect.

14              MR. MARTIN:  I'm sorry.  Your Honor, it's not

15    appropriate for --

16              THE COURT:  Okay.  But we don't have to go back to it.

17    Yeah, for the purpose of completeness, he says, "When I say,

18    'tour manager and security,' it was more tour manager than

19    security."  Okay.

20              MR. MARTIN:  The next one is what really we were

21    asking --

22              MR. LATTIMER:  Your Honor, it's called redirect.

23              MR. MARTIN:  It's the same question, the same answer.

24              THE COURT:  No.  It's completeness.  They're two

25    different rules.  Okay.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. LATTIMER:  Finished?

 2              THE COURT:  No, I like the next line.  "I'm a big

 3    guy."  Okay.  Yes, I am finished.  You finished?

 4              MR. LATTIMER:  Just about.

 5              THE COURT:  All right.

 6              MR. LATTIMER:  If I could just have a moment to look

 7    at my notes, Your Honor.

 8              THE COURT:  Uh-huh.

 9    BY MR. LATTIMER:

10    Q.   Mr. Williams.

11    A.   Yes, sir.

12    Q.   You testified that there was no tension and nothing

13    happened in the Eyebar before Mr. Kane got there; isn't that

14    right?

15    A.   Correct.

16    Q.   And the tension didn't start until he got there; isn't that

17    right?  Isn't that right?

18    A.   Correct.

19    Q.   And you also testified that, with regard to Mr. Godfrey,

20    you do what you do with your fists, right?

21    A.   Correct.

22    Q.   And that is beat people up.

23    A.   No.

24    Q.   Right?

25    A.   No.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    Q.   Well, what did you mean by, you do what you do?

 2    A.   That means I defending myself.

 3    Q.   You defend yourself?

 4    A.   Exactly.

 5    Q.   And you defended yourself against Mr. Godfrey, right?

 6    A.   Correct.

 7    Q.   Because he sucker-punched you, right?

 8    A.   Correct.

 9    Q.   And you defended yourself against Mr. Nightmare, right?

10    A.   No.

11    Q.   But you grabbed him anyway, right?

12    A.   Correct.

13    Q.   You weren't defending yourself with him, were you?

14    A.   No.

15    Q.   But you were defending yourself with Mr. Godfrey; is that

16    right?

17    A.   Correct.

18              MR. LATTIMER:  Nothing else.

19              MR. MARTIN:  Yes, Your Honor.

20                         REDIRECT EXAMINATION

21    BY MR. MARTIN:

22    Q.   Prior to the time you were engaged in the fight with

23    Mr. Godfrey, did you know he was a second-degree black belt?

24              MR. LATTIMER:  Objection, Your Honor.  Beyond the

25    scope.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1            THE COURT:  Well, besides that, how would he know
 2      that, even if it were true?  Sustained.
 3            MR. MARTIN:  I'm trying to lay a foundation for my
 4      follow-up question, Your Honor.
 5            THE COURT:  I know, but -- well, did you know?
 6            THE WITNESS:  No.
 7      BY MR. MARTIN:
 8      Q.   Were the moves that he was using on you consistent with
 9      somebody using martial arts?
10            MR. LATTIMER:  Objection, Your Honor.
11            THE COURT:  No, overruled.
12            THE WITNESS:  No.  We were squared up in a physical
13      altercation.
14            THE COURT:  Did you hear the question?  He said, was
15      it consistent with somebody using martial arts?  You said no.
16            THE WITNESS:  Yeah, no.  I don't know -- yeah, no.
17      BY MR. MARTIN:
18      Q.   Mr. Lattimer asked you about the minute to minute and a
19      half that you were, quote, "pounding" on Mr. Godfrey.  Was it a
20      fight, or were you pounding on him?
21      A.   It was a fight.
22      Q.   So during that minute and a half, was he moving and
23      throwing --
24      A.   We was engaged.  We was --
25            THE COURT:  Wait a minute.  Can you let him finish,
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    please?

2    BY MR. MARTIN:

3    Q.   Was he moving and throwing punches back and forth?

4    A.   Correct.

5    Q.   Mr. Lattimer asked you, during that minute and a half

6    before security broke it up, if anything else occurred.

7         Did Mr. Kittrell ever come down there and pick you up off

8    of Mr. Godfrey?

9    A.   No.

10   Q.   Did you ever feel anybody pulling you off of Marlin

11   Godfrey?

12   A.   No.

13   Q.   Let me ask you a question about Ginuwine.  When you were in

14   Los Angeles, is there any doubt, sir, that you were out there

15   working for Ginuwine?

16   A.   No doubt.  No doubt.

17   Q.   Mr. Lattimer asked you your marital status today, and he

18   asked you about Ms. Barrow and a friend in California.

19        During that time period, can you tell the jury what your

20   marital status was?

21   A.   Separated.

22   Q.   You were separated from your wife then?

23   A.   Correct.

24             MR. MARTIN:  No further questions, Your Honor.

25             THE COURT:  Mr. Milstein?

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1            MR. MILSTEIN:  No, Your Honor.

2            THE COURT:  Thank you.  Nothing else?  Okay.

3       You may step down.

4       (The witness steps down.)

5            THE COURT:  Any other witness?

6            MR. MARTIN:  Yes, Your Honor.

7            THE COURT:  Who?

8            MR. MARTIN:  May we approach?

9            THE COURT:  Yep.  Maybe I'll give them a break.

10      Ladies and gentlemen, I'll give you a break at this point

11  so you don't have to sit there.  Ten minutes, please.

12      (Jury out at 3:33 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

I N D E X

WITNESSES FOR THE DEFENSE


Terrence Williams:
Direct Examination, Continued, by Mr. Martin ......    3
Direct Examination by Mr. Milstein ...............   18
Cross-Examination by Mr. Lattimer ................   18
Redirect Examination by Mr. Martin ...............   62

PDF created with pdfFactory Pro trial version www.pdffactory.com

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE

PDF created with pdfFactory Pro trial version www.pdffactory.com